FILED

96 OCT 16 PM 4:22

U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ALABAMA

SOUTHERN DIVISION

|  |  |
|---|---|
| ROBERT M. GORDON, BERNARD R. McCOY and JAMES GENSTEIN, On Behalf of Themselves and All Others Similarly Situated, | ) No.   CV-98-J-2634-S<br>)<br>) CLASS ACTION<br>)<br>) |
| Plaintiffs, | ) CLASS ACTION COMPLAINT FOR<br>) VIOLATION OF THE FEDERAL<br>) SECURITIES LAWS |
| vs. | ) |
| HEALTHSOUTH CORPORATION, RICHARD M. SCRUSHY, LARRY R. HOUSE, MICHAEL D. MARTIN, JAMES P. BENNETT, ANTHONY J. TANNER, WILLIAM T. OWENS, ROBERT E. THOMSON, THOMAS W. CARMAN, P. DARYL BROWN, PHILLIP C. WATKINS, C. SAGE GIVENS, RICHARD F. CELESTE and PATRICK A. FOSTER, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| Defendants. | ) Plaintiffs Demand A<br>) Trial By Jury |

SUMMARY AND OVERVIEW OF THE ACTION

1.   This is a class action on behalf of all purchasers of the publicly traded securities of HealthSouth Corporation ("HealthSouth" or the "Company") between August 12, 1997 and September 30, 1998 (the "Class Period").  This action arises out of a fraudulent scheme and wrongful course of business that operated as a fraud or deceit on purchasers of HealthSouth securities by HealthSouth and its executive officers and directors ("defendants").

2.   During the Class Period, the defendants continually misrepresented the position and prospects of HealthSouth by

stating that it was in a "solid financial position"[1] due to its "tremendous franchise" which had positioned HealthSouth to acquire managed care contracts which would continue to drive incremental volume to HealthSouth facilities and thereby enhance HealthSouth's revenue, margin and earnings growth and would enable HealthSouth to continue to produce "consistent financial results." Moreover, defendants assured investors of HealthSouth's "ability to consistently produce superior financial results" which ensured that HealthSouth would achieve earnings per share ("EPS") of $1.15 and $1.40 in 1998 and 1999, respectively. As late as September 13, 1998, the defendants continued to assure securities analysts during numerous extensive conversations that there had been "no change in" the operating trends at HealthSouth or the "favorable fundamentals affecting HealthSouth" and that, therefore, the defendants shared the "conviction" that HealthSouth would achieve $0.30, $0.31 and $1.15 in the third and fourth quarters of 1998 and 1998, respectively.

3.   In fact, throughout the Class Period, defendants worked diligently to conceal the fact that HealthSouth's managed care customers had already begun to seek price reductions from HealthSouth on existing contracts and were delaying making payments to HealthSouth for services rendered and that, as a result thereof, HealthSouth could not possibly grow its revenues at 15%-20% annually or its earnings at 20%-25% annually. Defendants' scheme, which artificially inflated the price of HealthSouth stock to a Class Period high of approximately $30, was

---

[1]   Here, as elsewhere, emphasis has been added unless otherwise stated.

designed to and did enable defendants to: (i) <u>issue (sell)
HealthSouth shares worth approximately $1.6 billion</u> to purchase
Horizon Healthcare and National Surgery Centers; (ii) <u>issue (sell)
$567 million in bonds</u>, convertible into HealthSouth common stock,
to raise the $550 million needed to pay for the 34 surgery centers
acquired from Columbia/HCA; and (iii) in the case of top
HealthSouth insiders to reap $160 million in illegal insider-
selling proceeds by unloading 6.0 million of their HealthSouth
shares during the Class Period.  The defendants' insider trading
represented 83% of their HealthSouth stock holdings.

4.  On September 29-30, 1998 -- despite defendants'
repeated assurances of HealthSouth's strong operating trends and
favorable fundamentals -- HealthSouth suddenly revealed that
HealthSouth would likely fall far short of EPS estimates for 1998
and 1999.  HealthSouth stock utterly collapsed, falling from a
close of $18-3/8 on September 28, 1998 to $10-1/2 on September 30,
1998 -- a 43% two-day collapse on huge volume of 32 million
shares.  As a result of these acts, plaintiffs and the Class have
suffered hundreds of millions of dollars in damage.

5.  HealthSouth and virtually <u>all</u> of its executive officers
and directors personally profited from their deliberate and
dishonest acts of issuing false and misleading statements to
inflate HealthSouth stock by selling HealthSouth stock at
artificially inflated prices.  The table below summarizes the
sales by the individual defendants:

## Individual Defendants

| Name/Position | Shares Sold | Sales Price | Aggregate Proceeds | % of Total Shares Owned/Sold |
|---|---|---|---|---|
| Scrushy, CEO | 4,000,000 | $27.00 | $108,000,000 | 87% |
| House, Director | 482,996 | $26.26-30.00 | $13,082,880 | 100% |
| Bennett, President | 199,900 | $26.19-26.72 | $5,287,199 | 71% |
| Martin, CFO | 125,000 | $27.00 | $3,375,000 | 67% |
| Tanner, EVP | 292,750 | $25.94-26.75 | $7,717,481 | 71% |
| Owens, VP | 226,000 | $26.13-27.00 | $5,960,020 | 100% |
| Thomson, Div. Pres. | 128,500 | $26.13-26.63 | $3,387,360 | 98% |
| Carman, VP | 200,000 | $26.00-26.63 | $5,266,520 | 56% |
| Brown, Div. Pres. | 179,810 | $26.25-27.19 | $4,813,689 | 61% |
| Watkins, Director | 160,000 | $26.00-27.15 | $4,299,250 | 53% |
| Celeste, Director | 60,000 | $26.13-27.50 | $1,625,100 | 100% |
| Givens, Director | 30,000 | $27.12 | $813,600 | 100% |
| Foster, Div. Pres. | 11,200 | $26.38-26.50 | $296,188 | 95% |
| TOTALS: | 6,096,156 | $25.94-30.00 | $163,924,287 | 83% |

Defendants' stock sales were dramatic and unusual both in timing and amount. Richard Scrushy had never sold any significant amount of stock prior to this occasion. Nine of HealthSouth's eleven executive officers sold large portions of their HealthSouth common stock, ranging from 56% to 100% of their holdings. Seven of HealthSouth's eleven directors sold large portions of their

HealthSouth common stock, ranging from 53% to 100% of their holdings. A fundamental part of defendants' scheme was to use inflated HealthSouth shares to "goose" HealthSouth's growth by using inflated HealthSouth shares to acquire existing medical operations. For example, HealthSouth used its shares to acquire National Surgery Centers for approximately $590 million in HealthSouth stock, a transaction that was completed just <u>two months</u> before HealthSouth's stock collapsed in price.

HealthSouth

| Date | Securities Issued | Value | Purpose |
|---|---|---|---|
| 10/29/97 | Common Stock | $961 million | Horizon Healthcare acquisition |
| 4/16/98 | Convertible bonds | $567 million | Columbia Surgery Centers purchase |
| 7/22/98 | Common Stock | $590 million | National Surgery Centers purchase |

## JURISDICTION AND VENUE

6. Jurisdiction exists pursuant to §27 of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §78aa and 28 U.S.C. §1331. The claims asserted herein arise under §§10(b), 20(a) and 20(A) of the Exchange Act, 15 U.S.C. §§78j(b), 78t(a), 78t-1 and Rule 10b-5.

7. Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b). Many of the acts giving rise to the violations complained of occurred in this district. HealthSouth maintains its headquarters in this District.

8. Defendants used the instrumentalities of interstate commerce, including the U.S. mails, and the facilities of the national securities markets.

