FILED

99 APR 12 PM 3:23

U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ALABAMA

SOUTHERN DIVISION

| | |
|---|---|
| ROBERT M. GORDON, BERNARD R. McCOY, JAMES GENSTEIN, TWIN PLUS LLC, TRUST ADVISORS EQUITY PLUS LLC, IRENE RIGAS, BRIAN FISCHMAR, HARRY SCHIPPER, RYAN McCORMICK, UNITED FOOD & COMMERCIAL WORKERS UNION LOCAL 100-A PENSION FUND and VINOD PARIKH, | ) Master File No. ) CV-98-Ø-2634-S ) ) ) CLASS ACTION ) ) ) CONSOLIDATED AMENDED CLASS ) ACTION COMPLAINT FOR |
| Plaintiffs, | ) VIOLATIONS OF THE FEDERAL ) SECURITIES LAWS ) |
| vs. | ) ) |
| HEALTHSOUTH CORPORATION, RICHARD M. SCRUSHY, LARRY R. HOUSE, JAMES P. BENNETT, MICHAEL D. MARTIN, ANTHONY J. TANNER, WILLIAM T. OWENS, ROBERT E. THOMSON, THOMAS W. CARMAN, P. DARYL BROWN, PATRICK A. FOSTER, PHILLIP C. WATKINS, RICHARD F. CELESTE and AARON BEAM, JR., | ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) ) |
| In re HEALTHSOUTH CORPORATION SECURITIES LITIGATION | ) ) ) ) |
| This Document Relates To: | ) ) |
| ALL ACTIONS. | ) Plaintiffs Demand A ) Trial By Jury |

31

## SUMMARY AND OVERVIEW OF THE ACTION

1.   This is a class action on behalf of all persons who purchased or otherwise acquired the securities of HealthSouth Corporation ("HealthSouth" or the "Company") between 4/24/97 and 9/30/98 (the "Class Period"), including the acquisition of securities of HealthSouth in exchange for the  securities of Horizon/CMS Healthcare Corporation ("Horizon") in a merger consummated on or about 10/29/97 (the "Horizon Merger") and the acquisition of HealthSouth securities in exchange for the securities of National Surgery Centers, Inc. ("NSC") in a merger consummated on or about 7/22/98 (the "NSC Merger"), against HealthSouth and the Company's top officers and directors.

2.   By falsely representing that: (i) the Balanced Budget Act of 1997 (the "BBA"), which legislated the most significant changes to Medicare in 30 years, would only minimally impact HealthSouth's revenues and would have <u>no impact on earnings</u>; (ii) its mergers with Horizon and NSC would be immediately accretive to earnings per share ("EPS"); (iii) HealthSouth was experiencing, and would continue to experience, strong "same-store" sales growth; and (iv) as a result, HealthSouth would continue to achieve its historical rate of 15%-20% revenue growth and 20%-25% EPS growth, HealthSouth's stock was artificially inflated from $18-3/4 at the start of the Class Period to almost $28 by early 11/97 and to a Class Period and all-time high of $30.81 on 4/20/98. As a result of defendants' continued misrepresentations between 4/98 and 8/98, HealthSouth stock continued to perform well, trading between $25-$30 per share. This enabled defendants to: (i) <u>issue (sell)</u> <u>HealthSouth shares worth approximately $1.6 billion</u> to purchase

Horizon and NSC; (ii) <u>issue (sell) $567 million in bonds</u>, convertible into HealthSouth common stock, to raise the $550 million needed to pay for the 34 surgery centers acquired from Columbia/HCA Healthcare Corp.; and (iii) in the case of top HealthSouth insiders, to complete a massive insider bailout, selling 6 million shares of HealthSouth stock -- 82% of the stock they actually owned -- with the vast majority of sales occurring in only approximately 60 days, pocketing over $163 million in illegal insider-selling proceeds.

3. Beginning on 7/20/98, HealthSouth's stock began to decline. Between late 7/98 and 9/25/98, in an effort to stem the decline, defendants falsely represented that the drop in HealthSouth's stock price was <u>not due to any fundamental reason</u>, HealthSouth would achieve EPS of $.30, $.31 and $1.15 in 3Q98, 4Q98 and for all of 1998, respectively. Defendants also represented that the Company continued to experience solid increases in same-store sales and HealthSouth would continue to achieve its historic 20%-25% EPS growth in 1999, earning $1.40 per share. These misrepresentations kept HealthSouth stock from falling further and between 8/13/98 and 9/25/98, HealthSouth traded in a range of approximately $19-$24 per share.

4. Then, <u>only four days later</u>, on September 29-30, 1998 -- contrary to defendants' repeated assurances of HealthSouth's strong operating trends and favorable fundamentals -- HealthSouth suddenly revealed that HealthSouth would likely fall far short of EPS estimates for 1998 and 1999. HealthSouth stock utterly collapsed, falling from a close of $18-3/8 on 9/28/98 to $10-1/2 on 9/30/98 -- a 43% two-day collapse on huge volume of 32 million shares.

5.    In late 10/98, HealthSouth announced it would lay off between 50 and 100 employees from its Birmingham, Alabama headquarters, roughly 5%-10% of its home-office staff.  Moreover, HealthSouth Chairman and CEO Richard Scrushy volunteered to take "a significant reduction in pay."  In 1997, Scrushy reportedly made $13.4 million in salary and bonuses.  The cuts were the result of reduced federal reimbursement and managed care pricing pressures caused by the BBA.

6.    Contrary to its representations during the Class Period that the BBA would have no negative impact on HealthSouth's EPS and that the Company would continue its historic growth rate of 20%-25%, as reported in the Company's 10-Q for the 3Q98 dated 11/16/98, HealthSouth only netted $5.7 million, or a penny a share, for the quarter ended 9/30/98, <u>down 93%</u> from $85.9 million, or $.25 per share, a year ago.  The earnings report included a $105 million charge as HealthSouth dumped its home health business.  As a result of the BBA, in 11/98 the Company closed about 30 agencies in at least six states.  "<u>If you took a $100 million whack from the federal government, you'd make changes, too</u>," said Company spokesman Vince Thompson.

7.    The huge artificial inflation of HealthSouth's stock, the Individual Defendants' enormous stock sales at artificially inflated prices during the Class Period and the later collapse of HealthSouth's stock when the truth about HealthSouth's business and its greatly diminished prospects for future growth came out, are graphically displayed below:

- 3 -



**HealthSouth Corp.**

**January 2, 1997 - March 31, 1999**

**Daily Stock Prices**

8.   In early 2/97, the Clinton Administration proposed cutting Medicare payments by $100 billion over five years to help balance the federal budget.   By the end of 3/97, the Clinton Administration drafted regulations reducing hourly reimbursement of Medicare occupational and speech therapy services.   The new rates were being introduced to slow rising Medicare payments for contract rehabilitation therapy services in nursing homes, because the U.S. General Accounting Office ("GAO") had determined that Medicare was being overbilled for those services.   A 1995 GAO study found

- 4 -

"widespread examples of overcharges to Medicare for therapy services," with the program being charged as much as $600 an hour.

9.   By 4/10/97, the Clinton Administration proposed a freeze on Medicare payments to hospitals to help generate an additional $18 billion in savings for medicare.  The one-year freeze would deny hospitals the annual raise in Medicare payments that the government gives to account for inflation.  About $8.6 billion of that new savings would come from cuts in payments to hospitals, including the freeze in inflation-related pay increases.

10.   In early 5/97, as a result of the balanced budget agreement, the cuts to provide the $115 billion in Medicare savings agreed to by the Clinton Administration and Republican lawmakers as part of a five-year balanced budget plan would be determined by Congress.  A top Democratic staffer on the Ways and Means Health Subcommittee, predicted that the committees would adopt much of what Clinton already proposed for Medicare which would result in hospitals seeing their payments squeezed by about $40 billion over five years and Health Maintenance Organizations' ("HMO's") future Medicare payments reduced by $34 billion over five years.

11.   On 8/5/97 the BBA was enacted into law with an effective date of 10/1/97.  This act made major changes that affect Medicare payments for hospital inpatient services under the prospective payments systems ("PPS") and the cost limits applicable to excluded hospitals, such as rehabilitation hospitals, as well as other changes.  Most of these provisions were effective 10/1/97.  The Health Care Financing Administration ("HCFA"), the government arm that oversees Medicare, estimated that as a result of the BBA, there will be a decrease in payments to home health agencies

("HHA") of $1.06 billion in 1998 and $2.14 billion in 1999 compared to payments that would have been made if the BBA was not enacted. This was approximately a 9% reduction.

12.   Defendants were very concerned about these legislative developments and lobbied against their adoption, because, inter alia, at the same time that the Clinton Administration unveiled its budget proposals in 2/97, HealthSouth was finalizing its agreement to acquire Horizon and defendants knew that the Medicare reform which was proposed in 2/97-4/97 and later enacted in the BBA would have a disastrous impact on HealthSouth's business and that if they disclosed the impact of the BBA on HealthSouth's business, the price of HealthSouth common stock would substantially decline and potentially jeopardize HealthSouth's acquisition of Horizon, the bulk of which was financed with $961 million worth of HealthSouth stock, and which was viewed by the defendants as one of the most important acquisitions in the history of HealthSouth as it would enable HealthSouth to "corner the rehab market," continue the illusion that it could keep pace with its historical rate of 15%-20% growth in revenues and 20%-25% growth in EPS, and would allow HealthSouth to hide some of its operating deficiencies via the use of acquisition-related write-offs.   The defendants also knew that any decline in HealthSouth's common stock price would substantially harm them as a large percentage of each of the Individual Defendants' wealth was in the form of HealthSouth common stock.   Moreover, the defendants knew that any decline in the price of HealthSouth common stock would greatly reduce the defendants' ability to continue to use HealthSouth stock as a currency to acquire other businesses in an effort to maintain its historical

15%-20% annual growth rate in revenue and 20%-25% annual growth rate in EPS. As a result, defendants embarked on a scheme to push the price of HealthSouth stock much higher so that they could unload their stock at artificially inflated prices and pocket millions in illegal insider-trading proceeds, complete the acquisition of Horizon and continue HealthSouth's growth by acquisition strategy which was facilitated by HealthSouth's artificially inflated stock price, before HealthSouth's financial results were severely impacted by the BBA.

13. In order to inflate the price of HealthSouth's stock, during the Class Period, the defendants continually misrepresented the position and prospects of HealthSouth by stating that it was in a "solid financial position"[1] due to its "tremendous franchise" which had positioned HealthSouth to acquire managed care contracts which would continue to drive incremental volume to HealthSouth facilities and thereby enhance HealthSouth's revenue, margin and earnings growth and would enable HealthSouth to continue to produce "consistent financial results." Moreover, defendants assured investors of HealthSouth's "ability to consistently produce superior financial results" which ensured that HealthSouth would achieve EPS of $1.15 and $1.40 in 1998 and 1999, respectively. Defendants also represented that the BBA would have "no impact on earnings," that the Company will "emerge relatively unscathed" after enactment of the BBA, HealthSouth "continued to recognize strong same-store growth," the Company was experiencing "strong utilization trends," and HealthSouth "is poised for tremendous

---

[1]   Here, as elsewhere, emphasis has been added unless otherwise stated.

- 7 -

internal growth." Defendants also represented that HealthSouth "continued the successful integration" of the Company's major acquisitions, the acquisitions of NSC and Columbia/HCA, would "be immediately accretive to earnings," and that HealthSouth's "financial performance remained strong" as the Company "benefited from the profitability associated with strong same-store growth, as well as from economies of scale and expense controls." As late as 9/25/98, the defendants continued to assure securities analysts during numerous extensive conversations that there had been "no change in" the operating trends at HealthSouth or the "favorable fundamentals affecting HealthSouth" and that, therefore, the defendants shared the "conviction" that HealthSouth would achieve $0.30, $0.31 and $1.15 in 3Q98, 4Q98 and 1998, respectively.

14. These statements were false or misleading because, contrary to defendants' assertions that the BBA would not negatively impact HealthSouth's earnings, and would only minimally impact revenue, the BBA wiped out $100 million in HealthSouth's earnings in 3Q98 and over $300 million in 4Q98 and reduced its growth prospects from 20%-25% to as low as 10%. The BBA negatively impacted HealthSouth because among other things, the legislation reduced hospital capital payments for rehabilitation hospitals by 15% beginning on 10/1/97, eliminated Medicare increases for outpatient hospital departments of all PPS-exempt hospitals, such as rehabilitation hospitals, and eliminated formula-driven overpayments for fiscal year 1998 (10/1/97-9/30/98) for outpatient hospital departments. In addition to capping "Part B" outpatient rehabilitation services at $1,500 per year, the BBA gave the HCFA blanket authority to cut reimbursement for most "Part B" services

- 8 -

by up to 15% without any warning and without considering any
congressionally mandated factors.  Also, since the 15% limit only
applied to cuts within a given year, HCFA now could cut any service
by 15% every year until it reaches a desired level of payments.
The BBA instituted a prospective payment system ("PPS") for skilled
nursing facilities ("SNFs") and instructed the HCFA to look back to
a SNF's FY95 payments to determine facility-specific per-diem rates
for FY98, thereby ignoring any growth in reimbursement realized
during the past two years.  With the PPS for SNFs under the BBA,
Medicare reimbursement growth would slow during 1998.  In turn,
rehabilitation providers contracting with SNFs to provide therapy
faced reduced payment for their services or exclusion altogether as
SNFs bring rehab services in house.        Moreover, for 1998,
outpatient therapy services in specific settings were to be paid
one of two ways -- the lesser of the actual charges for the
services, or the adjusted reasonable costs minus beneficiary
coinsurance payments.  Adjusted reasonable costs are defined as
allowable reasonable costs minus 10%. Beginning in 1999, payments
for these services were to be equal to 80% of the lesser of the
actual charge for the services, or 80% of the applicable fee
schedule amount.  The revised payment formulas applied to
outpatient physical therapy services, outpatient speech-language
pathology services, and outpatient occupational therapy services
that are furnished by a rehab agency, a public health agency, a
clinic, an comprehensive out-patient rehabilitation facility,
Certified Outpatient Rehabilitation Facilities ("CORF"), or a SNF.
They also apply to the listed services that are delivered by an HHA
to an individual who is not homebound or by any company with an

- 9 -

arrangement with any of the specified entities.   Additionally, pursuant to the BBA, the HCFA changed the way it determines reimbursement rates for skilled nursing facilities, as well as other healthcare businesses.   Under the new system, which became effective 10/1/97, skilled nursing facilities are reimbursed for Medicare patients on a "per diem" system, meaning they get a set amount each day for each patient.   Those reimbursement rates were expected to be between 23%-63% lower under the new system.