## THE PARTIES

9.    (a)   Plaintiff Robert M. Gordon purchased 200 shares of HealthSouth common stock on August 14, 1998 at $21-11/16 per share and was damaged thereby.

(b)   Plaintiff Bernard R. McCoy purchased 895 shares of HealthSouth common stock on September 29, 1998 at $17.00 per share and was damaged thereby.

(c)   Plaintiff James Genstein purchased 400 shares of HealthSouth common stock on June 25, 1998 at $28-1/8 per share and was damaged thereby.

10.   Defendant HealthSouth is a corporation headquartered in Birmingham, Alabama.   Founded by Richard M. Scrushy, HealthSouth is a national provider of inpatient and outpatient rehabilitation, diagnostic services and outpatient surgery, operating in all fifty states.   During the relevant time period, HealthSouth common stock traded in an efficient market on the New York Stock Exchange under the "HRC" symbol.   HealthSouth has approximately 395 million shares outstanding.   Through facilities called Integrated Service Networks ("Integrated Service Networks" or "Integrated Service Models"), HealthSouth offers rehabilitation, diagnostic and surgery services at a single location, in selected markets throughout the Country.

11.   (a)   Defendant Richard M. Scrushy ("Scrushy") is Chairman of the Board, Chief Executive Officer and a founder of HealthSouth.   Scrushy, by reason of his executive position with HealthSouth and Board membership, was a controlling person of HealthSouth and had the power and influence, and exercised the same to cause HealthSouth to engage in the conduct complained of

- 6 -

herein.  During the Class Period, Scrushy sold 4,000,000 shares of HealthSouth common stock, representing 87% of the HealthSouth stock owned by him for proceeds of $108,000,000.

(b)  Defendant Larry R. House ("House") was, at all relevant times, a director of HealthSouth.  During the Class Period, House sold 482,996 shares of HealthSouth common stock, representing 100% of the HealthSouth stock owned by him for proceeds of more than $13 million.

(c)  Defendant James P. Bennett ("Bennett") was, at all relevant times, the President, Chief Operating Officer and a director of HealthSouth.  During the Class Period, Bennett sold 199,900 HealthSouth shares, representing 71% of the HealthSouth stock owned by him for proceeds of more than $5.2 million.

(d)  Defendant Michael D. Martin ("Martin") was Executive Vice President and Chief Financial Officer.  During the Class Period, Martin sold 125,000 HealthSouth shares representing 67% of the HealthSouth stock owned by him for proceeds of more than $3.3 million.

(e)  Defendant Anthony J. Tanner ("Tanner") was, at all relevant times, the Executive Vice President and a director of HealthSouth.  During the Class Period, Tanner sold 292,750 HealthSouth shares representing 71% of the HealthSouth stock owned by him for proceeds of more than $7.7 million.

(f)  Defendant William T. Owens ("Owens") was, at all relevant times, the Group Senior Vice President-Finance and Controller of HealthSouth.  During the Class Period, Owens sold 226,000 HealthSouth shares representing 100% of the HealthSouth stock owned by him for proceeds of more than $5.9 million.

(g)   Defendant Robert E. Thomson ("Thomson") was, at all relevant times, President and Chief Operating Officer of HealthSouth Inpatient Division.   During the Class Period, Thomson sold 128,500 HealthSouth shares representing more than 98% of the HealthSouth stock owned by him for proceeds of more than $3.3 million.

(h)   Defendant Thomas W. Carman ("Carman") was, at all relevant times, the Executive Vice President, Corporate Development, of HealthSouth.   During the Class Period, Carman sold 200,000 HealthSouth shares representing 56% of the HealthSouth stock owned by him for proceeds of more than $5.2 million.

(i)   Defendant P. Daryl Brown ("Brown") was, at all relevant times, President and Chief Operating Officer of HealthSouth Outpatient Division and a director of HealthSouth. During the Class Period, Brown sold 179,810 HealthSouth shares representing more than 61% of the HealthSouth stock owned by him for proceeds of more than $4.8 million.

(j)   Defendant Phillip C. Watkins ("Watkins") was, at all relevant times, a director of HealthSouth.   During the Class Period, Watkins sold 160,000 HealthSouth shares representing more than 53% of the HealthSouth stock owned by him for proceeds of more than $4.2 million.

(k)   Defendant Richard F. Celeste ("Celeste") was, at all relevant times, a director of HealthSouth.   During the Class Period, Celeste sold 60,000 HealthSouth shares representing 100% of the HealthSouth stock owned by him for proceeds of more than $1.6 million.

(l)   Defendant C. Sage Givens ("Givens") was, at all

relevant times, a director of HealthSouth.   During the Class Period, Givens sold 30,000 HealthSouth shares representing 100% of the HealthSouth stock owned by him for proceeds of $813,600.

(m)  Defendant Patrick A. Foster ("Foster") was, at all relevant times, President and Chief Operating Officer of HealthSouth Surgery Division.   During the Class Period, Foster sold 11,200 HealthSouth shares representing 95% of the HealthSouth stock owned by him for proceeds of $296,188.

12.  The defendants identified in ¶11(a)-(m) above are referred to herein as the "Individual Defendants."   Because of the positions these Individual Defendants maintained at HealthSouth, they each knew the adverse non-public information about the business of HealthSouth, as well as its finances and future business and EPS prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations with other corporate officers and employees, attendance at management and/or Board of Directors' meetings and committees thereof and via reports and other information provided to them in connection therewith.

13.  As officers, directors and/or controlling persons of a publicly held company and as sellers of HealthSouth stock, each of the Individual Defendants had a duty to disseminate accurate and truthful information promptly with regard to HealthSouth and to correct any previously issued statements that had become untrue and to disclose any adverse trends known to them that would materially affect the operating results of HealthSouth, so that the market price of HealthSouth stock would be based upon truthful

and accurate information.   Notwithstanding their duty to refrain from selling HealthSouth stock while in the possession of material adverse non-public information concerning HealthSouth, each of the defendants benefitted substantially from their fraud, including:

- The Individual Defendants who sold or otherwise disposed of 6.0 million shares of the Company's stock, pocketed over $163 million.

- HealthSouth which issued (sold) over $1.6 billion worth of HealthSouth common stock to complete two acquisitions, and sold $567 million worth of bonds convertible into HealthSouth common stock to raise the cash to complete another acquisition.

14.   The Individual Defendants controlled the contents of HealthSouth's SEC filings, corporate reports, communications to analysts and press releases.   Each of the Individual Defendants participated in writing or reviewing HealthSouth's corporate reports, press releases and SEC filings alleged to be misleading and thus had the ability and opportunity to prevent their issuance or cause them to be corrected.   Because of their positions and access to material non-public information, each of these defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations which were being made were then materially false and misleading.   Thus, each of the Individual Defendants is legally responsible for the falsifying of HealthSouth's public reports, financial statements and releases, detailed at ¶¶20, 24, 26, 28, 33, 35, 38, 40, 42, 45 and 47 herein as "group-published" information.

DEFENDANTS' FRAUDULENT SCHEME
AND COURSE OF BUSINESS

15.   Each of the defendants is liable for making false and misleading statements, failing to disclose material adverse facts, and participating in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of HealthSouth stock.   Defendants misdeeds were designed to and did: (i) deceive the investing public regarding HealthSouth; (ii) artificially inflated the price of HealthSouth securities; (iii) cause Class members to purchase HealthSouth securities at inflated prices; (iv) permit certain of the Individual Defendants to sell 6.0 million shares of their own HealthSouth stock at inflated prices, pocketing $163 million; (v) permit HealthSouth to issue (sell) $1.6 billion worth of HealthSouth common stock to complete the acquisitions of Horizon Healthcare and National Surgery Centers; and (vi) permit HealthSouth to issue (sell) $567 million worth of bonds, convertible into HealthSouth's common stock, to finance the $550 million acquisition of 34 surgery centers from Columbia/HCA.