15.   The BBA exerted tremendous pricing pressures on HealthSouth and the entire health care industry as the BBA's provisions rippled through the system.   As a result, HealthSouth was not only negatively impacted by the provisions of the BBA that directly applied to its facilities, but by the provisions that applied to HMO's and other managed care providers. In sum, the BBA reduced medicare reimbursements to managed care providers, who in turn, sought price reductions from HealthSouth.   Moreover, contrary to defendants' assertions that HealthSouth's acquisitions would be immediately accretive to earnings, the BBA dramatically lowered reimbursements to merged entities because merged or acquired facilities are considered "new providers" or "new agencies," and the BBA eliminated exemptions for new providers.   In addition, a branch office that turned into a sub-unit received new provider status.   "New providers" received the national per beneficiary limitation for cost reporting periods on or after 10/1/97.   The merger or consolidation of two companies when one company does not have a full FY94 cost report receives a per-year beneficiary limitation calculation as a "new provider."   In other words, an older company with 1994 cost reporting data that merges with a new

company (one formed after 1993) will be considered a new agency. This definition excludes the older company's 1994 cost reporting data, which results in a lower per-beneficiary limit than the older company would have received if it had never formed the merger. Thus, "old agencies" (those with cost reporting periods ending during federal FY94) receive payments based on their 1994 cost reports while "new agencies" with no 1994 cost reports are paid based upon median costs from cost reporting periods ending in 1994. This payment methodology had a deleterious financial impact on the newly formed agencies created by HealthSouth's mergers and acquisitions.

16. Thus, the positive statements about HealthSouth's business issued throughout the Class Period were false and misleading when made. The true facts were:

(a)  as a result of the BBA, HealthSouth's managed care customers had already begun to seek price reductions from HealthSouth on existing contracts and were delaying making payments to HealthSouth for services rendered;

(b)  HealthSouth would not continue to experience strong same store sales growth because HealthSouth "walked away" from managed care providers that were exerting pricing pressures on HealthSouth because these managed care providers that were experiencing reduced Medicare reimbursements under the BBA;

(c)  HealthSouth's incremental volume was not increasing as a result of the acquisition of managed care contracts because HealthSouth was "walking away" from managed care contracts and this, in turn, was decreasing incremental volume, revenue, margin and earnings growth;

- 11 -

(d)   HealthSouth's financial results were materially impacted by the BBA because it reduced hospital capital payments by 15%, eliminated Medicare increases for rehabilitation hospitals, eliminated formula-driven overpayments for outpatient hospitals, and established a PPS for SNFs;

(e)   The BBA totally undermined HealthSouth's growth-by-acquisition strategy and made it impossible for HealthSouth's acquisitions to be immediately accretive to EPS because the merged entities received significantly lower reimbursements than if the entities did not merge;

(f)   The BBA would slow, if not eliminate, HealthSouth's growth-by-acquisition strategy because the merged entities received significantly lower reimbursements.  This, in turn, would cause same store sales to decline because HealthSouth's acquisitions fueled same store volume and margin trends;

(g)   In violation of GAAP -- FAS 121, HealthSouth inappropriately failed to write-off/write-down HealthSouth's home health care business in accordance with GAAP.  Home health care represented a material factor of HealthSouth's assets.  By inappropriately failing to write-off/write-down the home health care business soon after the BBA, like other companies, such as Counsel Corporation, Columbia/HCA, Lincare and America Home Patient, who wrote-off their home health care business between 11/1/97-3/24/98, HealthSouth overstated their assets and net income by material amounts in each of the financial statements filed with the SEC during the Class Period in violation of GAAP and FAS 121.

(h)   The BBA reduced the reimbursements to HealthSouth's home health business to such an extent that the Company was forced

- 12 -

to abandon the home health segment and take a $100 million write-off and a $310 million writeoff of certain assets including those relating to health care staffing and respiratory therapy that were also negatively impacted by the BBA;

(i)   The BBA eliminated revenue that HealthSouth derived from Medicare billing improprieties as described in detail in ;

(j)   As a result of the BBA, HealthSouth's managed care payors were exerting significant and troublesome pricing pressures. Further, managed care payors, in an effort to mitigate the escalation of healthcare costs, delayed payments to HealthSouth for services it had rendered.   As a result of the pricing pressures, HealthSouth would be unable to grow its earnings by 25% annually in 1998 and 1999;

(k)   HealthSouth was unable to control costs or realize economies of scale resulting from its aggressive acquisition campaign.   In fact, operating costs often increased after HealthSouth acquired a new facility.  For example, when HealthSouth acquired a new facility or group of facilities, it forced all purchasing to be done from Birmingham.   All purchasing invoices were, therefore, sent to Birmingham for processing and payment. This created purchasing problems at individual facilities.   For instance, prior to being purchased by HealthSouth, National Surgery Centers had each of its individual facilities receive invoices and pay for the products purchased.   National Surgery facilities were, in most cases able to pay for goods and services within 15 to 30 days -- "net-15" or "net-30".   HealthSouth, during 1997 and 1998, was unable to achieve significant reductions in costs for same-store operations or for operations newly added through acquisition.

- 13 -

In essence, by virtue of HealthSouth's unfavorable purchasing contracts and inability to pay invoices in a timely manner, costs were actually increasing and margins shrinking.  The result was an inability to grow margins and earnings contrary to defendants' representations; and

(l)  As a result of the facts set forth above, HealthSouth would not grow its earnings by 25% annually in 1998 and 1999 and would not achieve EPS of $0.30, $0.31 and $1.15 and $1.40 in 3Q98, 4Q98 and 1998 and 1999, respectively.

17.  On 9/30/98, HealthSouth issued a press release which revealed, in stark contrast to the numerous positive statements defendants had issued during the Class Period, that:

(a)  It was <u>continuing</u> to see pressure from major managed care firms to renegotiate existing contract terms;

(b)  <u>It "was being pressured by payors to renegotiate rates and [was] seeing delays in payment under current contracts</u>;"

(c)  As a result, HealthSouth could no longer grow its earnings at the historical 20%-25% rate but only a 15%-20% rate going forward; and

(d)  As a result, HealthSouth might miss "analysts" earnings estimates in 1998 and 1999.

18.  This announcement caused HealthSouth common stock to plunge from a close of $18-3/8 on 9/28/98 to $10-1/2 on 9/30/98 -- a 43% two-day collapse on huge volume of 32 million shares.

19.  Public investors who invested based on HealthSouth's representations that:  (i) the BBA would not impact earnings; (ii) HealthSouth was experiencing, and would continue to experience strong same-store sale growth; and (iii) HealthSouth's forecasts of

- 14 -

strong growth of 20%-25% in 1997-1999, and paid as high as $30 per share for HealthSouth's stock during the Class Period, have suffered millions in damages. However, HealthSouth's insiders who knew the truth about the disastrous impact of the BBA and managed care pricing pressures, did not fare nearly so poorly. Before the startling revelations of 9/30/98 occurred, and HealthSouth's stock price collapsed, 13 of HealthSouth insiders <u>unloaded over 6 million shares of their HealthSouth stock at artificially inflated prices as high as $30.00 per share, pocketing over $163 million in illegal insider-trading proceeds</u> while HealthSouth stock was selling at artificially inflated levels and defendants were issuing very positive but false statements about HealthSouth's business, financial results and its prospects for continued EPS growth. Defendants' illegal insider selling during the Class Period is summarized below:

### Individual Defendants

| Name/Position | Shares Sold | Sales Price | Aggregate Proceeds | % of Total Shares Owned/Sold |
|---|---|---|---|---|
| Scrushy, CEO | 4,000,000 | $27.00 | $108,000,000 | 87% |
| House, Director | 482,996 | $26.26-30.00 | $13,082,880 | 100% |
| Bennett, President | 199,900 | $26.19-26.72 | $5,287,199 | 71% |
| Beam, CFO | 100,000 | $27.59 | $2,759.0075,0 | 65% |
| Martin, CFO | 125,000 | $27.00 | 00 | 67% |
| Tanner, EVP | 292,750 | $25.94-26.75 | $7,717,481 | 71% |
| Owens, VP | 226,000 | $26.13-27.00 | $5,960,020 | 100% |
| Thomson, Div. Pres. | 128,500 | $26.13-26.63 | $3,387,360 | 98% |
| Carman, VP | 200,000 | $26.00-26.63 | $5,266,520 | 56% |
| Brown, Div. Pres. | 179,810 | $26.25-27.19 | $4,813,689 | 61% |
| Watkins, Director | 160,000 | $26.00-27.15 | $4,299,250 | 53% |
| Celeste, Director | 60,000 | $26.13-27.50 | $1,625,100 | 100% |
| Foster, Div. Pres. | 11,200 | $26.38-26.50 | $296,188 | 95% |
| TOTALS: | 6,166,156 | $25.94-30.00 | $165,869,687 | 82% |

Defendants' stock sales were dramatic and unusual both in timing and amount. Nine of HealthSouth's eleven executive officers sold large portions of their HealthSouth common stock, ranging from 56%-100% of their holdings. Seven of HealthSouth's eleven directors sold large portions of their HealthSouth common stock, ranging from

53%-100% of their holdings.    Moreover, defendants began their selling spree within weeks of the effective date of the BBA i.e., 10/1/97.  Defendants also used the inflated HealthSouth shares to acquire existing medical operations.  For example, HealthSouth used its shares to acquire  NSC for approximately $590 million in HealthSouth stock, a transaction that was completed just weeks before HealthSouth stock's precipitous decline which began in late 7/98 and two months before HealthSouth's announcement that it would miss "analysts" estimates and that its growth would decline to 15%. The following chart lists the acquisitions through the use of artificially inflated securities of HealthSouth:

<u>HealthSouth</u>

| <u>Date</u> | Securities<br><u>Issued</u> | <u>Value</u> | <u>Purpose</u> |
|---|---|---|---|
| 10/29/97 | Common Stock | $961 million | Horizon Healthcare<br>acquisition |
| 4/16/98 | Convertible<br>bonds | $567 million | Columbia Surgery Centers<br>purchase |
| 7/22/98 | Common Stock | $590 million | National Surgery Centers<br>purchase |

## JURISDICTION AND VENUE

20.   Jurisdiction exists pursuant to §22 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §77v, and §27 of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §78aa, and 28 U.S.C. §1331.  The claims asserted herein arise under §§11 and 15 of the Securities Act, 15 U.S.C. §§77k and 77o, §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission ("SEC").

21.   Venue is proper in this District pursuant to §22 of the Securities Act, §27 of the Exchange Act and 28 U.S.C. §1391(b). Many of the acts giving rise to the violations complained of

occurred in this District.  HealthSouth maintains its headquarters in this District.

22.  Defendants used the instrumentalities of interstate commerce, including the U.S. mails, and the facilities of the national securities markets.

<u>THE PARTIES</u>

23.  On 1/19/99, the Court, pursuant to §21D(a)(3)(B) of the Exchange Act, appointed the HealthSouth Plaintiffs Group consisting of United Local Food Commercial Workers, Chicagoland Race Meet Operators and Local 134 I.B.E.W. Jt. Pen., Maryann McCord, P.V.B. Capital Management, Trust Advisors Equity Plus, James Totoro, Twin Plus, Dale A. Kirby, Jay Burke and Julius McQueen, The State Employees Retirement System, Commonwealth of Pennsylvania, and The City of Philadelphia through Board of Pensions and Retirement as Lead Plaintiffs.

24.  Defendant HealthSouth is a corporation headquartered in Birmingham, Alabama.  Founded by Richard M. Scrushy, HealthSouth is a national provider of inpatient and outpatient rehabilitation, diagnostic services and outpatient surgery, operating in all fifty states.  During the relevant time period, HealthSouth common stock traded in an efficient market on the New York Stock Exchange under the "HRC" symbol.  HealthSouth has approximately 395 million shares outstanding.  Through facilities called Integrated Service Networks or "Integrated Service Models"), HealthSouth offers rehabilitation, diagnostic and surgery services at a single location, in selected markets throughout the country.

25.  (a)  Defendant Richard M. Scrushy ("Scrushy") is Chairman of the Board, Chief Executive Officer and a founder of HealthSouth.

- 17 -

Scrushy, by reason of his executive position with HealthSouth and Board membership, was a controlling person of HealthSouth and had the power and influence, and exercised the same to cause HealthSouth to engage in the conduct complained of herein. During the Class Period, Scrushy sold 4,000,000 shares of HealthSouth common stock, representing 87% of the HealthSouth stock owned by him for proceeds of $108 million.

(b)   Defendant Larry R. House ("House") was, at all relevant times, a director of HealthSouth. During the Class Period, House sold 482,996 shares of HealthSouth common stock, representing 100% of the HealthSouth stock owned by him for process of more than $13 million.

(c)   Defendant James P. Bennett ("Bennett") was, at all relevant times, the President, Chief Operating Officer and a director of HealthSouth. During the Class Period, Bennett sold 199,900 HealthSouth shares, representing 71% of the HealthSouth stock owned by him for proceeds of more than $5.2 million.

(d)   Defendant Aaron Beam, Jr. ("Beam") was Executive Vice President, Chief Financial Officer and a director of HealthSouth until 10/1/97. Beam continued to be employed by HealthSouth until at least 12/31/97 to facilitate the transition to the new CFO. During the Class Period, Beam sold 100,000 HealthSouth shares representing 65% of the HealthSouth stock owned by him for proceeds of more than $2.7 million.

(e)   Defendant Michael D. Martin ("Martin") was Executive Vice President and Chief Financial Officer as of 10/1/97. Prior to 10/1/97, Martin was Treasurer of the Company for 8 years. During the Class Period, Martin sold 125,000 HealthSouth shares

representing 67% of the HealthSouth stock owned by him for proceeds of more than $3.3 million.

(f) Defendant Anthony J. Tanner ("Tanner") was, at all relevant times, the Executive Vice President and a director of HealthSouth. During the Class Period, Tanner sold 292,750 HealthSouth shares representing 71% of the HealthSouth stock owned by him for proceeds of more than $7.7 million.

(g) Defendant William T. Owens ("Owens") was, at all relevant times, the Group Senior Vice President-Finance and Controller of HealthSouth. During the Class Period, Owens sold 226,000 HealthSouth shares representing 100% of the HealthSouth stock owned by him for proceeds of more than $5.9 million.

(h) Defendant Robert E. Thomson ("Thomson") was, at all relevant times, President and Chief Operating Officer of HealthSouth's Inpatient Division. During the Class Period, Thomson sold 128,500 HealthSouth shares representing more than 98% of the HealthSouth stock owned by him for proceeds of more than $3.3 million.

(i) Defendant Thomas W. Carman ("Carman") was, at all relevant times, Executive Vice President, Corporate Development, of HealthSouth. During the Class Period, Carman sold 200,000 HealthSouth shares representing 56% of the HealthSouth stock owned by him for proceeds of more than $5.2 million.

(j) Defendant P. Daryl Brown ("Brown") was, at all relevant times, President and Chief Operating Officer of HealthSouth's Outpatient Division and a director of HealthSouth. During the Class Period, Brown sold 179,810 HealthSouth shares

representing more than 61% of the HealthSouth stock owned by him for proceeds of more than $4.8 million.

(k)   Defendant Patrick A. Foster ("Foster") was, at all relevant times, President and Chief Operating Officer of HealthSouth's Surgery Division.  During the Class Period, Foster sold 11,200 HealthSouth shares representing 95% of the HealthSouth stock owned by him for proceeds of $296,188.