HEALTHSOUTH'S AND ITS INSIDERS' ACTUAL KNOWLEDGE
OR RECKLESS DISREGARD OF THE UNDISCLOSED ADVERSE
CONDITIONS IMPACTING HEALTHSOUTH'S BUSINESS

16.   In order to monitor HealthSouth's overall corporate performance throughout the year, HealthSouth's top executives received monthly financial reports prepared by HealthSouth's financial department, under the guidance of Martin, HealthSouth's Chief Financial Officer, as well as other written and oral reports from members of management, including divisional managers and regional directors.   In order to effectively manage its business and control its cash flow, HealthSouth's management information system was capable of generating reports on a daily basis showing sales revenue by territory and by facility or "store," as well as overall corporate revenue, expenses, cash balances, etc.   As a result of this system, the Individual Defendants, who were HealthSouth's top managers, were aware of the corporation's performance on a daily basis and were thus aware, virtually immediately, of any significant problems with sales, revenue or expenses of any particular facility, "store" or territory.   Every Monday morning a meeting was held of the top executive officers of HealthSouth at its corporate headquarters in Birmingham, moderated by defendants Scrushy and/or Martin.   During each of these Monday morning meetings, the HealthSouth executives would individually review the events of the previous week, and the plans for the upcoming week, officer by officer.

17.   In addition to this intricate and extensive monitoring system of HealthSouth locations, HealthSouth's finance department generated monthly financial reports providing detailed data with respect to overall corporate revenue, net income and EPS, as well

as sales by facility and by territory -- all presented so as to compare performance for that month, that quarter and the year-to-date compared to the Company's plan/budget.   These monthly financial reports included a report prepared immediately after the monthly close and distributed to top management within 48-72 hours, which provided summary sales, expense and income data. These reports also included a monthly financial statement package that provided even more detailed information, including graphic comparisons of actual performance to forecasted performance and a narrative explanation of material variances of actual results compared to forecasted or budgeted results, which was completed within ten days after the monthly close and immediately provided to members of top management at the regularly scheduled Monday morning meeting.

18.   When HealthSouth's managed care customers began delaying payments to HealthSouth for services rendered and began to negotiate for substantial reductions in price in existing contracts, HealthSouth's internal corporate procedures immediately advised top executives of these problems.   Because the sales volume HealthSouth achieved from its managed care customers was absolutely critical to HealthSouth achieving the 20%-25% EPS growth and 15%-20% revenue growth forecasted for 1998-1999, the problems related to HealthSouth's managed care customers and their potential impact on the price of HealthSouth common stock were a matter of major concern and discussion among HealthSouth's top corporate managers, including the Individual Defendants.   This information was provided to each of the defendants during their tenure at HealthSouth in financial reports and/or the financial

statement reporting packages distributed to them throughout the Class Period and discussed during the regular Monday morning meetings.

19.  Because of the foregoing, each of the Individual Defendants was aware of HealthSouth's 1998-1999 forecasts and budgets, and of the internal reports detailing the distribution problems and the financial reports comparing HealthSouth's actual results to those budgeted and/or forecasted.  Based on the negative internal reports specified earlier and reports of the Company's actual performance compared to that budgeted and forecasted, the Individual Defendants each knew HealthSouth's business was not performing as well as publicly represented. Thus, defendants actually knew that each of the forward-looking public statements issued during the Class Period about HealthSouth were false and misleading when made and actually knew or recklessly disregarded that the non-forward-looking statements issued during the Class Period about HealthSouth were false and misleading when made.

## BACKGROUND TO THE CLASS PERIOD

20.  On February 18, 1997, HealthSouth announced that it had agreed to buy Horizon/CMS Healthcare Corp. for the payment of $961 million in stock and the assumption of $700 million in debt. Defendant Scrushy stated:

> "Whoever bought this particular company would end up with the largest rehabilitative share in America. We've got a tremendous franchise. . . . If we were to go out and try to build this network that we're acquiring, it'd take a lifetime. . . . Once we own these hospitals and these outpatient centers, that pretty much shuts out any other health care company from ever getting into our business in a significant way."

- 14 -

21.   However, because of regulatory delays in obtaining the approval of this acquisition, it had not occurred as of July 31, 1997, and did not occur until October 29, 1997.   Between July 31, 1997 and August 12, 1997, the price of HealthSouth common stock declined by 9%, falling from approximately $25-1/4 to $23.   This decline disturbed the Individual Defendants greatly, for several reasons.   First, the defendants realized that HealthSouth, after achieving several consecutive quarters of sequential growth in revenues and EPS, was about to hit a wall as its managed care customers had begun to demand price concessions from HealthSouth and had begun to delay making payments to HealthSouth for services rendered, all of which severely impeded HealthSouth's ability to grow.   The defendants realized that this information, if revealed to the securities markets, would cause the price of HealthSouth common stock to substantially decline and potentially jeopardize HealthSouth's acquisition of Horizon, the bulk of which was financed with $961 million worth of HealthSouth stock, and which was viewed by the defendants as one of the most important acquisitions in the history of HealthSouth as it would enable HealthSouth to continue to keep pace with its historical rate of 15%-20% growth in revenues and 20%-25% growth in EPS and would allow HealthSouth to hide some of its operating deficiencies via the use of acquisition-related write-offs.

22.   Second, the defendants realized that any decline in HealthSouth's common stock price would substantially harm them as a large percentage of each of the Individual Defendants' wealth was in the form of HealthSouth common stock.   Third, and most

importantly, the defendants realized that any decline in the price of HealthSouth common stock would greatly reduce the defendants' ability to continue to use HealthSouth stock as a currency to acquire other businesses in an effort to maintain its historical 15%-20% annual growth rate in revenue and 20%-25% annual growth rate in EPS.  Therefore, in an effort to stave off any decline in the share price of HealthSouth, which was critical to the completion of the acquisition of Horizon which was to be financed largely with HealthSouth stock, the defendants began, on August 12, 1997, a scheme to artificially maintain and inflate the share price of HealthSouth common stock.

<u>FALSE AND MISLEADING STATEMENTS</u>

23.  On August 12, 1997, defendant Scrushy had private one-on-one conversations with securities analysts, including Helen O'Donnell ("O'Donnell") of PaineWebber and Lucy Olwell ("Olwell") of Credit Swisse First Boston.  Several of these conversations occurred at HealthSouth's headquarters in Birmingham, Alabama. During these conversations, Scrushy told O'Donnell and Olwell that:

      •    There was no fundamental reason for the recent decline in the price of HealthSouth's common stock and HealthSouth's fundamental growth prospects remained intact.

      •    Same-store sales increases and improvements to recently acquired businesses should easily drive 25% annual earnings growth and provide for upside earnings surprises.

      •    HealthSouth could continue to grow its revenues by 15%-20% from its current asset base.

      •    The closure of the Horizon acquisition was imminent and extremely important to HealthSouth, for once it was in place, HealthSouth would have its essential business platform for growth in place, achieve significant same-store cost reductions and meaningfully accelerate internal development between 1998-2000.

- 16 -

- As a result, HealthSouth could easily achieve 1997 and 1998 EPS of $0.93-0.94 and $1.15, respectively.