(l)   Defendant Phillip C. Watkins ("Watkins") was, at all relevant times, a director of HealthSouth.  During the Class Period, Watkins sold 160,000 HealthSouth shares representing more than 53% of the HealthSouth stock owned by him for proceeds of more than $4.2 million.

(m)   Defendant Richard F. Celeste ("Celeste") was, at all relevant times, a director of HealthSouth.  During the Class Period, Celeste sold 60,000 HealthSouth shares representing 100% of the HealthSouth stock owned by him for proceeds of more than $1.6 million.

26.   The above individuals are the "Individual Defendants." They are each liable for the false statements pleaded in ¶¶33, 47, 48, 49, 60, 61, 62, 64, 66, 69, 72, 74, as those statements were "group-published" information.

27.   Individual Defendants Scrushy, Bennett, Beam, Martin, Tanner, Owens, Thomson, Carman, Brown, Beam, and Foster, by reason of their stock ownership and positions with HealthSouth, were controlling persons of HealthSouth.  HealthSouth controlled each of the Individual Defendants.  These controlling persons are liable under the Securities Act §15 and the Exchange Act §20(a).

<u>BACKGROUND TO THE CLASS PERIOD</u>

28.   Since at least 1996, defendants had focused on the ambitious expansion of HealthSouth by using HealthSouth securities to acquire other health care companies.   In January 1996, HealthSouth acquired Surgical Care Affiliates, Inc., which operated 67 surgery centers in 24 states, for almost 46 million shares of HealthSouth stock.   In March 1996, it acquired Advantage Health Corporation for more than 9 million HealthSouth shares and, a year later, Health Images, Inc. for approximately 10 million HealthSouth shares.

29.   On 2/18/97, HealthSouth announced that it had agreed to buy Horizon/CMS Healthcare Corp. for the payment of $961 million in stock and the assumption of $700 million in debt.   Defendant Scrushy stated:

> "Whoever bought this particular company would end up with the largest rehabilitative share in America. <u>We've got a tremendous franchise</u>. . . .  If we were to go out and try to build this network that we're acquiring, it'd take a lifetime. . . .  <u>Once we own these hospitals and these outpatient centers, that pretty much shuts out any other health care company from ever getting into our business in a significant way</u>."

30.   On the same day, in two articles disseminated by <u>Reuters</u>, defendant Scrushy stated:

> "<u>We believe that this transaction will be very positive for the stockholders of both companies</u> as well as to the patients and payors served by our respective facilities. Further, <u>we expect this acquisition to be accretive to 1997 earnings per share</u>, and we believe that the opportunities for revenue enhancement and synergies are comparable to those that we were able to obtain in our other significant acquisitions in the rehabilitation industry."

                          *   *   *

> Scrushy said entrance into these market, which bring HealthSouth's reach to 250 metropolitan areas in all 50

- 21 -

states, would enable the company to get new contracts
with large existing clients such as Wal-Mart Stores . . .
Marriott . . . and Coca-Cola Co . . . .

But he also said the move would put HealthSouth in
the best position to take advantage of anticipated
reforms in Medicare, which he said would enable the
company to make money for the first time from the
government-sponsored health-care plan for the elderly.

"As we see Medicare recipients move into a managed-
care environment, we're going to be sitting there in
every major city in America positioned to contract for
it," he said.

31.  On 4/3/97, Cowen & Co. issued a report on HealthSouth
written by Sullivan after discussions with Scrushy and Beam, which
was based on  and repeated information provided by them.  Scrushy
or Beam reviewed this report before it was issued and assured
Sullivan it was accurate.  HealthSouth copied and distributed it,
adopting it as its own.  The report rated HealthSouth a "strong
buy," contained EPS forecasts of $.93 for 1997 and $1.13 for 1998
and stated:

HRC will present at two investor conferences during the
week of April 14 [97] and report Q1:97 earnings the week
of 4/21.  HRC consistently has demonstrated an ability to
galvanize the company during conference presentations due
to their powerful great strategy, proven track record and
dynamic top management team.  Post the conferences, the
next trigger for HRC will be the Q1:97 earnings release
and conference call the week of 4/21. . . .  The just
released preliminary contract therapy rates enhance the
value of Horizon's $300MM contract therapy business as
uncertainty regarding these rates is beginning to
dissipate. . . .  The implications for HRC is that the
value of Horizon's contract therapy business, (which is
classified as "non-strategic") is now enhanced whether
the business is retained or divested.

32.  During the week of 4/14/97, defendant Scrushy spoke at
two investor conferences.  In the formal presentations and break-
out sessions, he told the assembled analysts, money and portfolio
managers, institutional investors, brokers and stock traders that:

• Same-store sales increases and improvements to recently acquired businesses should easily drive 25% annual earnings growth and provide for upside earnings surprises.

• HealthSouth would continue to grow its revenues by 15%-20% from its current asset base.

• The Horizon acquisition was on track.

• Industry trends were favorable and pricing was stable.

• As a result, HealthSouth could easily achieve 1997 and 1998 EPS of $0.93-$0.94 and $1.15, respectively.

<u>FALSE AND MISLEADING STATEMENTS</u>

33.   On 4/24/97, the start of the Class Period, HealthSouth issued a press release via <u>PR Newswire</u>, which reported the Company's 1Q97 results and was entitled "Health South Reports 29 Percent Increase In Income Per Share."  The release stated:

HEALTHSOUTH Corporation announced today its operating results for the first quarter of 1997.  Income per share rose 29% to 22 cents per share for the quarter ended March 31, 1997, compared to 17 cents per share for the same period in 1996. . . .

"<u>I am pleased to report our 43rd consecutive quarter of meeting or exceeding analysts' expectations</u>," said Richard M. Scrushy . . . .  "During the quarter we signed over 200 contracts with managed care companies and self-insured employers, bringing our total managed care relationships to more than 2,500.  As a result of our continued implementation of the Integrated Service Model and the benefits derived from these contractual relationships, <u>we continued to recognize strong same-store growth in all of our divisions</u>.  Our internal development activities are ahead of schedule . . . .

"In March, we completed the acquisition of Health Images, Inc. and began the integration of these facilities into our national network.  Additionally, <u>we announced the acquisition of Horizon/CMS Healthcare Corporation</u>, the nation's second-largest operator of rehabilitation hospitals.  <u>The acquisition is on track</u> and is expected to close mid-year."

34.   On 4/25/97, Credit Suisse First Boston issued a report on HealthSouth entitled "HRC: Reported Very Strong 1Q Operating Results" by Olwell, written after discussions with Scrushy and

Beam, which was based on and repeated information provided by them. Scrushy or Beam reviewed this report before it was issued and assured Olwell it was accurate. HealthSouth copied and distributed it, adopting it as its own. The report rated HealthSouth a "strong buy," contained EPS forecasts of $.93 for 1997 and $1.15 for 1998 and stated:

> Going forward, we expect to see internal development accelerate. The Horizon/CMS (HHC, $15_, Buy) acquisition gives HRC a meaningful presence 250 out of the nation's 300 largest metropolitan statistical areas (MSAs). In these MSA's, HRC has 90 fully integrated service models (ISMs) up and running. . . . This development activity should help <u>HRC easily maintain internal minimum operating earnings growth of 20%</u>, and increase upside earnings sensitivity in 1998.
>
> <u>Our investment thesis on HRC centers around strong same-store growth</u>, supported by a diverse product menu, superior cost structure, a proven track record of making strategic acquisitions, <u>and favorable industry trends</u>. . . .
>
> Pricing for both inpatient and outpatient rehabilitation remained about flat-to-slightly-up from year ago levels, with volume or patient visits accounting for most of the growth. <u>Because HRC is growing these businesses ahead of industry growth trends, in light of stable prices, we believe that HRC is also gaining market share</u> in some of its markets, and benefiting from its continued national contracts and crossreferral opportunities from the surgery business. . . .

35.   On 4/25/97, Alex. Brown & Sons, Inc. issued a report on HealthSouth entitled "1Q Beat Expectations-Raising 1997 EPS Estimate . . . 'Strong Buy' Rating" by Swenson, written after discussions with Scrushy and Beam which was based on and repeated information provided by them. Scrushy or Beam reviewed this report before it was issued and assured Swenson it was accurate. HealthSouth copied and distributed it, adopting it as its own. The report rated HealthSouth a "strong buy," contained EPS forecasts of $.94 for 1997 and $1.13 for 1998 and stated:

- 24 -

REVIEW OF "STRONG BUY" INVESTMENT RATING

<u>We continue to recommend purchase of HEALTHSOUTH on
the basis of the Company's strategic market
position/vision, accelerating operating performance and
attractive valuation.</u>  We continue to believe that <u>the
Company's earnings will grow at a rate of 25% for the
next 3-5 years</u>.  Our favorable opinion is based on the
following:

\*   \*   \*

INTEGRATED SERVICE MODEL/POSITIONED FOR MANAGED CARE--The
Company's Integrated Service Model (ISM) provides three
major services--inpatient/outpatient rehabilitation and
outpatient surgery--that, when operated as a single
entity, lead to lower costs and potentially better
outcomes. . . .

. . . [M]<u>argins to continue to expand</u> as HEALTHSOUTH
roles out its ISM.  Management has indicated that in
major metropolitan markets, implementation of the ISM can
expand operating margins by 5% due to the economics of
combining marketing, business and office systems.

36.  On 5/29/97, PaineWebber issued a report on HealthSouth
entitled "HEALTHSOUTH: Q2 Update" by O'Donnell, written after
discussions with Scrushy and Beam which was based on and repeated
information provided by them.  Scrushy or Beam reviewed this report
before it was issued and assured O'Donnell it was accurate.
HealthSouth copied and distributed it, adopting it as its own.
The report contained forecasts of $.93 for 1997 and $1.15 for 1998
and stated:

<u>Recent conversations with HEALTHSOUTH suggest a
continuation of the strong utilization gains seen in the
past two quarters. Management remains comfortable with
our EPS estimate of $0.23 for the June quarter, a 25%
increase</u>.

\*   \*   \*

Recent conversations with HEALTHSOUTH suggest a
continuation of strong utilization trends across all
business lines, similar to the results of the first
quarter. . . .

- 25 -

37.   The statements between 4/24/97-5/29/97 were false or misleading for the reasons set forth in detail in ¶¶14-16.

38.   On 6/24/97, J.P. Morgan Securities, Inc. issued a report on HealthSouth by Chiarelli entitled "HEALTHSOUTH: Initiating Coverage With A Buy And A $34 Price Target." Because this was J.P. Morgan Securities Inc.'s first report on HealthSouth, it was issued only after Chiarelli had extensive discussions with Scrushy and Beam and was based on and repeated information provided by them. Scrushy or Beam reviewed this report before it was issued and assured Chiarelli it was accurate.   HealthSouth copied and distributed it, adopting it as its own.   The report rated HealthSouth a "buy," contained EPS forecasts of $.93 for 1997 and $1.15 for 1998 and stated:

> Management's vision drives growth and margin expansion.   Management's strategy is to create a national, high-quality, cost effective healthcare system through acquisitions and internal growth. Since 1984, HEALTHSOUTH's management has met each goal it has set. Implementing the Integrated Service Model in targeted markets is the next step. The pending $1.65 billion acquisition of Horizon/CMS is an accelerated step in this direction. We expect attainment of this goal, along with benefits still to be realized from completed acquisitions, to drive margin expansion and earnings growth over the next three years.

39.   On 7/17/97, Credit Suisse First Boston issued a report on HealthSouth entitled "HRC: Impressive 2Q EPS Of $0.23" by Olwell, written after discussions with Scrushy and Beam which was based on and repeated information provided by them.   Scrushy or Beam reviewed this report before it was issued and assured Olwell it was accurate.   HealthSouth copied and distributed it, adopting it as its own.   The report rated HealthSouth a "strong buy," contained EPS forecasts of $.94 for 1997 and $1.15 for 1998 and stated:

- 26 -

Today, HRC reported impressive 2Q97 operating results, surpassing our expectations. Solid revenue gains across all businesses and operating margin improvements drove superior results. <u>Same-store growth trending ahead of industry growth would indicate that HRC is gaining marketshare; such growth and ensuing margin improvement will continue to drive earnings momentum for the next several years</u>. We reiterate our Strong Buy rating.

40. On 8/1/97, PaineWebber issued a report on HealthSouth entitled "HealthSouth: Medicare Budget Changes," written by O'Donnell after discussions with Scrushy and Beam which was based on and repeated information provided by them. Scrushy or Beam reviewed this report before it was issued and assured O'Donnell it was accurate. HealthSouth copied and distributed it, adopting it as its own. The report contained EPS forecasts of $.93 for 1997 and $1.15 for 1998 and stated:

KEY POINTS

<u>The Medicare budget reconciliation act passed by the House and Senate this week includes several changes related to hospitals exempt from the prospective payment system, including HEALTHSOUTH's rehabilitation hospitals. We do not expect these changes to result in any revision to our current EPS estimates</u>.

* * *

In 1996, Medicare accounted for 37.8% of HEALTHSOUTH's revenues and its largest concentration of Medicare revenues is in its rehabilitation hospitals. <u>From our discussions with management, the budget changes will result in some reductions in reimbursement initially but-they are not expected to be large enough to result in earnings estimate revisions</u>. . . .

41. On 8/12/97, defendant Scrushy had private one-on-one conversations with securities analysts, including O'Donnell of PaineWebber and Olwell of Credit Suisse First Boston. Several of these conversations occurred at HealthSouth's headquarters in

Birmingham, Alabama.    During these conversations, Scrushy told O'Donnell and Olwell that:

- There was no fundamental reason for the recent decline in the price of HealthSouth's common stock and HealthSouth's fundamental growth prospects remained intact.

- Same-store sales increases and improvements to recently acquired businesses should easily drive 25% annual earnings growth and provide for upside earnings surprises.

- HealthSouth could continue to grow its revenues by 15%-20% from its current asset base.

- The closure of the Horizon acquisition was imminent and extremely important to HealthSouth, for once it was in place, HealthSouth would have its essential business platform for growth in place, achieve significant same-store cost reductions and meaningfully accelerate internal development between 1998-2000.

- As a result, HealthSouth could easily achieve 1997 and 1998 EPS of $0.93-$0.94 and $1.15, respectively.

42.    On 8/13/97, Credit Suisse First Boston issued a report on HealthSouth entitled "HRC: One-On-One Meeting With Senior Management" by Olwell, written after discussions with Scrushy and Beam which was based on and repeated information provided by them. Scrushy or Beam reviewed this report before it was issued and assured Olwell it was accurate. HealthSouth copied and distributed it, adopting it as its own. It stated:

> One-on-one meeting with senior management.  Same-store growth and operating trends remain very strong across every one of HRC's businesses.  Including the imminent acquisition of Horizon/CMS Healthcare Corporation, HRC is poised for tremendous internal growth and development activity over the next several quarters.  HRC should be considered a core holding for any health care and growth investment portfolio.