24.   On September 3, 1997, HealthSouth announced that it had agreed to acquire ASC Network Corp. for $180 million in cash and assumed debt.   ASC Network operated 29 surgery centers throughout the country.   In connection with this announcement, defendant Scrushy spoke to securities analysts, including Jean Swenson ("Swenson") at Alex. Brown, Maureen Sullivan ("Sullivan") at Cowen & Co. and Olwell.   During those conversations, Scrushy stated:

- The acquisition of ASC Network had expanded HealthSouth's Integrated Service Model which was key to HealthSouth's ability to continue to report growth in annual EPS of 25%.

- The acquisition of Horizon would close in mid-October 1997.

- As HealthSouth continued to roll out its Integrated Service Model in additional major metropolitan markets, margins would improve.

- HealthSouth remained on track and, given its same-store sales growth and operating leverage, HealthSouth would continue to post annual EPS growth of 20%-25% and 1997 and 1998 EPS of $0.93 and $1.13-1.15, respectively.

25.   On October 29, 1997, HealthSouth completed the acquisition of Horizon for approximately $960 million in stock and the assumption of approximately $700 million in debt.

26.   On October 30, 1997, HealthSouth reported that, for the third quarter of 1997, its earnings rose to $0.24 per share from $0.19 per share in the third quarter of 1996.   Defendant Scrushy stated:

"In the third quarter, we achieved record profitability, continued to execute our internal growth strategy, and closed the ASC Network acquisition. . . . Continued same-store growth, increased internal development, and expense controls drove our increased profitability.   In addition to opening or acquiring 69

- 17 -

locations within the quarter, including 53 outpatient rehabilitation locations, three outpatient surgery centers, and 13 occupational medicine facilities, we also closed the ASC Network acquisition on September 30, adding 29 outpatient surgery centers and creating six new Integrated Service Markets.

"We are also pleased to announce the closing of the Horizon/CMS acquisition on October 29, which adds over 300 new inpatient and outpatient rehabilitation locations which we believe present excellent opportunities for growth. We look forward to the integration of the Horizon/CMS facilities into our national network, which will allow us to even better serve our patients and payors."

27.  In connection with this announcement, HealthSouth held a conference call with large institutional investors and securities analysts including Joseph Chiarelli ("Chiarelli") of J.P. Morgan Securities, O'Donnell and Swenson. During that call and in private one-on-one conversations with Chiarelli, O'Donnell and Swenson thereafter, Scrushy stated:

- He was very positive about HealthSouth's performance, which was strong across the board.

- HealthSouth had over 1500 projects in its acquisition pipeline with approximately $3.5 billion in revenues.

- Sales volume remained strong.

- Pricing remained stable.

- HealthSouth continued to build its managed care business, signing up 300 new contracts during the quarter, which was a positive development.

- As a result, HealthSouth would meet 1997 and 1998 EPS estimates of $0.93-0.94 and $1.15, respectively.

28.  On November 3, 1997, HealthSouth announced that it had sold certain non-strategic assets of Horizon for $1.25 billion in cash. In connection with that announcement, as reflected in the November 4, 1997 San Antonio Express-News, Scrushy stated:

"We're sitting here loaded with a billion in cash . . . it's all opportunity . . . ."

29. On November 6, 1997, defendant Scrushy sold 4 million HealthSouth shares, 99% of his holdings, for $27 per share, or $108 million. To allay concern about his planned bailout, Scrushy indicated that he wanted to exercise expiring options before knowledge of another pending transaction blocked him from trading. Commenting on the huge sale, Scrushy stated: "It's what any normal red-blooded American would do."

30. Between November 6 and November 28, 1997, the Individual Defendants embarked upon a torrential selling spree dumping over 5.1 million shares for proceeds of more than $137 million dollars.

31. The statements in ¶¶24-29 were false and misleading when made. The true facts, which defendants concealed, were that:

(a) HealthSouth's managed care customers had begun to indicate that they would seek significant price reductions in 1998;

(b) HealthSouth's managed care customers had begun, in an effort to mitigate the escalation of healthcare costs, to delay payments to HealthSouth for services it had rendered;

(c) HealthSouth's profit margins were not rising but were beginning to soften;

(d) As a result of (a)-(c), the defendants knew or recklessly disregarded that HealthSouth could not grow its earnings by 25% annually in 1997 and 1998.

(e) The Individual Defendants realized that, through interlocking directorships with Medpartners, Inc. and Phycor, Inc. via defendant House (Medpartners' CEO) and defendant Givens

(Phycor's Director) on our about the first week of January 1998, Phycor would call off its agreement to acquire Medpartners, which would likely have an adverse impact on HealthSouth's stock price, given the close affiliation between the two companies.

32.   On or about January 8, 1998, Phycor announced that it would not proceed with its agreement to acquire Medpartners.  Upon this announcement, Medpartners collapsed approximately 40% in price, causing stocks throughout the industry, including HealthSouth's, to soften.

33.   On January 16, 1998, Medpartners issued a press release regarding the termination of Phycor's agreement to acquire Medpartners, and the appointment of defendant Scrushy as Chairman and Acting Chief Executive Officer of Medpartners.  In connection with that press release, Scrushy stated:

> "First and foremost, I will be continuing in all my current roles and responsibilities with HealthSouth.  I could only undertake this assignment knowing that HealthSouth has a deep pool of talented executives, is in solid financial position, is producing consistent financial results, and is successfully executing its strategic plan."

34.   On February 16, 1998, analyst Sullivan of Cowen & Co. met with defendants Scrushy, Martin, Bennett and Thomson at the HealthSouth headquarters in Birmingham, Alabama.  During that meeting defendants Scrushy, Martin, Bennett and/or Thomson stated:

> •    HealthSouth only had Integrated Service Networks in 96 of the 300 largest metropolitan areas and thus HealthSouth still had plenty of growth ahead.
>
> •    HealthSouth still had numerous acquisition opportunities.
>
> •    The budget process for 1998 had recently been completed and they each felt very comfortable with HealthSouth's budget, which called for 1998 EPS growth of 25%, which HealthSouth would meet or exceed.

- HealthSouth would meet or exceed 1999 EPS growth expectations of 20%-25%.

- As a result, HealthSouth would meet 1997, 1998 and 1999 EPS estimates of $0.93-$0.94, $1.14 and $1.40, respectively.

35. On February 25, 1998, HealthSouth announced that, for 1997, its earnings rose to $0.94 from $0.74 in the previous year. Defendant Scrushy stated:

> "HEALTHSOUTH's 46th quarter of meeting or exceeding analysts' expectations demonstrates our ability to consistently produce superior financial results . . . . In 1997, we added over 275 new locations through internal development, completed the Health Images acquisition in March, closed the ASC Network acquisition in September, and completed the Horizon/CMS acquisition in October. On December 31, 1997, HEALTHSOUTH completed the divestiture of the Horizon/CMS long-term care assets for $1.25 billion. This significantly strengthened our balance sheet, leading to our recent upgrade by both Standard & Poor's and Moody's to investment grade. We plan to continue executing our strategic plan in 1998 by growing our existing product lines, backed by our added financial strength and ability to deliver consistent financial results."

36. In connection with this announcement, HealthSouth held a conference call, hosted by defendant Scrushy, with institutional investors and securities analysts, including Chiarelli. During that call and in follow-up one-on-one conversations thereafter, defendant Scrushy stated:

- He was very positive about HealthSouth's financial performance and position.

- HealthSouth's business was strong across all business lines and experiencing substantial growth.

- Managed care contracts were driving the same-store sales growth.

- HealthSouth's acquisition pipeline remained full.

- HealthSouth continued implementation of its Integrated Service Model.

- HealthSouth had a significant competitive pricing advantage in that its Medicare costs were 40% of the industry average ($10,230 cost per discharge vs $19,250).

- HealthSouth continued to execute its strategic plan.