43.    On 8/14/97, Cowen & Co. issued a report on HealthSouth entitled "Post Acute Washington Reimbursement Changes" by Sullivan, written after discussions with Scrushy and Beam which was based on and repeated information provided by them.    Scrushy or Beam

- 28 -

reviewed this report before it was issued and assured Sullivan it was accurate.  HealthSouth copied and distributed it, adopting it as its own.  It stated:

> HEALTHSOUTH (HRC):  <u>HRC will emerge relatively unscathed</u>
> <u>post the adoption of any potential rehab and outpatient</u>
> <u>changes that we believe could be adopted</u>.
>
> Inpatient Rehab - Inpatient rehab is roughly 44% of total revenues (pre-Horizon acquisition) with half of these coming from the Medicare program.  <u>Internal</u>
> <u>budgeting and Street guidance assume zero TEFRA rate</u>
> <u>increases in 1998 and account for the 15% capital cost</u>
> <u>reduction</u>.  Regarding rebasing of TEFRA limits and reducing incentive payment amounts (from the current 5% of target to 3% of target), we believe <u>these to be two</u>
> <u>easy cuts to manage through given the nominal % of</u>
> <u>revenues exposed as well as the fact that these revenues</u>
> <u>are being slightly reduced, and not eliminated</u>
> <u>altogether</u>.
>
> Outpatient Rehab And Surgery Center - Outpatient and surgery center revenues are roughly 18% and 20% of total HRC revenues (again pre-Horizon).  <u>Medicare represents</u>
> <u>less than 10% of outpatient revenues and less than 20% of</u>
> <u>surgery center revenues.  As previously mentioned, we</u>
> <u>believe there</u> to be little likelihood of the adoption of an outpatient PPS in the near future. Coupled with HRC's low Medicare exposure in these two divisions, <u>we believe</u>
> <u>there to be little impact on HRC</u>.

44.   On 9/3/97, HealthSouth announced that it had agreed to acquire ASC Network Corp. for $180 million in cash and assumed debt.   ASC Network operated 29 surgery centers throughout the country.   In connection with this announcement, defendant Scrushy spoke to securities analysts, including Jean Swenson at Alex. Brown, Sullivan at Cowen & Co. and Olwell.   During those conversations, Scrushy stated:

> •   The acquisition of ASC Network had expanded HealthSouth's Integrated Service Model which was key to HealthSouth's ability to continue to report growth in annual EPS of 25%.
>
> •   The acquisition of Horizon would close in mid-October 1997.

- As HealthSouth continued to roll out its Integrated Service Model in additional major metropolitan markets, margins would improve.

- HealthSouth remained on track and, given its same-store sales growth and operating leverage, HealthSouth would continue to post annual EPS growth of 20%-25% and 1997 and 1998 EPS of $0.93 and $1.13-$1.15, respectively.

45. On 9/3/97, Cowen & Co. issued a report on HealthSouth by Sullivan, written after discussions with Scrushy and Beam which was based on and repeated information provided by them. Scrushy or Beam reviewed this report before it was issued and assured Sullivan it was accurate. HealthSouth copied and distributed it, adopting it as its own. The report rated HealthSouth a "buy," contained EPS forecasts of $.93 for 1997 and $1.13 for 1998 and stated:

> We are positive on HRC's prospects as it closes on the sizeable Horizon acquisition and expands its integrated networks through smaller acquisitions and a high level of internal development. HEALTHSOUTH's ability to consolidate the rehab and surgery center industries has resulted in market share gains and improving margins. These favorable trends should continue as HRC adds full-scale integrated rehab and surgery networks throughout the country. We continue to view HRC as a predictable high quality 20-25% grower, with 1997 EPS at the high end of this range and 1998 potentially moving up to +25% as the pending Horizon acquisition is integrated.

46. The statements issued between 6/24/97-9/3/97 were false or misleading for the reasons set forth in detail in ¶¶14-16.

47. On 10/29/97, HealthSouth completed the acquisition of Horizon by merger for approximately $960 million in stock and the assumption of approximately $700 million in debt. In connection with the acquisition of Horizon, HealthSouth issued a Registration Statement and Prospectus which: (i) set forth an unaudited balance sheet of HealthSouth as of 6/30/97, and unaudited statements of operation for HealthSouth for the six months ended 6/30/97, and twelve months ended 12/31/96; (ii) provided forecasts based upon

- 30 -

projections provided by HealthSouth and its management to Merrill Lynch Pierce Fenner & Smith Incorporated ("Merrill Lynch"); and (iii) described in positive terms the relationship which HealthSouth had with its managed care providers.  On page 18 of the Prospectus, dated 9/26/97, the risk factors regarding the merger are outlined.  HealthSouth stated:

> Substantially all of HEALTHSOUTH's revenues are derived from private and governmental third party payors (in 1996, approximately 37.8% from Medicare and approximately 62.2% from commercial insurers, managed care plans, workers' compensation payors and other private pay revenue sources).  There are increasing pressures from many payor sources to control healthcare costs and to limit increases in reimbursement rates for medical services.  There can be no assurances that payments under governmental and third party payor programs will remain at levels comparable to present levels.  In attempts to limit the federal budget deficit, there have been, and HEALTHSOUTH expects that there will continue to be, a number of proposals to limit Medicare reimbursements for certain services. HEALTHSOUTH cannot now predict whether any of these pending proposals will be adopted or, if adopted and implemented, what effect such proposals would have on HEALTHSOUTH.

These "risk factors" were false and misleading because, as described in detail in ¶¶14-16, HealthSouth's business, and prospects were already being materially impacted by the BBA.

48.  On page 42 of the Prospectus, dated 9/26/97 the investment banker, Merrill Lynch, recommended the proposed merger based upon HealthSouth's forecasts for FY96-FY2000:

> Merrill Lynch reviewed HealthSouth's historical financial performance for FY 1994 through FY 1995 and its projected financial performance as set forth in HealthSouth's Forecast for FY 1996 through FY 2000, based on HealthSouth's public documents (with respect to its historical and financial performance) and HealthSouth's Forecast.   Merrill Lynch reviewed (i) HealthSouth's annual percentage revenue and EPS growth from FY 1994 through FY 1995 and HealthSouth's forecasted percentage revenue and EPS growth from FY 1996 through FY 2000 and (ii) HealthSouth's annual incremental EBITDA and EBIT growth from FY 1994 through FY 1995 and HealthSouth's

- 31 -

forecasted annual incremental EBITDA and EBIT growth from FY 1996 through FY 2000 and (ii) (sic) HealthSouth's EBITDA, forecasted EBITDA, EBIT and forecasted EBIT as a percentage of HealthSouth's revenue or forecasted revenue, as the case may be, for the same periods.

49.  On 10/30/97, HealthSouth reported that, for 3Q97, its earnings rose to $0.24 per share from $0.19 per share in 3Q96. Defendant Scrushy stated:

> In the third quarter, <u>we achieved record profitability, continued to execute our internal growth strategy</u>, and closed the ASC Network acquisition. . . . <u>Continued same-store growth</u>, increased internal development, and expense controls drove our increased profitability. . . .
>
> <u>We are also pleased to announce the closing of the Horizon/CMS acquisition</u> on October 29, which adds over 300 new inpatient and outpatient rehabilitation locations <u>which we believe present excellent opportunities for growth</u>. We look forward to the integration of the Horizon/CMS facilities into our national network, which will allow us to even better serve our patients and payors.

50.  In connection with this announcement, HealthSouth held a conference call with large institutional investors and securities analysts including Chiarelli of J.P. Morgan Securities, O'Donnell and Swenson.  During that call and in private one-on-one conversations with Chiarelli, O'Donnell and Swenson thereafter, Scrushy stated:

- He was very positive about HealthSouth's performance, which was strong across the board.

- HealthSouth had over 1500 projects in its acquisition pipeline with approximately $3.5 billion in revenues.

- Sales volume remained strong.

- Pricing remained stable.

- HealthSouth continued to build its managed care business, signing up 300 new contracts during the quarter, which was a positive development.

• As a result, HealthSouth would meet 1997 and 1998 EPS estimates of $0.93-$0.94 and $1.15, respectively.

51. On 11/3/97, HealthSouth announced that it had sold certain non-strategic assets of Horizon for $1.25 billion in cash. In connection with that announcement, as reflected in the 11/4/97 <u>San Antonio Express-News</u>, Scrushy stated: "We're sitting here loaded with a billion in cash. . . . <u>It's all opportunity</u>."

52. On 11/6/97, defendant Scrushy sold 4 million HealthSouth shares, 87% of his holdings, for $27 per share, or $108 million. To allay concern about his planned bailout, Scrushy indicated that he wanted to exercise expiring options before knowledge of another pending transaction blocked him from trading. Commenting on the huge sale, as reported in <u>Bloomberg</u> Scrushy stated: "It's what any normal red-blooded American would do."

53. The statements issued between 10/30/97-11/6/97 were false or misleading for the reasons set forth in detail in ¶¶14-16.

54. Between 11/6/97 and 11/28/97, the Individual Defendants embarked upon a torrential selling spree dumping over 6 million shares for proceeds of more than $160 million.

55. On 1/16/98, Medpartners issued a press release via <u>PR Newswire</u> regarding the termination of PhyCor's agreement to acquire Medpartners and the appointment of defendant Scrushy as Chairman and Acting Chief Executive Officer of Medpartners. In connection with that press release, Scrushy stated:

> "First and foremost, I will be continuing in all my current roles and responsibilities with HEALTHSOUTH. <u>I could only undertake this assignment knowing that HEALTHSOUTH has a deep pool of talented executives, is in solid financial position, is producing consistent financial results, and is successfully executing its strategic plan</u>."

56.  On 2/16/98, analyst Sullivan of Cowen & Co. met with defendants Scrushy, Martin, Bennett and Thomson at the HealthSouth headquarters in Birmingham, Alabama.    During that meeting defendants Scrushy, Martin, Bennett and Thomson stated:

- HealthSouth only had Integrated Service Networks in 96 of the 300 largest metropolitan areas and thus HealthSouth still had plenty of growth ahead.

- HealthSouth still had numerous acquisition opportunities.

- The budget process for 1998 had recently been completed and they each felt very comfortable with HealthSouth's budget, which called for 1998 EPS growth of 25%, which HealthSouth would meet or exceed.

- HealthSouth would meet or exceed 1999 EPS growth expectations of 20%-25%.

- As a result, HealthSouth would meet 1997, 1998 and 1999 EPS estimates of $0.93-$0.94, $1.14 and $1.40, respectively.

57.  On 2/17/98, Cowen & Co. issued a report on HealthSouth by Sullivan, written after discussions with Scrushy and Martin and which was based on and repeated information provided by them. Scrushy or Martin reviewed this report before it was issued and assured Sullivan it was accurate.    HealthSouth copied and distributed it, adopting it as its own.    The report rated HealthSouth a "strong buy," contained EPS forecasts of $1.15 for 1998 and $1.40 for 1999 and stated:

Visit Reinforces Stellar Outlook- Yesterday we visited HRC's headquarters in Birmingham.    We met with CEO Richard Scrushy, CFO Michael Martin, COO Jim Bennett and the head of HRC's inpatient division, Robert Thompson.    We maintain our 1-strong buy rating on HRC. Post our corporate headquarters visit and meetings with top management we believe earning visibility on HRC's EPS is one of the highest in the health care services universe.

58. On 2/25/98, HealthSouth announced via PR Newswire that, for 1997, its earnings rose to $0.94 from $0.74 in the previous year. Defendant Scrushy stated:

> "HEALTHSOUTH's 46th quarter of meeting or exceeding analysts' expectations demonstrates our ability to consistently produce superior financial results . . . . In 1997, we added over 275 new locations through internal development, completed the Health Images acquisition in March, closed the ASC Network acquisition in September, and completed the Horizon/CMS acquisition in October. On December 31, 1997, HEALTHSOUTH completed the divestiture of the Horizon/CMS long-term care assets for $1.25 billion. This significantly strengthened our balance sheet, leading to our recent upgrade by both Standard & Poor's and Moody's to investment grade. We plan to continue executing our strategic plan in 1998 by growing our existing product lines, backed by our added financial strength and ability to deliver consistent financial results."

59. In connection with this announcement, HealthSouth held a conference call, hosted by defendant Scrushy, with institutional investors and securities analysts, including Chiarelli. During that call and in follow-up one-on-one conversations thereafter, defendant Scrushy stated:

- He was very positive about HealthSouth's financial performance and position.

- HealthSouth's business was strong across all business lines and experiencing substantial growth.

- Managed care contracts were driving the same-store sales growth.

- HealthSouth's acquisition pipeline remained full.

- HealthSouth continued implementation of its Integrated Service Model.

- HealthSouth had a significant competitive pricing advantage in that its Medicare costs were 40% of the industry average ($10,230 cost per discharge vs $19,250).

- HealthSouth continued to execute its strategic plan.

- 35 -

- As a result, Scrushy remained comfortable that HealthSouth would meet 1998 and 1999 EPS estimates of $1.15 and $1.40, respectively.

The statements issued between 1/16/98-2/25/98 were false or misleading for the reasons set forth in detail in ¶¶14-16.

60. On or about 3/20/98, HealthSouth commenced an offering of $567,750,000 3.25% convertible subordinated debentures (the "Offering"), which were convertible into HealthSouth common stock at a price of $36.25. These securities were priced, in large part, based upon the performance of HealthSouth's common stock and the financial position of HealthSouth.

61. In connection with the Offering, HealthSouth issued a Registration Statement and Prospectus which stated:

REIMBURSEMENT BY THIRD-PARTY PAYORS

Substantially all of HEALTHSOUTH's revenues are derived from private and governmental third-party payors (in 1997, approximately 36.9% from Medicare and approximately 63.1% from commercial insurers, managed care plans, workers' compensation payors and other private pay revenue sources). There are increasing pressures from many payor sources to control healthcare costs and to limit increases in reimbursement rates for medical services. There can be no assurances that payments under governmental and third-party payor programs will remain at levels comparable to present levels. In attempts to limit the federal budget deficit, there have been, and HEALTHSOUTH expects that there will continue to be, a number of proposals to limit Medicare reimbursements for certain services. HEALTHSOUTH cannot now predict whether any of these pending proposals will be adopted or, if adopted and implemented, what effect such proposals would have on HEALTHSOUTH.

The registration statement was misleading because it failed to disclose that HealthSouth's short term EPS growth was generated by its massive acquisitions which it would be unable to sustain, and that HealthSouth could not grow its EPS by 20% annually in 1998 and 1999, The Registration Statement also misleadingly suggested that

there were only pressures "from payor sources . . . <u>to limit
increases in reimbursement rates</u> for medical services."  However
the Registration Statement  failed to disclose that HealthSouth's
managed care customers had been seeking significant price
reductions on existing contracts and delaying payments to
HealthSouth for services it had rendered.  Moreover, the "risk
factors" were false and misleading because, as described in detail
in ¶¶14-16, HealthSouth's business and prospects were already being
materially impacted by the BBA.