- As a result, Scrushy remained comfortable that HealthSouth would meet 1998 and 1999 EPS estimates of $1.15 and $1.40, respectively.

37. On or about March 20, 1998, HealthSouth commenced an offering (the "Offering") of $567,750,000 3.25% convertible subordinated debentures, which were convertible into HealthSouth common stock at a price of $36.25. These securities were priced, in large part, based upon the performance of HealthSouth's common stock and the financial position of HealthSouth.

38. In connection with the Offering, HealthSouth issued a Registration Statement and Prospectus which stated:

REIMBURSEMENT BY THIRD-PARTY PAYORS

Substantially all of HEALTHSOUTH's revenues are derived from private and governmental third-party payors (in 1997, approximately 36.9% from Medicare and approximately 63.1% from commercial insurers, managed care plans, workers' compensation payors and other private pay revenue sources). There are increasing pressures from many payor sources to control healthcare costs and to limit increases in reimbursement rates for medical services. There can be no assurances that payments under governmental and third-party payor programs will remain at levels comparable to present levels. In attempts to limit the federal budget deficit, there have been, and HEALTHSOUTH expects that there will continue to be, a number of proposals to limit Medicare reimbursements for certain services. HEALTHSOUTH cannot now predict whether any of these pending proposals will be adopted or, if adopted and implemented, what effect such proposals would have on HEALTHSOUTH.

*   *   *

COMPETITION

HEALTHSOUTH operates in a highly competitive industry. HEALTHSOUTH generally operates its facilities in communities that also are served by

similar facilities operated by others. Although HEALTHSOUTH is the largest provider of outpatient surgery and rehabilitation healthcare services on a nationwide basis, in any particular market it may encounter competition from local or national entities with longer operating histories or other superior competitive advantages. There can be no assurance that such competition, or other competition which HEALTHSOUTH may encounter in the future, will not adversely affect HEALTHSOUTH's results of operations.

39. On March 16, 1998, the "Heard on the Street" column of The Wall Street Journal contained an article regarding HealthSouth, specifically dealing with defendant Scrushy's service as the temporary CEO of Medpartners. When asked whether he was spending to much time serving as the CEO of Medpartners, Scrushy stated: "The answer to that is 'no,' and if you just wait around a couple of weeks, you'll see why."

40. On April 16, 1998, HealthSouth announced that it had acquired 34 outpatient surgery centers from Columbia/HCA Healthcare Corp. for $550 million. Defendant Scrushy stated:

"They're outstanding centers and they're in great locations . . . . It really prevents anyone else from being able to build the position that we have in this business."

41. In connection with this announcement, HealthSouth held a conference call, hosted by defendant Scrushy, with institutional investors and securities analysts, including Sullivan, Swenson and Chiarelli. During that call or in follow-up one-on-one conversations thereafter, Scrushy stated:

• HealthSouth's management team would improve the operating results of the assets it acquired from Horizon.

• HealthSouth still had plenty of room to grow as Integrated Service Networks were only in 96 of the top 300 markets.

• Revenues in Integrated Service Networks had the potential to improve 20%-25% with cross-referrals from other

HealthSouth facilities.

- Margins in Integrated Service Networks were typically 3%-5% higher than conventional stand-alone facilities.

- As a result, HealthSouth's EPS would continue to grow at 20%-25% annually for the next three years and achieve analysts' EPS estimates of $1.15 in 1998 and $1.40 in 1999.

42. On April 21, 1998, HealthSouth announced that, for the first quarter of 1998, its earnings rose to $0.27 per share from $0.22 per share in the first quarter of 1997. Defendant Scrushy stated: "[W]e just blew it out with development." He further stated:

> "I am pleased to report our 47th consecutive quarter of meeting or exceeding analysts' expectations . . . . During the first quarter of 1998, we continued the successful integration of our major 1997 acquisitions and the implementation of our Integrated Service Model. In addition, we added 106 new facilities through our internal development program and continued to recognize strong same-store growth in all divisions. During the quarter, we also received investment-grade ratings from Standard & Poor's and Moody's and capitalized on the upgrade to raise nearly $568 million in an institutional private placement of convertible debentures. As we move into the second quarter, we have continued to further our strategic plan with last week's announcement of HEALTHSOUTH'S pending acquisition of 34 ambulatory surgery centers from Columbia/HCA."

43. In connection with the foregoing announcement, HealthSouth held a conference call, hosted by defendant Scrushy, for institutional investors and securities analysts, including Swenson, Chiarelli and Sullivan. During that call and in follow-up one-on-one conversations thereafter, Scrushy stated:

- He was very positive about HealthSouth's performance and prospects, and HealthSouth's business was strong across all business lines.

- Managed care contracts were continuing to drive incremental volume to HealthSouth's facilities and were boosting revenue, margins and earnings growth.

• The continued implementation of the Integrated Services Model would increase margins and position HealthSouth for managed care.

• As a result, HealthSouth could continue to grow its earnings at an annual rate of 20%-25%, and thereby meet estimates of $1.15-$1.16 in 1998 and $1.40 in 1999.

44. The statements in ¶¶35-43 were false and misleading when made. The true facts, which defendants concealed, were that:

(a) HealthSouth's managed care customers had begun to indicate that they would seek significant price reductions in 1998;

(b) HealthSouth's managed care customers had begun, in an effort to exacerbate the escalation of healthcare costs, to delay payments to HealthSouth for services it had rendered;

(c) As a result, HealthSouth's profit margins would not rise but would fall;

(d) While the Registration Statement and Prospectus revealed that there were "increasing pressures" from "many payor sources" to "control healthcare costs" and to "limit increases in reimbursement rates," the defendants concealed that several payor sources had then informed HealthSouth that it would demand reductions in reimbursement rates in 1998 and 1999;

(e) The defendants concealed that several of HealthSouth's managed care customers were delaying payments to HealthSouth;

(f) As a result of (a)-(e), HealthSouth's financial position had been materially weakened;

(g) As a result of (a)-(f), HealthSouth was not in a "solid financial position," was not producing "consistent financial results" and was not "successfully executing its

- 25 -

strategic plan"; and

(h) As a result of (a)-(g), the defendants knew or recklessly disregarded that HealthSouth could not grow its earnings by 25% annually in 1997 and 1998.

45. On May 6, 1998, HealthSouth announced that it had signed an agreement to acquire National Surgery Centers, Inc. for $590 million in HealthSouth stock. Under the terms of the deal, HealthSouth would pay no less than 0.8714 shares of HealthSouth stock valued at $30.50 and no more than 1.1509 shares of HealthSouth stock for each share of National Surgery Centers. Defendant Scrushy stated:

> "The addition of NSC's surgery centers further solidifies HEALTHSOUTH'S position as the nation's leading provider of outpatient surgery services. The 250 surgery centers that we will operate upon consummation of the NSC transaction and the recently announced acquisition of 34 surgery centers from Columbia/HCA will enable us to provide high-quality, cost-effective outpatient surgery services to physicians, patients and payors in more locations than any other company has ever done. We expect the transaction to be immediately accretive to earnings, and we look forward to working with these outstanding facilities as we integrate them into HealthSouth's national network."

46. In connection with this announcement, HealthSouth held a conference call, hosted by defendant Scrushy, for institutional investors and securities analysts, including Sullivan, Swenson, O'Donnell, A.J. Rice ("Rice") of Bear Stearns and Chiarelli. During that call or in follow-up one-on-one conversations thereafter, defendant Scrushy stated:

- HealthSouth's business remained strong.

- The acquisition of National Surgery Centers increased the likelihood that HealthSouth would continue to achieve 20%-25% annual EPS growth.

- HealthSouth continued to implement its Integrated Service Model, which was designed to produce higher margins.