62. On 4/2/98, HealthSouth filed with the SEC its Annual
Report on Form 10-K for fiscal year 1997 ("1997 10-K"), ended
12/31/97.  The 1997 10-K stated:

> As the largest provider of outpatient surgery and
> rehabilitative healthcare services in the United States,
> the Company is able to realize economies of scale and
> compete successfully for national contracts with large
> payors and employers while retaining the flexibility to
> respond to particular needs of local markets.  The
> national network affords the company to offer large
> national and regional employers and payors the
> convenience of dealing with a single provider, to utilize
> the convenience of dealing with a single provider, to
> utilize greater buying power through centralized
> purchasing, to achieve more efficient costs of capital
> and labor and to more effectively recruit and retain
> physicians.

> In order to participate in the Medicare program and
> receive Medicare reimbursement, each facility must comply
> with the applicable regulations of the United States
> Department of Health and Human Services. . . .  The
> Company has developed its operational systems to assure
> compliance with the various standards and requirements of
> the Medicare program and has established ongoing quality
> assurance activities to monitor compliance.  <u>The Company
> believes that all of such facilities currently meet all
> applicable Medicare requirements</u>.

> As part of the Balanced Budget Act of 1997, Congress
> directed the United States Department of Health and Human
> Services to develop regulations that would subject
> inpatient rehabilitation hospital [sic] to a PPS.  The
> prospective rates are to be phased in beginning October

- 37 -

1, 2000, and are to be fully implemented on October 1, 2002. The Act requires that the rates must be equal to 98% of the amount of payments that would have been made if the PPS had not been adopted. In addition, payments that would have been made if the PPS had not been adopted. In addition, the Act requires the establishment of a PPS for hospital outpatient department services, effective for services furnished beginning in 1999. <u>Since the drafting of the regulations covering these initiatives is in very early stages, the Company cannot predict at this time the effect that any such changes may have on its operations</u>.

63.  On 4/1/98, Cowen & Co. issued an industry report on Health Care service stocks, by Anon, written after discussions with Scrushy and Martin which was based on and repeated information provided by them.  Scrushy or Martin reviewed this report before it was issued and assured Anon it was accurate.  HealthSouth copied and distributed it, adopting it as its own.  It stated:

> After beating the performance of the S&P 500 for the first nine months of 1997, the post acute care stocks started to show some weakness in Q4:97 and continued to do so in Q1:98.  The weakness was tied to industry skittishness over to the <u>impact</u> of the impending changes in reimbursement called for in the <u>Balanced Budget Act</u> of 1997.  We expect the post acute care stocks to muddle along until visibility on prospective payment increases, in spite of any positive news on an individual company basis.  <u>Due to our lukewarm opinion of the nursing home stocks until reimbursement uncertainty clears, we rate only one post acute stock strong buy.  HEALTHSOUTH, the industry leader in rehab and outpatient surgery, has a solid fundamental outlook, strong competitive position, and little exposure to reimbursement changes</u>.  We rate RehabCare and Manor Care to buy.

> \* \* \*

> No News on Progress Of Rehab and Long Term Hospital PPS

> Changes in the rehab and long term hospital area included in the Balanced Budget Act of 1997 include a two step process: 1) reduce the maximum TEFRA target amount (facility-specific maximum reimbursement amount per discharge) to the 75th percentile and reduce the "incentive" payments (bonus payment if a facility's costs are less than the target amount); and 2) change to prospective payment reimbursement for long terms hospitals (phase-in starting 10/1/99) and inpatient rehab

- 38 -

(phase-in starting 10/1/00).  The impact of #1 is mixed.
Vencor's long term hospital division will experience a
revenue and margin hit (enough to flatten margins and
earnings in Q4:98, the first quarter to change will be in
place of Vencor).  <u>HRC, on the other hand, has estimated
that, the annualized hit to revenues will approximate
$10MM, with no impact on earnings estimates</u>.  The impact
of #2 on operators is much the same as for the nursing
homes: low cost operators will benefit from the change,
being able to keep all of the difference between the
prospective payment amount and their cost of delivering
care.  That being said, HCFA has been more focused on the
near term regulations for nursing homes, so while rehab
and long-term hospital prospective payment are still
slated to happen, there has been relatively little
progress on these projects.

64.  On 4/16/98, HealthSouth announced that it had acquired 34

outpatient surgery centers from Columbia/HCA for $550 million.

Defendant Scrushy stated:

> "They're outstanding centers and they're in great
> locations. . . .  <u>It really prevents anyone else from
> being able to build the position that we have in this
> business</u>."

65.  In connection with this announcement, HealthSouth held a

conference call, hosted by defendant Scrushy, with institutional

investors and securities analysts, including Sullivan, Swenson and

Chiarelli.  During that call and in follow-up one-on-one

conversations thereafter, Scrushy stated:

- HealthSouth's management team would improve the operating
results of the assets it acquired from Horizon.

- HealthSouth still had plenty of room to grow as Integrated
Service Networks were only in 96 of the top 300 markets.

- Revenues in Integrated Service Networks had the potential
to improve 20%-25% with cross-referrals from other HealthSouth
facilities.

- Margins in Integrated Service Networks were typically 3%-5%
higher than conventional stand-alone facilities.

- As a result, HealthSouth's EPS would continue to grow at
20%-25% annually for the next three years and achieve
analysts' EPS estimates of $1.15 in 1998 and $1.40 in 1999.

66.   On 4/21/98, HealthSouth announced via <u>PR Newswire</u> that, for 1Q98, its earnings rose to $0.27 per share from $0.22 per share in 1Q97.   Defendant Scrushy stated:  "[W]e just blew it out with development."   He further stated:

> "<u>I am pleased to report our 47th consecutive quarter of meeting or exceeding analysts' expectations</u>. . . . During the first quarter of 1998, <u>we continued the successful integration</u> of our major 1997 acquisitions and the implementation of our Integrated Service Model.   In addition, we added 106 new facilities through our internal development program and <u>continued to recognize strong same-store growth in all divisions</u>.   During the quarter, we also received investment-grade ratings from Standard & Poor's and Moody's and capitalized on the upgrade to raise nearly $568 million in an institutional private placement of convertible debentures.   <u>As we move into the second quarter, we have continued to further our strategic plan with last week's announcement of HEALTHSOUTH's pending acquisition of 34 ambulatory surgery centers from Columbia/HCA</u>."

67.   In   connection   with   the   foregoing   announcement, HealthSouth held a conference call, hosted by defendant Scrushy, for  institutional  investors  and  securities  analysts,  including Swenson, Chiarelli and Sullivan.   During that call and in follow-up one-on-one conversations thereafter, Scrushy stated:

- He was very positive about HealthSouth's performance and prospects, and HealthSouth's business was strong across all business lines.

- Managed care contracts were continuing to drive incremental volume to HealthSouth's facilities and were boosting revenue, margins and earnings growth.

- The continued implementation of the Integrated Services Model would increase margins and position HealthSouth for managed care.

- As a result, HealthSouth could continue to grow its earnings at an annual rate of 20%-25%, and thereby meet EPS estimates of $1.15-$1.16 in 1998 and $1.40 in 1999.

68.   On 4/22/98, J.P. Morgan issued a report on HealthSouth by Chiarelli, written after discussions with Scrushy and Martin which

was based on repeated information provided by them.    Scrushy or Martin reviewed the report and assured Chiarelli it was accurate. HealthSouth copied and distributed it, adopting it as its own. The report rated HealthSouth a "buy," contained EPS forecasts of $1.16 for 1998 and $1.40 for 1999 and stated:

> HealthSouth reported first quarter earnings of $0.27 per share, $0.01 above consensus.    Management was very positive on yesterday's conference call, and results were strong across all business lines.

69.    On 5/6/98, HealthSouth announced via <u>PR Newswire</u> that it had signed an agreement to acquire NSC for $590 million in HealthSouth stock.    Under the terms of the deal, HealthSouth would pay no less than 0.8714 shares of HealthSouth stock valued at $30.50 and no more than 1.1509 shares of HealthSouth stock for each share of NSC stock.    Defendant Scrushy stated:

70.    In connection with this announcement, HealthSouth held a conference call, hosted by defendant Scrushy, for institutional investors and securities analysts, including Sullivan, Swenson, O'Donnell, A.J. Rice ("Rice") of Bear Stearns and Chiarelli. During that call or in follow-up one-on-one conversations thereafter, defendant Scrushy stated:

- HealthSouth's business remained strong.

- The acquisition of NSC increased the likelihood that HealthSouth would continue to achieve 20%-25% annual EPS growth.

- HealthSouth continued to implement its Integrated Service Model, which was designed to produce higher margins.

- As a result, he remained confident that HealthSouth would achieve EPS estimates of $1.15-$1.16 in 1998 and $1.40 in 1999.

71.    The statements issued between 3/20/98-5/6/98 were false or misleading for the reasons set forth in detail in ¶¶14-16.

- 41 -

72.   On 7/21/98, HealthSouth announced via <u>PR Newswire</u> that, for 2Q98, its EPS rose to $0.28 from $0.23 in 2Q97.  In connection with this announcement, defendant Scrushy stated:

> "I am very pleased to report our operating results for the second quarter of 1998 . . . .  During the quarter we continued our focus on internal growth as well as agreeing to acquire National Surgery Centers, Inc. and over 30 outpatient surgery centers from Columbia/HCA Healthcare Corporation.  <u>Our financial performance remained strong as we benefited from the profitability associated with strong same-store growth, as well as from economies of scale and expense controls</u>.
>
> <u>We were pleased to close the Columbia/HCA acquisition on July 1, 1998.  With an 85% overlap with HEALTHSOUTH markets, we expect that this acquisition will be immediately accretive to earnings and contribute to our integrated service model development</u>.  I am also pleased to announce the expected closing of the National Surgery Centers acquisition later this week."

73.   In connection with this press release, HealthSouth held a conference call, hosted by defendant Scrushy, for institutional investors and securities analysts.  During that call and in private one-on-one conversations with Swenson, Sullivan and Chiarelli thereafter, Scrushy stated:

- He was very positive regarding HealthSouth's performance and position.

- During the quarter, HealthSouth added 577,000 new lives to its Integrated Services Division, a positive development.

- The Integrated Services Division, coupled with managed care contracts, was continuing to drive incremental volume to HealthSouth facilities and thereby enhancing revenue, margin and earnings growth.

- As a result, HealthSouth's same-store sales growth remained strong.

- HealthSouth had an acquisition pipeline of approximately 1,500 candidates, with approximately $3.5 to $4 billion in revenues.

- As a result, HealthSouth would be able to grow its revenues at the rate of 15%-20% through the year 2001.

- As a result, HealthSouth would be able to grow its earnings at 20%-25% in 1998 and 1999 and thereby meet EPS estimates of $1.15 in 1998 and $1.40 in 1999.

74.   During the week of 7/20/98, HealthSouth completed the acquisition of NSC by issuing 1.0972 shares of HealthSouth stock for each share of NSC stock, or stock worth approximately $590 million.   In connection with the acquisition of NSC, HealthSouth issued a Registration Statement and Prospectus which:   (i) set forth an unaudited balance sheet of HealthSouth as of 6/30/97 and unaudited statements of operation for HealthSouth for the six months ended 6/30/97 and twelve months ended 12/31/96; and (ii) described in positive terms the relationship which HealthSouth had with its managed care providers.   In the Prospectus, risk factors regarding the merger were outlined.   HealthSouth stated:

> Substantially all of HEALTHSOUTH's revenues are derived from private and governmental third-party payors (in 1997, approximately 36.9% from Medicare and approximately 63.1% from commercial insurers, managed care plans, workers' compensation payors and other private pay revenue sources).   There are increasing pressures from many payor sources to control healthcare costs and to limit increases in reimbursement rates for medical services.   There can be no assurances that payments under governmental and third-party payor programs will remain at levels comparable to present levels.   In attempts to limit the federal budget deficit, there have been, and HEALTHSOUTH expects that there will continue to be, a number of proposals to limit Medicare reimbursements for certain services.   HEALTHSOUTH cannot now predict whether any of these pending proposals will be adopted or, if adopted and implemented, what effect such proposals would have on HEALTHSOUTH.

These "risk factors" were false and misleading because, as described in detail in ¶¶14-16, HealthSouth's business and prospects were already being materially impacted by the BBA.

75.   Between 7/20/98-7/27/98, HealthSouth's shares fell by approximately 15.5%. <u>As a result, analyst Chiarelli of J.P. Morgan</u>

- 43 -

called HealthSouth on or about 7/21/98 and spoke extensively with
its management, including defendants Scrushy and Martin. During
those extensive conversations, defendants Scrushy and Martin
stated:

- The decline in HealthSouth's shares had no basis in fact
and was not due to any fundamental reason.

- They had the conviction that HealthSouth would achieve
EPS of $0.30, $0.31 and $1.15 in 3Q98, 4Q98 and 1998,
respectively.

- The Company continued to experience solid increases in
same-store sales growth in all of its divisions.

- The Company expected strong internally generated growth
through 1999 and, as a result, it would have no difficulty in
achieving EPS of $1.40 (or 21% growth over 1998).

76.   On 7/22/98, J.P. Morgan issued a report on HealthSouth by
Chiarelli, written after discussions with Scrushy and Martin which
was based on information and repeated information provided by them.
Scrushy or Martin reviewed the report and assured Chiarelli it was
accurate.   HealthSouth copied and distributed it, adopting it as
its own.   The report rated HealthSouth a "buy," contained EPS
forecasts of $1.16 for 1998 and $1.40 for 1999 and stated:

> We have had [sic] spoken extensively with management and
> feel confident that there are no issues regarding the
> company's Medicare billing practices, and we do not
> believe the company would acquire operations which are
> inconsistent with current operations and earnings growth.
> In  our  discussion  with  management,  we  reviewed
> acquisitions made over the past five years, and we are
> comfortable that there are no issues that could prompt a
> Federal  investigation  regarding  Medicare  billing
> practices. . . . Same-facility growth continues to drive
> revenue.   The company continues to experience solid
> increase in same-facility growth in all of its divisions.

77.   Between 7/27/98-8/14/98, the price of HealthSouth stock
remained particularly weak. As a result, analyst Sullivan of Cowen
& Co. contacted HealthSouth and spoke with its management,

including defendants Scrushy and Martin. During those conversations, which occurred on 8/13/98, Scrushy and Martin stated:

- HealthSouth was not being adversely impacted by HMOs' efforts to obtain price reductions.

- HealthSouth had already negotiated discounted fees in exchange for volume contracts and HealthSouth, given its cost advantage, would not be adversely impacted.

- There was <u>no change in operating trends</u> at HealthSouth.

78. Between 8/4/98-8/14/98, analyst Rice of Bear Stearns also had several conversations with HealthSouth management, including defendants Scrushy and Martin, regarding the weakness in HealthSouth's share price. During those conversations, defendants Scrushy and Martin stated:

- <u>There had been no change in the favorable fundamentals enjoyed by HealthSouth</u>.

- <u>The operating trends at HealthSouth had changed little</u> from the 23% increase in EPS HealthSouth achieved in 2Q98.

79. Between 7/27/98 through and including 9/13/98, analyst Chiarelli of J.P. Morgan <u>spoke extensively</u> with HealthSouth's management, including defendants Scrushy and Martin, in private one-on-one conversations. During those conversations, defendants Scrushy and Martin stated:

- The decline in HealthSouth's shares had no basis in fact and was not due to any fundamental reason.