- As a result, he remained confident that HealthSouth would achieve EPS estimates of $1.15-$1.16 in 1998 and $1.40 in 1999.

47. On July 21, 1998, HealthSouth announced that, for the second quarter of 1998, its EPS rose to $0.28 from $0.23 in the second quarter of 1997. In connection with this announcement, defendant Scrushy stated:

> "I am very pleased to report our operating results for the second quarter of 1998 . . . . During the quarter we continued our focus on internal growth as well as agreeing to acquire National Surgery Centers, Inc. and over 30 outpatient surgery centers from Columbia/HCA Healthcare Corporation. Our financial performance remained strong as we benefited from the profitability associated with strong same-store growth, as well as from economies of scale and expense controls.

> "We were pleased to close the Columbia/HCA acquisition on July 1, 1998. With an 85% overlap with HEALTHSOUTH markets, we expect that this acquisition will be immediately accretive to earnings and contribute to our integrated service model development. I am also pleased to announce the expected closing of the National Surgery Centers acquisition later this week."

48. In connection with this press release, HealthSouth held a conference call, hosted by defendant Scrushy, for institutional investors and securities analysts. During that call and in private one-on-one conversations with Swenson, Sullivan and Chiarelli thereafter, Scrushy stated:

- He was very positive regarding HealthSouth's performance and position.

- During the quarter, HealthSouth added 577,000 new lives to its Integrated Services Division, a positive development.

- The Integrated Services Division, coupled with managed care contracts, was continuing to drive incremental volume to HealthSouth facilities and thereby enhancing revenue, margin and earnings growth.

- As a result, HealthSouth's same-store sales growth remained strong.

- HealthSouth had an acquisition pipeline of approximately 1,500 candidates, with approximately $3.5 to $4 billion in revenues.

- As a result, HealthSouth would be able to grow its revenues at the rate of 15%-20% through the year 2001.

- As a result, HealthSouth would be able to grow its earnings at 20%-25% in 1998 and 1999 and thereby meet EPS estimates of $1.15 in 1998 and $1.40 in 1999.

49.  During the week of July 20, 1998, HealthSouth completed the acquisition of National Surgery Centers by issuing 1.0972 shares of HealthSouth stock for each share of National Surgery Centers stock, or stock worth approximately $590 million.

50.  Between July 20, 1998 and July 27, 1998, HealthSouth's shares fell by approximately 15.5%.  <u>As a result, analyst Chiarelli of J.P. Morgan Securities called HealthSouth on or about July 27, 1998 and spoke extensively with its management, including defendants Scrushy and/or Martin</u>.  During those extensive conversations, defendants Scrushy and/or Martin stated:

- The decline in HealthSouth's shares had no basis in fact and was not due to any fundamental reason.

- <u>They had the conviction that HealthSouth would achieve EPS of $0.30, $0.31 and $1.15 in the third and fourth quarters of 1998 and 1998, respectively</u>.

- The Company continued to experience solid increases in same-store sales growth in all of its divisions.

- The Company expected strong internally generated growth through 1999 and, as a result, it would have no difficulty in achieving EPS of $1.40 (or 21% growth over 1998).

51.  Between July 27 and August 14, 1998, the price of HealthSouth remained particularly weak.  As a result, analyst Sullivan of Cowen & Co. contacted HealthSouth and spoke with its

management, including defendants Scrushy and/or Martin.   During those conversations, which occurred on August 13, 1998, Scrushy and/or Martin stated:

- HealthSouth was not being adversely impacted by HMOs' efforts to obtain price reductions.

- HealthSouth had already negotiated discounted fees in exchange for volume contracts and HealthSouth, given its cost advantage, would not be adversely impacted.

- There was <u>no change in operating trends</u> at HealthSouth.

52.   Between August 4 and August 14, 1998, analyst Rice of Bear Stearns also had several conversations with HealthSouth management, including defendants Scrushy and/or Martin, regarding the weakness in HealthSouth's share price.   During those conversations, defendants Scrushy and/or Martin stated:

- <u>There had been no change in the favorable fundamentals enjoyed by HealthSouth.</u>

- <u>The operating trends at HealthSouth had changed little</u> from the 23% increase in EPS HealthSouth achieved in the second quarter of 1998.

53.   Between July 27, 1998 through and including September 13, 1998, analyst Chiarelli of J.P. Morgan Securities <u>spoke extensively</u> with HealthSouth's management, including defendants Scrushy and/or Martin, in private one-on-one conversations. During those conversations, defendants Scrushy and/or Martin stated:

- The decline in HealthSouth's shares had no basis in fact and was not due to any fundamental reason.

- <u>They had the conviction that HealthSouth would achieve $0.30, $0.31 and $1.15 EPS in the third and fourth quarters of 1998 and 1998, respectively</u>.

- The Company continued to experience solid increases in same-store sales growth in all of its divisions.

- The Company expected strong internally generated

growths through 1999 and, as a result, it would have no difficulty in achieving EPS of $1.40 (or 21% growth over 1998).

54. On September 14, 1998, analyst Rice of Bear Stearns spoke with management at HealthSouth, including defendants Scrushy and/or Martin, regarding the Bear Stearns Healthcare Conference to be held the week of September 21, 1998, at which defendant Scrushy was scheduled to speak on September 25, 1998. During those private one-on-one conversations, defendants Scrushy and/or Martin told Rice that:

• Scrushy hoped to have some "positive things" regarding HealthSouth to discuss at the conference.

• HealthSouth's management was frustrated with the recent sell-off in HealthSouth's share price, and Scrushy would address the concerns of investors at the conference.

55. On Friday, September 25, 1998, defendant Scrushy spoke at the Bear Stearns Health Care Conference. During the conference, which was attended by numerous securities analysts, including Rice of Bear Stearns, Scrushy stated:

• He was positive and upbeat regarding HealthSouth's prospects.

• He was confident in the Company's ability to achieve analysts earnings expectations of $0.30, $0.31 and $1.15 for the third and fourth quarters of 1998 and 1998, respectively.

56. The statements in ¶¶45-55 were false and misleading when made. The true facts, which defendants concealed, were that:

(a) HealthSouth's managed care customers had begun to indicate that they would seek significant price reductions in 1998;

(b) HealthSouth's managed care customers had begun, in an effort to mitigate the escalation of healthcare costs, to delay payments to HealthSouth for services it had rendered;

(c)   As a result, HealthSouth's profit margins were not rising but were falling;

(d)   While the Registration Statement and Prospectus revealed that there were "increasing pressures" from "many payor sources" to "control healthcare costs" and to "limit increases in reimbursement rates," the defendants concealed that several payor sources had then informed HealthSouth that it would demand reductions in reimbursement rates in 1998 and 1999;

(e)   The defendants concealed that several of HealthSouth's managed care customers were delaying payments to HealthSouth;

(f)   As a result of (a)-(e), HealthSouth's financial position had been materially weakened;

(g)   As a result of (a)-(f), HealthSouth was not in a "solid financial position," was not producing "consistent financial results" and was not "successfully executing its strategic plan"; and

(h)   As a result of (a)-(g), the defendants knew or recklessly disregarded that HealthSouth would not grow its earnings by 25% annually in 1997 and 1998 and would not achieve EPS of $0.30, $0.31 and $1.15 and $1.40 in the third and fourth the quarters of 1998 and 1998 and 1999, respectively.