- <u>They had the conviction that HealthSouth would achieve $0.30, $0.31 and $1.15 EPS in 3Q98, 4Q98 and for the full-year 1998, respectively</u>.

- The Company continued to experience solid increases in same-store sales growth in all of its divisions.

- The Company expected strong internally generated growths through 1999 and, as a result, it would have no difficulty in achieving EPS of $1.40 (or 21% growth over 1998).

80.   On 8/14/98, Bear Stearns issued a report on HealthSouth by Rice/Tom Gallucci, written after discussions with Scrushy and Martin which was based on and repeated information provided by them.   Scrushy or Martin reviewed this report before it was issued and assured Rice and Gallucci it was accurate.   HealthSouth copied and distributed it, adopting it as its own.   The report rated HealthSouth a "buy," contained EPS forecasts of $1.16 for 1998 and $1.40 for 1999 and stated:

> We have had several conversations with management over the last 10 days, and we believe that there has been no change in the favorable fundamentals enjoyed by the company. . . .  HRC posted a 23% increase in EPS during the second quarter, and we believe that the company will post a similar rate of increase for all of 1998.

81.   On 9/14/98, analyst Rice of Bear Stearns spoke with management at HealthSouth, including defendants Scrushy and Martin, regarding the Bear Stearns Healthcare Conference to be held the week of 9/21/98, at which defendant Scrushy was scheduled to speak on 9/25/98.   During those private one-on-one conversations, defendants Scrushy and Martin told Rice that:

- Scrushy hoped to have some "_positive things_" regarding HealthSouth to discuss at the conference.

- HealthSouth's management was frustrated with the recent sell-off in HealthSouth's stock, and Scrushy would address the concerns of investors at the conference.

82.   On Friday, 9/25/98, defendant Scrushy spoke at the Bear Stearns Healthcare Conference.   During the conference, which was attended by numerous securities analysts, including Rice of Bear Stearns, Scrushy stated:

- He was positive and upbeat regarding HealthSouth's prospects.

- 46 -

> • He was confident in the Company's ability to achieve analysts earnings expectations of $0.30, $0.31 and $1.15 for 3Q98 and 4Q98 and 1998, respectively.

83. The statements issued between 7/21/98 and 9/25/98 were false or misleading for the reasons stated in detail in ¶¶14-16.

84. On 9/29/98, HealthSouth's stock price began to collapse, falling from $18-3/8 to $14-5/8, as HealthSouth began to communicate to analysts that it might miss analysts' EPS estimates for 3Q98, 4Q98, 1998 and 1999. Then, on 9/30/98, HealthSouth revealed, in stark contrast to the numerous positive statements defendant Scrushy and HealthSouth management made during the Class Period, that:

(a) It was <u>continuing</u> to see pressure from major managed care firms to renegotiate existing contract terms;

(b) <u>Defendant Scrushy stated it was "being pressured by payors to renegotiate rates and [was] seeing delays in payment under current contracts</u>;"

(c) As a result, HealthSouth could no longer grow its earnings at the historical 20%-25% rate but only a 15%-20% rate going forward; and

(d) As a result, HealthSouth might miss "analysts" earnings estimates in 1998 and 1999.

85. Defendant Scrushy stated: "If we determine that market estimates are out of line with our internal expectations, we will reverse our guidance to the investment community. Until we have completed that process, we believe it is premature to comment on our expectations for the coming months." Scrushy did, however, admit: "[W]e think there will be some adjustment." However, upon this announcement, several analysts revised their 1998 and 1999 EPS

- 47 -

estimates downward and, over the two-day period of 9/29/98-9/30/98, HealthSouth stock collapsed approximately 50% in value from $18-3/8 to $10-1/2 and the price of HealthSouth's 3.25% convertible subordinated debentures declined to approximately 20% below the price at which they were offered. As a result, plaintiffs and the Class suffered hundreds of millions in damage.

86. On 10/14/98, Cowen Securities, Inc. issued a report on HealthSouth by Cederlund, written after discussions with Scrushy and Martin which was based on and repeated information provided by them. Scrushy or Martin reviewed this report before it was issued and assured Cederlund it was accurate. The report stated:

> - $300MM Shortfall From Previous Expectations - HRC management stated that its estimate of the pretax shortfall in 1999 versus prior expectations is $300MM. This is comprised of $100MM from the impact of the Balanced Budget Act Of 1997 and $200MM from a decline in same-store volume growth (down 1-2%) and rates (down 2-4%). The $100MM hit from BBA 1997 was larger than most thought and is likely due to cuts in reimbursement for capital costs and bad debt, modest inpatient rehab cuts tied to lower target rates and incentive payments, and the termination of home health operations. Cost reductions of $50MM included in the guidance could be the low point in a $50-100MM range.

87. On 10/27/98, HealthSouth issued a press release via PR Newswire announcing operating results for the quarter and nine months ended 9/30/98. The release stated:

> The Company also announced that, during the third quarter of 1998, it had adopted a plan to discontinue substantially all of its home health operations, and that implementation of that plan would begin effective November 1, 1998. The Company indicated that it had determined that such operations, which were acquired by the Company as portions of larger strategic acquisitions, were inconsistent with the Company's core business and growth strategy. The Company will incur a one-time charge of approximately $96 million, net of income taxes, in the third quarter to cover expenses and write-offs relating to the termination of such operations, reducing net income per share (assuming dilution) by 22 cents for

- 48 -

the quarter and 23 cents for the nine months ended
September 30, 1998. Arrangements are being made with
other providers for the transition of patients currently
under care by the affected operations.

88.  On or about 11/16/98, HealthSouth filed its 10-Q report
for the quarter ended 9/30/98.  The report stated:

During the third quarter of 1998, the Company adopted a
plan to dispose of or otherwise discontinue substantially
all of its home health operations, effective November 1,
1998.   Such operations, which were acquired by the
Company as portions of larger strategic acquisitions, are
inconsistent with the Company's core business and growth
strategy.   Accordingly, the Company recorded an
impairment loss of approximately $105,339,000 during the
quarter ending September 30, 1998.  The loss represents
the write-down of the home health assets, including
goodwill, to their estimated fair value less the
estimated costs to sell or otherwise dispose of the
assets.

89.  On 12/4/98, the Business Journal-Sacramento reported:

HealthSouth not only shuttered some 30 home health
agencies last month, but it took a $ 105 million charge
on its third-quarter earnings related to the termination
of this sector of the company's business.  HealthSouth
operates six surgery centers, eight rehabilitation
centers and three occupational medicine clinics in the
area.

"If you took a $ 100 million whack from the federal
government, you'd make changes, too," said the company
spokesman Vince Thompson.

90.  On 4/18/99, Healthsouth issued a press release entitled
"Healthsouth announces $1 billion stock repurchase program and one-
time charge in the Fourth Quarter."  The press release stated:

HEALTHSOUTH also announced today that it expected to
report a one-time charge, net of tax, of approximately
$310 million in the fourth quarter of 1998.  This charge,
most of which will be non-cash, relates to the value of
certain assets obtained through the Company's major
acquisitions.  The assets involved in the charge include
those relating to the Company's healthcare staffing,
respiratory therapy and durable medical equipment
businesses, which do not fit with the Company's strategic
focus and which have been or are being closed or sold, as
well as smaller facilities and facilities not located in
target markets, which will be consolidated, closed or

- 49 -

sold.   The exact amount of the one-time charge will be determined over the next few weeks in accordance with FAS 121.

91.   On 1/14/99, Cowen Securities, Inc. issued a report on HealthSouth by Cederlund written after discussions with Scrushy and Martin which was based on and repeated information provided by them.   Scrushy or Martin reviewed this report before it was issued and assured Cederlund it was accurate.   The report stated:

> -   So, What Happened?
> In what came as a surprise to investors in early October, HRC lowered its guidance on secular growth to 15-20% from its previous 20-25% and cited managed care pricing pressure as a near-term issue.  Therefore, we lowered our 1999 EPS estimate from $1.35-1.40 to $1.10.   The lower EPS reflects what we estimate could be a $300MM pretax shortfall in 1999 versus prior expectations.   The components of $300MM shortfall are $200MM from a decline in same-store volume growth (down 1-2%) and rates (down 2-4%) and $100MM from the impact of the Balanced Budget Act of 1997.

92.   On 3/31/99, HealthSouth filed its 10-K report for the year ended 12/31/98.   HealthSouth finally disclosed that its closure and write down of its home health operations was a direct result of the BBA and not because they were "inconsistent with the Company's core business and growth strategy".   The 10K stated:

> During the third quarter of 1998, <u>the Company adopted a plan to dispose of or otherwise discontinue substantially all of its home health operations.   The decision to adopt the plan was prompted in large part by the negative impact of the 1997 Balanced Budget Act (the "BBA"), which placed reimbursement limits on home health businesses.</u>  The limits were announced in March 1998 and the Company thereafter began to see the adverse affect on home health margins.   The negative trends that occurred as a result in the reduction in reimbursement brought about by the BBA caused the Company to re-evaluate its view of the home health product line.   The plan was approved by the Board of Directors on September 16, 1998 and all home health operations covered by the plan were closed by December 31, 1998.
>
> The Company recorded impairment and restructuring charges of approximately $72,000,000 related to the home

health plan.  In addition, the Company determined that approximately $27,768,000 in notes receivable and approximately $19,228,000 in accounts receivable would not be collectible as a result of the closing of its home health operations.  These non-recurring amounts have been recognized in operating unit expenses and the provision for doubtful accounts, respectively.  The total non-recurring charges and expenses included in the results of operations for the year ended December 31, 1998 related to the home health plan was approximately $118,996.000.

## DEFENDANTS' STOCK SALES

93.  While HealthSouth's insiders were issuing false and misleading statements about HealthSouth's business, HealthSouth was able to sell bonds to the public to raise $567 million to acquire 34 surgery centers from Columbia/HCA and issue HealthSouth shares worth $1.6 billion to purchase Horizon and NSC.  This artificial inflation in HealthSouth's stock price also enabled certain of the HealthSouth insiders named as defendants to sell over 6 million shares of their HealthSouth stock for proceeds of about $163 million to profit from the artificial inflation in HealthSouth's stock price.  Notwithstanding their access to non-public information as a result of their positions with the Company, the Individual Defendants identified below sold the following amounts of HealthSouth shares at artificially inflated prices through the Class Period while in possession of material non-public information:

### Individual Defendants

| Name/Position | Shares Sold | Sales Price | Aggregate Proceeds | % of Total Shares Owned/Sold |
|---|---|---|---|---|
| Scrushy, CEO | 4,000,000 | $27.00 | $108,000,000 | 87% |
| House, Director | 482,996 | $26.26-30.00 | $13,082,880 | 100% |
| Bennett, President | 199,900 | $26.19-26.72 | $5,287,199 | 71% |
| Beam, CFO | 100,000 | $27.59 | $2,759,000 | 65% |
| Martin, CFO | 125,000 | $27.00 | $3,375,000 | 67% |
| Tanner, EVP | 292,750 | $25.94-26.75 | $7,717,481 | 71% |
| Owens, VP | 226,000 | $26.13-27.00 | $5,960,020 | 100% |
| Thomson, Div. Pres. | 128,500 | $26.13-26.63 | $3,387,360 | 98% |
| Carman, VP | 200,000 | $26.00-26.63 | $5,266,520 | 56% |
| Brown, Div. Pres. | 179,810 | $26.25-27.19 | $4,813,689 | 61% |

| | | | | |
|---|---|---|---|---|
| Watkins, Director | 160,000 | $26.00-27.15 | $4,299,250 | 53% |
| Celeste, Director | 60,000 | $26.13-27.50 | $1,625,100 | 100% |
| Foster, Div. Pres. | 11,200 | $26.38-26.50 | $296,188 | 95% |
| TOTALS: | 6,166,156 | $25.94-30.00 | $165,869,687 | 82% |

### HealthSouth

| Date | Securities Issued | Value | Purpose |
|---|---|---|---|
| 10/29/97 | Common Stock | $961 million | Horizon Healthcare acquisition |
| 4/16/98 | Convertible bonds | $567 million | Columbia Surgery Centers purchase |
| 7/22/98 | Common Stock | $590 million | National Surgery Centers purchase |

94.    These  insider  stock  sales  were  unusual  in  timing  and amount.    The  Individual  Defendants  all  sold  large  portions  of their  holdings.    As  the  foregoing  tables  illustrate,  the defendants  sold  or  issued  HealthSouth  stock  and  securities  when the  securities  were  artificially  inflated  due  to  the  nondisclosure of  the  adverse  facts  related  to  HealthSouth's  declining  rate  of growth,  the  adverse  material  impact  of  the  BBA,  delay  in  receipt of  payments,  and  pricing  pressure  from  managed  care  companies.

95.    Defendants'  positive  statements  pushed  HealthSouth  stock to  a  Class  Period  high  of  $30.81  per  share  and  maintained  the stock  price  at  inflated  levels  throughout  the  Class  Period, enabling  HealthSouth's  key  insiders  to  unload  an  aggregate  of  6 million  shares  of  their  HealthSouth  stock  at  between  $25.94-$30.00 per  share  during  9/29/97-7/20/98  allowing  them  to  get  over  $163.9 million  in  illegal  insider-trading  proceeds.    <u>Of  the  thirteen HealthSouth  insiders  who  unloaded  shares  at  these  inflated  prices, six  sold  over  53%-71%  of  the  stock  they  actually  owned,  1  sold over  87%  of  the  stock  he  actually  owned,  Scrushy  sold  over  87%  of the  HealthSouth  stock  he  actually  owed  and  six  sold  between  95%- 100%  of  the  stock  they  actually  owned</u>!

96.   During 1/96-4/97, HealthSouth insiders sold very little of their HealthSouth stock, selling less than 881,600 shares during this 16-month period, or about 55,097 shares per month.

97.   This insider selling by the Individual Defendants was highly unusual, both in its timing and in its amount.   These sales came just after the BBA became effective, which defendants represented would not negatively impact earnings and while HealthSouth was completing the acquisitions of Horizon and NSC, which defendants represented would immediately be accretive to EPS.   HealthSouth insiders wanted to sell off large amounts of their HealthSouth shares at profitable prices before the market learned what they already knew, that the BBA was severely impacting HealthSouth's business.

98.   Defendants' stock sales during the Class Period took place near the all-time peak of HealthSouth's stock price.   This compares with HealthSouth's closing price of $10-3/4 on 9/30/98 after HealthSouth revealed that it could no longer achieve its historic growth rate of 20%-25% and would fall short of its projected results.