57.   On September 29, 1998, HealthSouth's stock price began to collapse, falling from $18-3/8 to $14-5/8, as HealthSouth began to communicate to analysts that it might miss analysts' EPS estimates for the third and fourth quarters of 1998 and 1999. Then, on September 30, 1998, HealthSouth revealed, in stark contrast to the numerous positive statements defendant Scrushy and

HealthSouth management made during the Class Period, that:

(a) It was <u>continuing</u> to see pressure from major managed care firms to renegotiate existing contract terms;

(b) It <u>"was being pressured by payors to renegotiate</u> <u>rates and [was] seeing delays in payment under current contracts</u>;"

(c) As a result, HealthSouth could no longer grow its earnings at the historical 20%-25% rate but only a 15-20% rate going forward; and

(d) As a result, HealthSouth might miss "analysts" earnings estimates in 1998 and 1999.

58. Defendant Scrushy stated: "If we determine that market estimates are out of line with our internal expectations, we will reverse our guidance to the investment community. Until we have completed that process, we believe it is premature to comment on our expectations for the coming months." Scrushy did, however admit: "[W]e think there will be some adjustment." However, upon this announcement, several analysts revised their 1998 and 1999 EPS estimates downward and, over the two-day period of September 29-30, 1998, HealthSouth stock collapsed approximately 50% in value from $18-3/8 to $10-1/2 and the price of HealthSouth's 3.25% convertible subordinated debentures declined to approximately 20% below the price at which they were offered. As a result, plaintiffs and the Class suffered hundreds of millions in damage. However, it is no surprise that the defendants, as reflected in the following paragraph, fared far better.

## HEALTHSOUTH'S AND ITS INSIDERS' STOCK SALES

59. While HealthSouth's insiders were issuing false and misleading statements about HealthSouth's business, HealthSouth

was able to sell bonds to the public to raise $567 million to acquire 34 surgery centers from Columbia/HCA and issue HealthSouth shares worth $1.6 billion to purchase Horizon and National Surgery Centers. This artificial inflation in HealthSouth's stock price also enabled certain of the HealthSouth insiders, named as defendants, to sell over 6.0 million shares of their HealthSouth stock for proceeds of about $163 million to profit from the artificial inflation in HealthSouth's stock price their fraud had created, in some instances selling large portions of the shares they owned or had acquired via the exercise of options during the Class Period. Notwithstanding their access to non-public information as a result of their positions with the Company, the Individual Defendants identified below sold the following amounts of HealthSouth shares at artificially inflated prices through the Class period while in possession of material non-public information:

### Individual Defendants

| Name/Position | Shares Sold | Sales Price | Aggregate Proceeds | % of Total Shares Owned/Sold |
|---|---|---|---|---|
| Scrushy, CEO | 4,000,000 | $27.00 | $108,000,000 | 87% |
| House, Director | 482,996 | $26.26-30.00 | $13,082,880 | 100% |
| Bennett, President | 199,900 | $26.19-26.72 | $5,287,199 | 71% |
| Martin, CFO | 125,000 | $27.00 | $3,375,000 | 67% |
| Tanner, EVP | 292,750 | $25.94-26.75 | $7,717,481 | 71% |
| Owens, VP | 226,000 | $26.13-27.00 | $5,960,020 | 100% |
| Thomson, Div. Pres. | 128,500 | $26.13-26.63 | $3,387,360 | 98% |
| Carman, VP | 200,000 | $26.00-26.63 | $5,266,520 | 56% |
| Brown, Div. Pres. | 179,810 | $26.25-27.19 | $4,813,689 | 61% |
| Watkins, Director | 160,000 | $26.00-27.15 | $4,299,250 | 53% |
| Celeste, Director | 60,000 | $26.13-27.50 | $1,625,100 | 100% |

| Givens, Director | 30,000 | $27.12 | $813,600 | 100% |
| Foster, Div. Pres. | 11,200 | $26.38-26.50 | $296,188 | 95% |
| TOTALS: | 6,096,156 | $25.94-30.00 | $163,924,287 | 83% |

HealthSouth

| Date | Securities Issued | Value | Purpose |
|------|-------------------|-------|---------|
| 10/29/97 | Common Stock | $961 million | Horizon Healthcare acquisition |
| 4/16/98 | Convertible bonds | $567 million | Columbia Surgery Centers purchase |
| 7/22/98 | Common Stock | $590 million | National Surgery Centers purchase |

60.   These insider stock sales were unusual in timing and amount.   The Individual Defendants all sold large portions of their holdings.   As the foregoing tables illustrate, the defendants sold or issued HealthSouth stock and securities when the securities were artificially inflated due to the nondisclosure of the adverse facts related to HealthSouth's declining rate of growth, delay in receipt of payments, and pricing pressure from managed care companies.

### CLAIM FOR RELIEF I

For Violation Of Section 10(b) Of The Exchange
Act And Rule 10b-5 Against All Defendants

61.   Plaintiffs incorporate by reference ¶¶1-60.

62.   Each of the defendants: (a) knew or had access to the material adverse non-public information about HealthSouth's financial results and then-existing business conditions, which was not disclosed; and (b) participated in drafting, reviewing and/or approving the misleading statements, releases, reports and other public representations of and about HealthSouth.

63.   During the Class Period, defendants, with knowledge of

or reckless disregard for the truth, disseminated or approved the false statements specified above, which were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

64.   Defendants have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they:  (a) employed devices, schemes and artifices to defraud;  (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon the purchasers of HealthSouth stock during the Class Period.

65.   Plaintiffs and the Class have suffered damage in that, in reliance on the integrity of the market, they paid artificially inflated prices for HealthSouth stock.  Plaintiffs and the Class would not have purchased HealthSouth stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' false and misleading statements.

<u>CLAIM FOR RELIEF II</u>

For Violation Of Section 20(a) Of The Exchange
<u>Act Against Defendants HealthSouth And Scrushy</u>

66.   Plaintiffs incorporate by reference ¶¶1-65.

67.   Scrushy acted as a controlling person of HealthSouth within the meaning of §20 of the Exchange Act.  By reason of his positions as Chairman of the Board and CEO of HealthSouth, Scrushy

had the power and authority to cause HealthSouth to engage in the wrongful conduct complained of herein.   HealthSouth controlled each of the Individual Defendants and all of its employees.

68.   By reason of such wrongful conduct, HealthSouth and Scrushy are liable pursuant to §20(a) of the Exchange Act.   As a direct and proximate result of these defendants' wrongful conduct, plaintiffs and the other members of the Class suffered damages in connection with their purchases of HealthSouth stock during the Class Period.

## CLASS ACTION ALLEGATIONS

69.   Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b) on behalf of all persons who purchased the securities of HealthSouth during the Class Period (the "Class"), except defendants, members of their immediate families and any entity in which a defendant has a controlling interest.

70.   The members of the Class are so numerous that joinder of all members is impracticable.   HealthSouth has more than 395 million shares of stock outstanding.   During the Class Period, millions of shares of HealthSouth's stock were purchased by thousands of persons who were damaged thereby.

71.   Plaintiffs' claims are typical of the claims of the Class because plaintiffs and the Class members sustained damages from defendants' wrongful conduct.

72.   Plaintiffs will adequately protect the interests of the Class.   Plaintiffs have retained counsel who are experienced and competent in class action securities litigation.   Plaintiffs have no interests which conflict with those of the Class.

73.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

74.   Common questions of law and fact predominate over questions which affect only individual members.   Among the questions of law and fact common to the Class are:

(a)   Whether the federal securities laws were violated by defendants' acts;

(b)   Whether HealthSouth's statements during the Class Period misrepresented and/or omitted material facts;

(c)   Whether defendants pursued the fraudulent scheme and course of business complained of;

(d)   Whether defendants acted intentionally or recklessly;

(e)   Whether the market price of HealthSouth securities was artificially inflated due to the activities complained of; and

(f)   The extent and measure of damage sustained by the Class.