99.   The stock sales by each Individual Defendant were unusual:

(a)   Scrushy sold 4,000,000 shares of HealthSouth stock during the Class Period for $108,000,000.   This compares with $19,036,444 million in proceeds received by Scrushy from the sale of HealthSouth stock for the entire 16-month period prior to the Class Period.   Scrushy sold no stock after the Class Period from 9/98-3/99;

- 53 -

(b)   House sold 482,996 shares of HealthSouth stock during the Class Period for $13,082,880.   This compares with $2,820,837 in proceeds received by House from the sale of HealthSouth stock for the entire 16-month time period prior to the Class Period.   House sold no stock after the Class Period from 9/98-3/99;

(c)   Bennett sold 199,900 shares of HealthSouth stock during the Class Period for $5,297,199.   This compares with $1,025,000 in proceeds received by Bennett from the sale of HealthSouth stock for the entire 16-month time period prior to the Class Period.   Bennett sold no stock after the Class Period from 9/98-3/99;

(d)   Martin sold 125,000 shares of HealthSouth stock during the Class Period for $3,375,000.  This compares with Martin selling no HealthSouth stock for the entire 16-month time period prior to the Class Period.  Martin sold no stock after the Class Period from 9/98-3/99;

(e)   Beam sold 100,000 shares of HealthSouth stock during the Class Period for $2,759,000.  This compares with Beam selling no HealthSouth stock for the entire 16-month time period prior to the Class Period.   Beam sold no stock after the Class Period from 9/98-3/99;

(f)   Owens sold 226,000 shares of HealthSouth stock during the Class Period for $5,960,020.   This compares with $1,170,000 in proceeds received by Owens from the sale of HealthSouth stock for the entire 16-month time period prior to the Class Period.   Owens sold no stock after the Class Period from 9/98-3/99;

(g)   Thomson sold 128,500 shares of HealthSouth stock during the Class Period for $3,387,360.  This compares with Thomson selling no HealthSouth stock for the entire 16-month time period prior to the Class Period.  Thomson sold no stock after the Class Period from 9/98-3/99;

(h)   Carman sold 200,000 shares of HealthSouth stock during the Class Period for $5,366,520.  This compares with Carman selling no HealthSouth stock for the entire 16-month time period prior to the Class Period.  Carmen sold no stock after the Class Period from 9/98-3/99;

(i)   Brown sold 185,074 shares of HealthSouth stock during the Class Period for $4,813,689.  This compares with $292,050 in proceeds received by Brown from the sale of HealthSouth stock for the entire 16-month time period prior to the Class Period.  Brown sold no stock after the Class Period from 9/98-3/99;

(j)   Watkins sold 160,000 shares of HealthSouth stock during the Class Period for $4,299,250.  This compares with $37,130 in proceeds received by Brown from the sale of HealthSouth stock for the entire 16-month time period prior to the Class Period.  Watkins sold no stock after the Class Period from 9/98-3/99;

(k)   Celeste sold 600,000 shares of HealthSouth stock during the Class Period for $1,625,100.  This compares with Celeste selling no HealthSouth stock for the entire 16-month time period prior to the Class Period.  Celeste sold no stock after the Class Period from 9/98-3/99;

(1)  Foster  sold  11,200  shares  of  HealthSouth  stock during  the  Class  Period  for  $196,188.   This  compares  with  Foster selling  no  HealthSouth  stock  for  the  entire  16-month  time  period prior  to  the  Class  Period.   Foster  sold  no  stock  after  the  Class Period  from  9/98-3/99.

### INAPPLICABILITY OF STATUTORY SAFE HARBOR

100.  The  federal  statutory  safe  harbor  provided  for  forward-looking  statements  ("FLS")  under  certain  circumstances  does  not apply  to  any  of  the  allegedly  false  statements  pleaded  in  this Complaint.   Further,  none  of  the  statements  pleaded  above  that were  FLS  were  identified  as  "forward-looking  statements"  when made.   Nor  was  it  stated  that  actual  results  "could  differ materially  from  those  projected."   Nor  were  the  FLS  set  forth above  accompanied  by  meaningful  cautionary  statements  identifying important  factors  that  could  cause  actual  results  to  differ materially  from  the  statements  made  therein.   Defendants  are liable  for  the  FLS  set  forth  above  because,  at  the  time  each  of those  forward-looking  statements  was  made,  the  speaker  knew  the forward-looking  statement  was  false  and  the  forward-looking statement  was  authorized  and/or  approved  by  an  executive  officer of  HealthSouth  who  knew  that  those  statements  were  false  when made.   None  of  the  particular  oral  statements  in  HealthSouth's conference  calls  or  other  oral  presentations  pleaded  herein  were so  identified  as  required.   The  defendants  are  liable  for  the false  FLS  pleaded  because,  at  the  time  each  FLS  was  made,  the speaker  knew  the  FLS  was  false  and  the  FLS  was  authorized  and/or approved  by  an  executive  officer  of  HealthSouth  who  knew  that  the FLS  was  false.   None  of  the  historic  or  present-tense  statements

made by defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made nor were any of the projections or forecasts made by defendants expressly related to or stated to be dependent on those historic or present-tense statements when made.

CLASS ACTION ALLEGATIONS

101. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b) on behalf of all persons who purchased or otherwise acquired the securities of HealthSouth during the Class Period (the "Class"), including those who acquired their HealthSouth stock in exchange for the securities of Horizon/CMS in the Horizon Merger or the securities of NSC in the NSC Merger, except defendants, members of their immediate families and any entity in which a defendant has a controlling interest.

102. The members of the Class are so numerous that joinder of all members is impracticable. HealthSouth has more than 395 million shares of stock outstanding. During the Class Period, millions of shares of HealthSouth's stock were purchased by thousands of persons, and millions of shares were acquired in each of the Horizon and NSC Mergers by thousands of persons, who were damaged thereby.

103. Plaintiffs' claims are typical of the claims of the Class, because plaintiffs and the Class members sustained damages in similar manner from defendants' wrongful conduct.

104. Plaintiffs will adequately protect the interests of the Class.   Plaintiffs have retained counsel who are experienced and competent in class action securities litigation.   Plaintiffs have no interests which conflict with those of the Class.

105. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

106. Common questions of law and fact predominate over questions which affect only individual Class members.   Among the questions of law and fact common to the Class are:

(a)   Whether the federal securities laws were violated by defendants' acts;

(b)   Whether HealthSouth's statements during the Class Period misrepresented and/or omitted material facts;

(c)   Whether defendants pursued the scheme and course of business complained of;

(d)   Whether the market price of HealthSouth securities was artificially inflated due to the activities complained of; and

(e)   The extent and measure of damage sustained by the Class.

## CLAIM FOR RELIEF I

For Violation Of Section 11 Of The Securities Act
Against Defendants HealthSouth, Scrushy, House, Bennett, Beam,
Tanner, Owens, Brown, Watkins and Celeste

107. Plaintiffs repeat and reallege each and every allegation contained above as if set forth herein in full except the allegations of fraud.   This Count does not allege fraud by defendants.

108. This Count is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, and is based upon defendants' negligence or

theories of strict liability, on behalf of the Class of purchasers of HealthSouth stock pursuant to the Registration Statements issued in connection with the Horizon Merger and the NSC Merger (the "Mergers"), against defendants HealthSouth, Scrushy, House, Bennett, Beam, Tanner, Owens, Brown, Watkins and Celeste

109. The Registration Statements for the Mergers were materially inaccurate and misleading, contained untrue statements of material facts, omitted to state other material facts necessary to make the statements made not misleading, and concealed and failed adequately to disclose material facts as described above.

110. Defendants Scrushy, House, Bennett, Beam, Tanner, Owens, Brown, Watkins and Celeste signed the Registration Statements for the Mergers and/or were directors of HealthSouth at the time the Registration Statements became effective and additionally were responsible for the contents and dissemination of the Registration Statements. Defendant HealthSouth, as the issuer, is strictly liable for all such misrepresentations and omissions in the Registration Statements.

111. Less than three years has elapsed from the time that the stock sold in conjunction with the Mergers upon which this Count is brought were sold to the public to the time of the filing of this action. Less than one year has elapsed from the time when plaintiffs discovered or reasonably could have discovered the facts upon which this Count is based to the time of the filing of this action.

## CLAIM FOR RELIEF II

For Violation Of Section 15 Of The Securities Act
Against Defendants HealthSouth and Scrushy, Bennett, Beam,
Martin, Tanner, Owens, Thomson, Carman, Brown and Foster

112. Plaintiffs repeat and reallege each and every allegation contained above as if set forth herein in full except the allegations of fraud. This Count does not allege fraud by defendants.

113. Scrushy, Bennett, Beam, Martin, Tanner, Owens, Thomson, Carman, Brown and Foster acted as controlling persons of HealthSouth within the meaning of §15 of the Securities Act, 15 U.S.C. §77o. By reason of their executive positions at HealthSouth, Scrushy, Bennett, Beam, Martin, Tanner, Owens, Thomson, Carman, Brown and Foster had the power and authority to cause HealthSouth to engage in the wrongful conduct complained of herein, including the misrepresentations in the Registration Statements. HealthSouth controlled each of the Individual Defendants and all of its employees, including in connection with the misrepresentations in the Registration Statements.

114. By reason of such wrongful conduct, HealthSouth and Scrushy, Bennett, Martin, Tanner, Owens, Thomson, Carman, Brown and Foster are liable pursuant to §15 of the Securities Act. As a direct and proximate result of these defendants' wrongful conduct, plaintiffs and the other members of the class suffered damages in connection with their acquisition of HealthSouth stock in the Horizon and NSC Mergers.

CLAIM FOR RELIEF III

For Violation Of Section 10(b) Of The Exchange
Act And Rule 10b-5 Against All Defendants

115. Plaintiffs incorporate by reference ¶¶1-114.

SCIENTER AND SCHEME ALLEGATIONS

Scheme

116. Each of the defendants is liable for making false and
misleading statements, failing to disclose material adverse facts,
and participating in a fraudulent scheme and course of business
that operated as a fraud or deceit on purchasers of HealthSouth
stock. Defendants' misdeeds were designed to and did: (i) deceive
the investing public regarding HealthSouth; (ii) artificially
inflated the price of HealthSouth securities; (iii) cause Class
members to purchase HealthSouth securities at inflated prices;
(iv) permit certain of the Individual Defendants to sell 6.0
million shares of their own HealthSouth stock at inflated prices,
pocketing $163 million; (v) permit HealthSouth to issue (sell)
$1.6 billion worth of HealthSouth common stock to complete the
acquisitions of Horizon and NSC; and (vi) permit HealthSouth to
issue (sell) $567 million worth of bonds, convertible into
HealthSouth's common stock, to finance the $550 million
acquisition of 34 surgery centers from Columbia/HCA.

117. As officers, directors and/or controlling persons of a
publicly held company and as sellers of HealthSouth stock, each of
the Individual Defendants had a duty to disseminate accurate and
truthful information promptly with regard to HealthSouth and to
correct any previously issued statements that had become untrue
and to disclose any adverse trends known to them that would

- 61 -

materially affect the operating results of HealthSouth, so that the market price of HealthSouth stock would be based upon truthful and accurate information.  Notwithstanding their duty to refrain from selling HealthSouth stock while in the possession of material adverse non-public information concerning HealthSouth, each of the defendants benefitted substantially from their fraud, including:

- The Individual Defendants, who sold or otherwise disposed of 6.0 million shares of the Company's stock and pocketed over $163 million.

- HealthSouth, which issued (sold) over $1.6 billion worth of HealthSouth common stock to complete two acquisitions, and sold $567 million worth of bonds convertible into HealthSouth common stock to raise the cash to complete another acquisition.

### Knowledge

118. Scrushy, Bennett, Beam, Martin, Tanner, Owens, Thomson, Carman, Brown and Foster were the top executives of Healthsouth. They ran HealthSouth as "hands-on" managers, dealing with important issues facing HealthSouth's business, i.e., its acquisition of Horizon and NSC, HealthSouth's Medicare reimbursements, same-store sales and managed care contracts.

119. Because success with the Horizon and NSC acquisitions, HealthSouth's Medicare reimbursements, same-store sales and managed care contracts were indispensable elements to HealthSouth meeting its internally budgeted and publicly disseminated 1997, 1998 and 1999 revenue and EPS forecasts, defendants constantly monitored each of these key factors affecting HealthSouth's business.

120. In order to monitor HealthSouth's overall corporate performance throughout the year, HealthSouth's top executives received monthly financial reports prepared by HealthSouth's

financial department, under the guidance of Martin, HealthSouth's Chief Financial Officer, as well as other written and oral reports from members of management, including divisional managers and regional directors.  In order to effectively manage its business and control its cash flow, HealthSouth's management information system was capable of generating reports on a daily basis showing sales revenue by territory and by facility or "store," as well as overall corporate revenue, expenses, cash balances, etc.  As a result of this system, the Individual Defendants, who were HealthSouth's top managers, were aware of the corporation's performance on a daily basis and were thus aware, virtually immediately, of any significant problems with sales, revenue or expenses of any particular facility, "store" or territory.  Every Monday morning a meeting was held of the top executive officers of HealthSouth at its corporate headquarters in Birmingham, moderated by defendants Scrushy and/or Martin.  During each of these Monday morning meetings, the HealthSouth executives would individually review the events of the previous week and the plans for the upcoming week, officer by officer.

121. In addition to this intricate and extensive monitoring system of HealthSouth locations, HealthSouth's finance department generated monthly financial reports providing detailed data with respect to overall corporate revenue, net income and EPS, as well as sales by facility and by territory -- all presented so as to compare performance for that month, that quarter and the year-to-date compared to the Company's plan/budget.  These monthly financial reports included a report prepared immediately after the monthly close and distributed to top management within 48-72

hours, which provided summary sales, expense and income data. These reports also included a monthly financial statement package that provided even more detailed information, including graphic comparisons of actual performance to forecasted performance and a narrative explanation of material variances of actual results compared to forecasted or budgeted results, which was completed within ten days after the monthly close and immediately provided to members of top management at the regularly scheduled Monday morning meeting.

122. When the BBA began to impact HealthSouth's business, the Company's managed care customers began delaying payments to HealthSouth for services rendered and began to negotiate for substantial reductions in price in existing contracts, HealthSouth's internal corporate procedures immediately advised top executives of these problems. Because the Medicare reimbursements and sales volume HealthSouth achieved from its managed care customers was absolutely critical to HealthSouth achieving the 20%-25% EPS growth and 15%-20% revenue growth forecasted for 1998-1999, the problems related to Medicare reimbursements and pricing pressures from managed care customers were a matter of major concern and discussion among HealthSouth's top corporate managers, including the Individual Defendants. This information was provided to each of the defendants during their tenure at HealthSouth in financial reports and/or the financial statement reporting packages distributed to them throughout the Class Period and discussed during the regular Monday morning meetings.

123. Because of their top executive positions with HealthSouth and involvement in the day-to-day management of its business, each of the Individual Defendants actually knew from internal corporate documents and conversations with other corporate officers and employees and their attendance at management and Board meetings, the adverse non-public information about the disastrous impact the BBA was already having on the Company, pricing pressures that were caused by the BBA and HealthSouth's deteriorating revenue and EPS prospects. Thus, each of the defendants actually knew or recklessly disregarded that the public statements about HealthSouth were false or misleading when made.