## INAPPLICABILITY OF STATUTORY SAFE HARBOR

75.   The federal statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Further none of the statements pleaded at ¶¶23-24, 27-29, 33-34, 36, 39-41, 46, 48, and 50-55 that were forward-looking statements were identified as "forward-looking statements" when made.   Nor was it stated that actual results "could differ materially from those projected."   Nor were the forward-looking statements made in ¶¶26, 35, 38, 45 and 47 accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from the statements made therein. Defendants are liable for the forward-looking statements in ¶¶26, 35, 38, 45 and 47 because, at the time each of those forward-looking statements was made, the speaker knew the forward-looking statement was false and the forward-looking statement was authorized and/or approved by an executive officer of HealthSouth who knew that those statements were false when made.

## BASIS OF ALLEGATIONS

76.   Because the Private Securities Litigation Reform Act of 1995, §21D(c) of the Exchange Act [15 U.S.C. §78u-4(c)], requires complaints to be pleaded in conformance with Federal Rule of Civil Procedure 11, plaintiffs have alleged the foregoing based upon the investigation of their counsel, which included a review of HealthSouth's SEC filings, securities analysts' reports and advisories about the Company, press releases issued by the Company, media reports about the Company and discussions with consultants, and pursuant to Rule 11(b)(3), believe that, after reasonable opportunity for discovery, substantial additional evidentiary support will likely exist for the allegations set forth in ¶¶23-55.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray for judgment as follows:

1.   Declaring this action to be a proper class action pursuant to Rules 23(a) and 23(b) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

2.   Awarding plaintiffs and the members of the Class compensatory damages;

3.   Determining that the instant action is a proper class action maintainable under Rule 23 of the Federal Rules of Civil Procedure and determining that plaintiffs' counsel is class counsel;

4.   Against each defendant and in favor of plaintiffs and all members of the Class for damages in an amount determined to have been sustained by plaintiffs and the members of the Class;

5.   Awarding plaintiffs and members of the Class the costs

of this suit, including reasonable attorneys' and experts' fees and other disbursements;

6. Against each defendant for damages jointly and/or severally;

7. Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity and the federal statutory provisions sued thereunder, pursuant to Rules 64, 65 and any appropriate state law remedies, including attaching, impounding or imposing a constructive trust on or otherwise restricting the proceeds of defendants' trading activities or their other assets to assure that plaintiffs have an effective remedy; and

8. Such other and further relief as may be just and proper.

<u>JURY DEMAND</u>

Plaintiffs demand a trial by jury.

DATED: October 16, 1998

                    LAW OFFICES OF M. CLAY
                      RAGSDALE
                    M. CLAY RAGSDALE


                    _____
                    M. CLAY RAGSDALE

                    1929 Third Avenue North
                    550 Farley Building
                    Birmingham, AL  35203
                    Telephone:  205/251-4775

                    MILBERG WEISS BERSHAD
                      HYNES & LERACH LLP
                    WILLIAM S. LERACH
                    ALAN SCHULMAN
                    DARREN J. ROBBINS
                    600 West Broadway, Suite 1800
                    San Diego, CA  92101
                    Telephone:  619/231-1058

                    LAW OFFICES OF STEVEN E.

CAULEY, P.A.
STEVEN E. CAULEY
Suite 218, Cypress Plaza
2200 N. Rodney Parham Road
Little Rock, AR  72212
Telephone:  501/312-8500

LAW OFFICES OF ALFRED G.
  YATES, JR.
ALFRED G. YATES, JR.
519 Allegheny Building
429 Forbes Avenue
Pittsburgh, PA  15219
Telephone:  412/391-5164

SCOTT & SCOTT, LLC
NEIL ROTHSTEIN
1520 Spruce Street
Suite 308
Philadelphia, PA  19102
Telephone:  215/545-3226

HOFFMAN & EDELSON
MARC H. EDELSON
45 W. Court Street
Doylestown, PA  18901
Telephone:  215/230-8043

WECHSLER HARWOOD HALEBIAN
  & FEFFER LLP
ROBERT I. HARWOOD
488 Madison Avenue
8th Floor
New York, NY  10022
Telephone:  212/935-7400

Attorneys for Plaintiffs

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

James Genstein, ("Plaintiff") declares, as to the claims asserted under the federal securities laws, that:

1.    I have reviewed the complaint, (the "Action"), prepared by counsel and authorize its filing and am willing to serve as a lead or named plaintiff in the Action on the basis of the allegations in that complaint or a substantively similar or related complaint or amended complaint to be filed.

2.    I did not purchase the security that is the subject of the Action at the direction of plaintiffs' counsel or in order to participate in any private action arising under the federal securities laws.

3.    I am willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    During the proposed Class Period, I executed the following transactions relating to Healthsouth:

| Security | Transaction | Date |
|---|---|---|
| Common Stock | Purchased 400 shs. | 6/25/98 at $28 1/8/sh |

5.    In the past three years, I have not sought to serve nor have served as a representative party in behalf of a class in an action filed under the federal securities laws.

6.    I will not accept any payment for serving as a representative party on behalf of a class beyond my pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 14 day of October, 1998.

James Genstein

## CERTIFICATION OF NAMED PLAINTIFF
### PURSUANT TO FEDERAL SECURITIES LAWS

Bernard Rogers  McCoy  (NAME) ("Plaintiff"), declares as to the claims asserted under the federal securities laws, that:

1.  Plaintiff has reviewed the Healthsouth complaint and authorized its filing.

2.  Plaintiff did not purchase the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.  Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.  Plaintiff has made no transaction(s) during the Class Period in the debt or equity securities that are the subject of this action except those set forth below:

| Security | Transaction | Date | Price Per Share |
|---|---|---|---|
| Common Stock | Purchased 100 shares | 3-17-97 | $43 $^{50}$ |
|  | Purchased 761 | 7-30-97 | 26 7/8 |
|  | Sold 300 | 7-15-98 | 28 5/16 |
|  | Purchased 895 | 9-29-98 | 17 $^{00}$ |

5.  During the three years prior to the date of this Certificate, Plaintiff has sought to serve or served as a representative party for a class in the following actions filed under the federal securities laws.  None

6.  The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expensed (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 8th day of October , 1998, at Haslett , Michigan .
            (city)        (state)

SIGNATURE                    PRINTED NAME   Bernard R. McCo.

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

ROBERT M. GORDON (NAME) ("Plaintiff"), declares as to the claims asserted under the federal securities laws, that:

1.  Plaintiff has reviewed the Healthsouth complaint and authorized its filing.

2.  Plaintiff did not purchase the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.  Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.  Plaintiff has made no transaction(s) during the Class Period in the debt or equity securities that are the subject of this action except those set forth below:

| Security | Transaction | Date | Price Per Share |
|---|---|---|---|
| Common Stock | Purchased 200 shares | 8/14/98 | $ 21 11/16 |

RE: ITEM 5.

I HAVE ALSO SUBMITTED A SIMILAR CERTIFICATION IN A CLASS ACTIONS AGAINST PHYCOR INC.

5.  D...    — BRYANT V. PHYCOR, ET. AL.    9/23/98    ...t to serve or
    ser   — ROSENWALD V. PHYCOR, ET. AL    9/23/98    ...r the federal
    sec   — MEYER  V. PHYCOR, ET. AL    9/17/98

6.  Th...    ...on behalf of
    the    ...sonable costs
    anc    ...the class as
    ord

I declare under penalty of perjury that the foregoing is true and correct. Executed this 8TH day of OCTOBER , 1998, at FAIR LAWN , NJ .
                                                    (city)            (state)

_(signature)_   ROBERT M. GORDON
SIGNATURE        PRINTED NAME