124. The growth of HealthSouth's core business was completely dependent on the Company's "growth through acquisition" strategy. However, defendants knew that its Medicare reimbursements would be drastically reduced under the BBA because the facilities acquired were "new providers" and subject to lower reimbursements than if the merger never took place. Defendants also knew that the BBA virtually wiped out HealthSouth's home health business and that this business segment would have to be abandoned and written off. As a result, defendants knew that HealthSouth would not be able to achieve the 1998-1999 EPS growth being forecast.

The Defendants Knew That the BBA Made HealthSouth's
Medicare Billing Improprieties Less Profitable
And That, As A Result, It Was Impossible For
HealthSouth To Achieve 20%-25% Growth

125. Prior to the enactment of the BBA, Medicare was governed by the Social Security Act amendments of 1983 which contained provisions for a PPS. The PPS covers routine and ancillary

- 65 -

operating costs of most Medicare in-patient hospital services. The Secretary of HHS establishes fixed payment amounts per discharge based on diagnosis-related groups ("DRG").  The PPS, importantly, relates to in-patient services.  With few exceptions, the reimbursement HealthSouth's in-patient facilities are entitled to is limited to the DRG rate, regardless of the number of services provided to the patient or the length of the patient's hospital stay.  Under PPS, a hospital may retain the difference, if any, between its DRG rate and its operating costs incurred in furnishing in-patient services.    HealthSouth in-patient facilities, however, are at risk for any operating costs that exceed the DRG rate to which it is entitled for each patient. HealthSouth's medical center facilities are generally subject to PPS with respect to Medicare in-patient services.

126. Prior to the BBA, out-patient rehabilitation services and free-standing in-patient rehabilitation facilities were exempt from PPS and in-patient rehabilitation units within "acute care hospitals" were eligible to obtain an exemption from PPS upon satisfaction of certain criteria.  HealthSouth claimed that twelve of its out-patient centers were Medicare-certified, CORFs and 432 are Medicare-certified rehabilitation agencies.  CORFs have been designated cost-reimbursed Medicare providers.    They were therefore reimbursed reasonable costs (subject to certain limits) for services provided to Medicare patients.  Medicare-certified rehabilitation agencies, on the other hand, were reimbursed on the lower of the reasonable cost for services provided to Medicare patients or charges for such services.  CORFs which are physician-directed clinics, as well as out-patient surgery centers, were

reimbursed by Medicare on a fee screen basis, that is, they receive a fixed fee which is determined by the geographical area in which the facility is located for each procedure performed. HealthSouth claims its CORFs submit monthly bills to fiscal intermediaries for services provided to Medicare patients, and that it files annual cost reports with the intermediaries for each such facility. Adjustments are then made if costs have exceeded payments from the fiscal intermediary or vice versa.

127. HealthSouth's Medicare billing improprieties were systemic, rampant throughout the HealthSouth network of in-patient and out-patient facilities. They included:

(a)  HealthSouth routinely instructed its employees to alter patient admitting data to insure that the patients being admitted would meet the 80%/20% Health Care Finance Administration Ten ("HCFA Ten") requirements. As long as 80% of admissions to HealthSouth in-patient facilities fell within the HCFA Ten definition, Medicare reimbursed HealthSouth for services it provided to all of its Medicare patients.

(b)  Throughout the Class Period and before, HealthSouth marketing personnel routinely visited nursing homes, hospitals, and other facilities to "get bodies in the door" of HealthSouth facilities. Once there, patients were assigned illnesses based on the HCFA Ten definition, regardless of actual maladies. HealthSouth specifically marketed its services to hospitals which sought to avoid restrictions on reimbursement imposed by DRG. HealthSouth offered hospitals the option of releasing patients to HealthSouth facilities before the five-day DRG period expired. Hospitals would get paid the DRG rate and only be required to

- 67 -

provide one to four days of acute care to patients. Once released, patients entered HealthSouth facilities and were assigned the HCFA Ten diagnosis, once again, regardless of actual malady. This enabled HealthSouth to maintain its Medicare reimbursement eligibility.

(c)  HealthSouth routinely altered patient records after discharge to meet the HCFA Ten definition.

(d)  HealthSouth routinely post-dated or pre-dated certain services so that HealthSouth would get higher rates of reimbursement. For example if a person requires a prosthetic device, the device had to be ordered and paid for from the daily rate HealthSouth received from Medicare, if that service was done on an in-patient basis. By pre-dating or post-dating the admission date, HealthSouth obtained separate payments for prosthetic devices by representing that it provided service on an out-patient basis.

(e)  Supervisors at HealthSouth CORFs were instructed to, and routinely did, alter time records, billing for time not actually spent with patients and billing for canceled visits. This enabled HealthSouth to increase the amount of recorded time patients received care. By so altering records, HealthSouth generated higher billings and presented Medicare with commensurately high costs. Because out-patient rehabilitation centers are not subject to PPS, Medicare, in turn, reimbursed HealthSouth for its inflated costs. The profitability of these practices was greatly reduced by provisions of the BBA. For example, the BBA redefines the movement of patients from PPS facilities to post-acute-care providers (SNFs, PPS-exempt

hospitals, and home health) as "transfers" as opposed to "discharges." Instead of being reimbursed for reasonable costs, the payment for these post-acute transfers cannot exceed the sum of 50% of the regular transfer payment and 50% of the regular DRG payment.

128. Because of the foregoing, each of the Individual Defendants was aware of HealthSouth's 1998-1999 forecasts and budgets, and of the internal reports detailing the distribution problems and the financial reports comparing HealthSouth's actual results to those budgeted and/or forecasted. Based on the negative internal reports specified earlier and reports of the Company's actual performance compared to that budgeted and forecasted, the Individual Defendants each knew HealthSouth's business was not performing as well as publicly represented. Thus, defendants actually knew that each of the forward-looking public statements issued during the Class Period about HealthSouth were false and misleading when made and actually knew or recklessly disregarded that the non-forward-looking statements issued during the Class Period about HealthSouth were false and misleading when made.

## Motive/Opportunity

129. In addition to having actual knowledge of the falsity of their false statements, each of the defendants had the motive and the opportunity to perpetrate the fraudulent scheme and course of business described herein. HealthSouth's executives were highly motivated to present HealthSouth's business in a very favorable light to the investment community to inflate HealthSouth's stock to higher levels, thereby greatly increasing its value for use as

consideration in acquisitions.  A rising per-share price would notably induce stockholders of other companies (like Horizon and NSC) to approve an acquisition by HealthSouth but also the higher HealthSouth's stock price rose, the fewer shares HealthSouth would have to issue to complete any such acquisition, making the acquisition much less dilutive to HealthSouth, and its EPS.

130. During the Class Period, while the defendants were continuing to issue false and misleading statements about HealthSouth's business and prospects, HealthSouth's top insiders sold 6 million shares of their HealthSouth stock for proceeds of over $163 million, thereby personally profiting from the artificial inflation in HealthSouth's stock price.  Notwithstanding this knowledge, these HealthSouth's insiders sold over 82% of their holdings in HealthSouth at artificially inflated prices.

131. The Individual Defendants controlled the contents of HealthSouth's SEC filings, corporate reports, communications to analysts and press releases.  Each of the Individual Defendants participated in writing or reviewing HealthSouth's corporate reports, press releases and SEC filings alleged to be misleading and thus had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information, each of these defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations which were being made were then materially false and misleading.  Therefore, each of the defendants: (a) knew or had access to the material adverse non-

public information about HealthSouth's financial results and then-existing business conditions, which was not disclosed; and (b) participated in drafting, reviewing and/or approving the misleading statements, releases, reports and other public representations of and about HealthSouth.

132. During the Class Period, defendants, with knowledge of or reckless disregard for the truth, disseminated or approved the false statements specified above, which were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

133. Defendants have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon the purchasers of HealthSouth stock during the Class Period.

134. Plaintiffs and the Class have suffered damage in that, in reliance on the integrity of the market, they paid artificially inflated prices for HealthSouth stock. Plaintiffs and the Class would not have purchased HealthSouth stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' false and misleading statements.

## CLAIM FOR RELIEF IV

For Violation Of Section 20(a) Of The Exchange
Act Against Defendants HealthSouth And Scrushy, Bennett, Beam,
Martin, Tanner, Owens, Thomson, Carman, Brown and Foster

135. Plaintiffs incorporate by reference ¶¶1-134.

136. Scrushy, Bennett, Beam, Martin, Tanner, Owens, Thomson, Carman, Brown and Foster acted as controlling persons of HealthSouth within the meaning of §20 of the Exchange Act, 15 U.S.C. §78t.   By reason of their executive positions Scrushy, Bennett, Beam, Martin, Tanner, Owens, Carman, Brown and Foster had the power and authority to cause HealthSouth to engage in the wrongful conduct complained of herein.   HealthSouth controlled each of the Individual Defendants and all of its employees.

137. By reason of such wrongful conduct, HealthSouth and Scrushy, Bennett, Beam, Martin, Tanner, Owens, Thomson, Carman, Brown and Foster are liable pursuant to §20(a) of the Exchange Act.   As a direct and proximate result of these defendants' wrongful conduct, plaintiffs and the other members of the Class suffered damages in connection with their purchases of HealthSouth stock during the Class Period.

## BASIS OF ALLEGATIONS

138. Plaintiffs have alleged the foregoing based upon the investigation of their counsel, which included a review of HealthSouth's SEC filings, securities analysts' reports and advisories about the Company, press releases issued by the Company, media reports about the Company and discussions with consultants and percipient witnesses.   Plaintiffs believe that, after reasonable opportunity for discovery, substantial additional

evidentiary support will likely exist for the allegations set forth above.

### PRAYER FOR RELIEF

WHEREFORE, plaintiffs pray for judgment as follows:

1.    Declaring this action to be a proper class action pursuant to Rules 23(a) and 23(b) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

2.    Awarding plaintiffs and the members of the Class compensatory damages;

3.    Against each defendant and in favor of plaintiffs and all members of the Class for damages in an amount determined to have been sustained by plaintiffs and the members of the Class;

4.    Awarding plaintiffs and members of the Class the costs of this suit, including reasonable attorneys' and experts' fees and other disbursements;

5.    Against each defendant for damages jointly and/or severally;

6.    Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity and the federal statutory provisions sued thereunder, pursuant to Rules 64, 65 and any appropriate state law remedies, including attaching, impounding or imposing a constructive trust on or otherwise restricting the proceeds of defendants' trading activities or their other assets to assure that plaintiffs have an effective remedy; and

7.    Such other and further relief as may be just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

DATED:  April 12, 1999

                                    LAW OFFICES OF M. CLAY
                                       RAGSDALE
                                    M. CLAY RAGSDALE
                                    E. ANSEL STRICKLAND
                                    M. STAN HERRING


                                    _____
                                         M. CLAY RAGSDALE

                                    1929 Third Avenue North
                                    550 Farley Building
                                    Birmingham, AL  35203
                                    Telephone:  205/251-4775

                                    Liaison Counsel for Plaintiffs


DATED: April 9, 1999

                                    MILBERG WEISS BERSHAD
                                       HYNES & LERACH LLP
                                    WILLIAM S. LERACH
                                    ALAN SCHULMAN
                                    EDWARD P. DIETRICH
                                    DEBRA J. WYMAN


                                    _____
                                         EDWARD P. DIETRICH

                                    600 West Broadway, Suite 1800
                                    San Diego, CA  92101
                                    Telephone:  619/231-1058

                                    MILBERG WEISS BERSHAD
                                       HYNES & LERACH LLP
                                    KATHLEEN A. HERKENHOFF
                                    355 South Grand Avenue
                                    Suite 4170
                                    Los Angeles, CA  90071
                                    Telephone:  213/617-9007

BERGER & MONTAGUE, P.C.
DANIEL BERGER
SANDRA STEIN, Of Counsel
STEPHEN A. WHINSTON
JACOB A. GOLDBERG
1622 Locust Street
Philadelphia, PA  19103
Telephone:  215/875-3000

Co-Lead Counsel for Plaintiffs

LAW OFFICES OF STEVEN E.
   CAULEY, P.A.
STEVEN E. CAULEY
SCOTT E. POYNTER
Suite 218, Cypress Plaza
2200 Rodney Parham Road
Little Rock, AR  72212
Telephone:  501/312-8500

SCHATZ & NOBEL, P.C.
ANDREW M. SCHATZ
JEFFREY S. NOBEL
216 Main Street
Hartford, CT  06106-1817
Telephone:  860/493-6292

DAVID B. KAHN & ASSOCIATES,
   LTD.
DAVID B. KAHN
One Northfield Plaza
Suite 100
Northfield, IL  60093-1211
Telephone:  847/501-5083

Plaintiffs' Executive
Committee Members

# United States District Court

__NORTHERN__ **DISTRICT OF** __ALABAMA__

ROBERT M. GORDON, BERNARD R. McCOY, JAMES
GENSTEIN, TWIN PLUS LLC, TRUST ADVISORS
EQUITY PLUS LLC, IRENE RIGAS, BRIAN FISCHMAR,
HARRY SCHIPPER, RYAN McCORMICK, UNITED FOOD &
COMMERCIAL WORKERS UNION LOCAL 100-A PENSION
FUND and VINOD PARIKH,

AMENDED
## SUMMONS IN A CIVIL ACTION

        Plaintiffs,

CASE NUMBER:   CV-98-0-2634-S

vs.

HEALTHSOUTH CORPORATION, RICHARD M. SCRUSHY,
LARRY R. HOUSE, JAMES P. BENNETT, MICHAEL D.
MARTIN, ANTHONY J. TANNER, WILLIAM T. OWENS,
ROBERT E. THOMSON, THOMAS W. CARMAN, P. DARYL
BROWN, PATRICK A. FOSTER, PHILLIP C. WATKINS,
RICHARD F. CELESTE and AARON BEAM, JR.,

        Defendants.

**TO:** (Name and Address of Defendant)

Aaron Beam, Jr.

**YOU ARE HEREBY SUMMONED** and required to file with the Clerk of this Court and serve upon

PLAINTIFF'S ATTORNEY (name and address)

M. CLAY RAGSDALE
LAW OFFICES OF M. CLAY RAGSDALE
1929 Third Avenue North
550 Farley Building
Birmingham, AL  35203
205/251-4775

an answer to the complaint which is herewith served upon you, within _____20._____ days after service of
this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default ~~will~~ be taken
against you for the relief demanded in the complaint. _May_

PERRY D. MATHIS, CLERK

CLERK

_Meredith Winslett_

BY DEPUTY CLERK

DATE  4-12-99

Clerk, U.S. District Court
Room 140, U.S. Courthouse
1729 5th Avenue North
Birmingham, Alabama  35203-2040

CERTIFICATE OF SERVICE

    I hereby certify that a copy of the foregoing has been served upon defense counsel of record by placing a copy of same in the U.S. Mail, postage prepaid and properly addressed, on this __12__ day of April, 1999, as follows:

W. Michael Atchison  Hand
Rik S. Tozzi
STARNES & ATCHISON LLP
100 Brookwood Place, 7th Floor
Birmingham, AL 35209

Peter Q. Bassett
Susan E. Hurd
ALSTON & BIRD LLP
One Atlantic Center
1201 West Peachtree Street
Atlanta, Georgia 30309-3424

                        Of Counsel