# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

03 FEB 27  AM 11: 41

U.S. DISTRICT COURT
N.D. OF ALABAMA

|  |  |  |
|---|---|---|
| In re HEALTHSOUTH | ] | |
| CORPORATION SECURITIES | ] | |
| LITIGATION | ] | Master File No. |
|  | ] | CV-98-BE-2634-S |
| This Document Relates To: All | ] | |
| Actions | ] | |

**ENTERED** *pc*

FEB 27 2003

## MEMORANDUM OPINION

This case came before the court on plaintiffs' Motion for Class Certification (Doc. 101)

filed April 25, 2001.[1]  Plaintiffs seek to have certified as a class "all persons who purchased or

otherwise acquired the securities of HealthSouth Corporation ("HealthSouth" or the "Company")

between April 24, 1997 and September 30, 1998 (the "Class Period"), including those persons

who acquired HealthSouth securities in exchange for the securities of Horizon/CMS Healthcare

Corporation ("Horizon") in a merger consummated on or about October 29, 1997, and those

persons who acquired HealthSouth securities in exchange for the securities of National Surgery

Centers, Inc. ("NSC") in a merger consummated on or about July 22, 1998, and were injured

thereby.  Excluded from the Class are defendants herein, the officers, directors, and employees of

the Company, members of the immediate family of each of the individual defendants, any entities

in which any of the defendants has or had a controlling interest, and the legal representatives,

---

[1]This case, filed in 1998, was reassigned to this judge on November 14, 2001.  The court
continued the class certification hearing scheduled for November 29, 2001 to February 21, 2002.
Then, upon motion of plaintiffs, rescheduled the hearing to April 23, 2002.

163

heirs, successors, predecessors in interest, affiliates or assigns of the defendants."[2]

After reviewing the numerous submissions of counsel, holding an evidentiary hearing on April 23, 2002, and reviewing additional post-hearing submissions, the court concludes that plaintiffs failed to meet their burden of proof required to certify the proposed class. Therefore, the Motion for Class Certification will be denied by separate order for the reasons stated in this opinion.

I.    Background

A.    Procedural History

The original complaint, Gordon, et. al., v. HealthSouth Corp., was filed on October 16, 1998. The complaint asserted various securities laws violations against numerous defendants: HealthSouth Corporation, and some of its officers and directors including Richard Scrushy, Larry R. House, Michael D. Martin, James P. Bennet, Anthony J. Tanner, William T. Owens, Robert E. Thomson, Thomas W. Carman, P. Daryl Brown, Phillip C. Watkins, C. Sage Givens, Richard F. Celeste, Patrick Foster, and Aaron Beam, Jr. Six other cases against HealthSouth were subsequently consolidated with the lead case by orders entered December 4, 1998 (Doc. 6), December 29, 1998 (Doc. 13), and January 14, 1999 (Doc. 26). The court approved a stipulation appointing "HealthSouth plaintiffs' group" as lead plaintiffs and approving lead counsel on January 19, 1999 (Doc. 28).[3]

---

[2]Motion for Class Certification (Doc. 101).

[3]The HealthSouth Plaintiffs Group consists of the following: United Local Food & Commercial Workers, Chicagoland Race Meet Operators and Local 134 I.B.E.W. Jt. Pen., Maryann McCord, PVB Capital Management, Trust Advisors Equity Plus, LLC., James Totoro Twin Plus, Dale A. Kirby, Jay Burke and Julius McQueen, the Pennsylvania Group's Members, the State Employees Retirement System, Commonwealth of Pennsylvania, and the City of

The plaintiffs filed an amended consolidated complaint on April 12, 1999 (Doc. 31); the defendants filed a "Motion to Dismiss Plaintiffs' Consolidated Amended Class Action Complaint or, in the Alternative, to Strike Certain Allegations" on June 28, 1999 (Doc. 38). After substantial briefings by all parties, the Motion to Dismiss was submitted to Magistrate Judge John Ott who issued a 106 page Report and Recommendation on September 13, 2000 (Doc. 67). Judge Ott recommended that the complaint be dismissed because plaintiffs had not pled scienter with the requisite specificity required by the Public Securities Litigation Reform Act of 1995 ("PSLRA" or "Reform Act"). By order entered December 20, 2000, Judge Inge Johnson rejected the Report and Recommendation, and denied the defendants' motion to dismiss, but granted defendants' motion to strike the plaintiffs' declarations (Doc. 75). The defendants sought to have the order amended to allow for an interlocutory appeal (Doc. 79); after substantial briefing , the court denied the defendants' request on March 12, 2001 (Doc. 93). The defendants answered the complaint on March 26, 2001 (Doc. 97).

The plaintiffs filed their Motion for Class Certification on April 25, 2001 (Doc. 101). Judge Johnson set discovery and briefing deadlines on the class certification issue and set a hearing on the motion for November 29, 2001 (Doc. 103). However, on November 14, 2001, the case was reassigned to the undersigned judge (Doc. 114). Continuing that hearing constituted the first order entered by the undersigned upon taking the bench (See Doc. 115).

The court held a status conference on January 29, 2002 (Doc. 118), and allowed

---

Philadelphia through Board of Pensions and Retirement. Lead Plaintiffs selected Milberg, Weiss, Bershad, Hynes & Lerach, LLP and Berger & Montague, P.C. as co-lead counsel for the class. The Law Offices of Steven E. Cauley, P.A., Schate & Nobel, P.C., and David B. Kahn & Associates, Ltd. serve as Executive Committee members, and M. Clay Ragsdale serves as Liason Counsel.

additional discovery and submissions regarding the motion for class certification. After several continuances, the court held a hearing on the motion to certify a class on April 23, 2002. Because the hearing raised as many questions as it answered, the court ordered post-hearing briefs on certain issues (Doc. 139). After granting the defendants' Motion to Strike declarations submitted by plaintiffs that were outside the scope of the supplemental briefing order (Doc. 143, 150), and receiving additional briefs and authority (Doc. 151, 152, 160, 161), the motion to certify a class is finally under submission and ready for a ruling.

      B.     Legal and Factual Allegations

The plaintiffs basically allege that during the class period, April 24, 1997 to September 30, 1998, HealthSouth and its top officers and directors engaged in a fraud on HealthSouth's investors that artificially inflated the price of HealthSouth stock by making false statements about the true financial state of HealthSouth and concealing the allegedly devastating effects the Balanced Budget Act of 1997 ("BBA") would have on HealthSouth.

For purposes of the class certification issue, the court treats the allegations of the complaint as true. *See Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177-78 (1974); *Hudson v. Delta Air Lines, Inc.*, 90 F.3d 451, 456 (11th Cir. 1996), *cert. denied*, 519 U.S. 1149 (1997); In re *Theragenics Corp. Securities Litigation*, 205 F.R.D. 687, 693 (N.D. Ga. 2002). The plaintiffs allege that the defendants made the following false and/or misleading statements[4]:

In early February 1997, the Clinton Administration proposed the BBA to help balance the

---

[4] This recitation is modified from plaintiffs' original Memorandum of Law in Support of Plaintiffs' Motion for Class Certification (Doc. 102).

federal budget by cutting Medicare payments by $100 billion over five years. ¶ 8.[5]  Defendants understood that passage of this legislation would mean drastic cuts of tens of billions of dollars of Medicare payments over a five-year period to healthcare providers like HealthSouth.  ¶¶ 8-14. Moreover, because Medicare payments constituted 60% of HealthSouth's patient mix, defendants knew that such cuts would have disastrous consequences on the Company's business. Thus, defendants purposefully lobbied against its passage. ¶ 12.  In particular, Patrick A. Foster, HealthSouth's Senior Vice President of Inpatient Operations, testified before the Congressional House Committee on Ways and Means on April 10, 1997 against passage of the BBA.

On August 5, 1997, Congress enacted the BBA with an effective date of October 1, 1997. The passage of the BBA resulted in, among other things, reduced Medicare payments for hospital inpatient services; the creation of tremendous pricing pressures on the entire health care industry – especially on health maintenance organizations and other managed care providers; and dramatically lowered reimbursements to newly merged entities, all of which directly affected HealthSouth and its then recent acquisitions.  ¶¶ 11, 14-15.

Plaintiffs allege that despite the adverse impact that defendants knew the BBA was having[6] on HealthSouth's business, defendants falsely represented throughout the Class Period

---

[5] Paragraph references are to plaintiffs' Consolidated Amended Class Action Complaint for Violations of the Federal Securities Laws (the "Complaint")(Doc. 31).

[6] Although the plaintiffs repeatedly refer to the impact of the BBA in the present tense, e.g., "was having," the court finds that the plaintiffs' allegations of misrepresentations and concealments about the effect of the BBA between April 24, 1997, the start of the proposed class period, and August 5, 1997, the date the BBA was passed, cannot constitute misrepresentations of "material fact" as required by Rule 10(b)5 because no fact existed until Congress actually passed the BBA in its final form and the Act took effect on October 1, 1997.  Nevertheless, for the purpose of setting forth plaintiffs' allegations, the court adopts the plaintiffs' use of the present tense.

that HealthSouth was maintaining its historical performance, and that the BBA would be of little

or no consequence. ¶ 13.  In truth, plaintiffs allege, defendants knew throughout the Class Period

that HealthSouth's financial results would be materially and adversely affected by various

provisions of the BBA.  ¶¶ 14-16.  However, according to the allegations, the defendants knew

that if they disclosed the true impact that the BBA was having on HealthSouth's business, the

price of its common stock would substantially decline and jeopardize the Horizon acquisition, the

bulk of which ($961 million) was being financed with HealthSouth stock.  ¶ 12.  Accordingly,

defendants were determined to maintain HealthSouth's stock price to facilitate the Horizon

acquisition; continue the illusion that it could keep pace with its historical rate of 15% - 20%

growth in revenues and 20% - 25% growth in EPS; and hide some of its operating deficiencies

via the use of acquisition-related writeoffs.  ¶¶ 12, 29-30.

        In addition, plaintiffs allege, defendants also misrepresented that HealthSouth "continued

the successful integration" of its major acquisitions, that those acquisitions would "be

immediately accretive to earnings," and that its "financial performance remained strong" as

HealthSouth "benefitted from the profitability associated with strong same-store growth, as well

as from economies of scale and expense controls."  ¶¶ 13.  Plaintiffs assert that defendants knew

that the opposite was true, *i.e.* that the BBA was having a devastating effect on HealthSouth's

financial results and that HealthSouth would not grow its earnings by 25% annually in 1998 and

1999, or achieve EPS of $0.30, $0.31, $1.15 and $1.40 in 3Q98, 4Q98, and years 1998 and 1999,

respectively.  ¶¶ 14-16.  According to the plaintiffs, the BBA wiped out $100 million of

HealthSouth's earnings in 3Q98 and by over $300 million in 4Q98, and reduced its growth

prospects from 20% - 25% to as low as 10%.  ¶ 14.

Plaintiffs further purport that the false statements made by defendants throughout the Class Period had the intended effect. HealthSouth's stock was artificially inflated from $18-3/4 at the start of the Class period in April 1997, to almost $28 by early November 1997, reaching an all time high of $30.81 on April 20, 1998. ¶ 2. This artificial inflation enabled HealthSouth to acquire Horizon on October 29, 1997 for approximately $960 million in HealthSouth stock and the assumption of approximately $700 million in debt (¶ 47); to acquire NSC, a multi-state network of some 40 free-standing ambulatory surgery centers, on July 22, 1998, in another stock swap of some $590 million of HealthSouth stock (¶ 74); and to let the individual defendants sell over 6 million shares of their own HealthSouth stock, reaping proceeds in excess of $163 million, within weeks of the BBA's enactment. ¶¶ 54, 93. Plaintiffs allege that defendant Scrushy, HealthSouth's CEO, alone sold 4,000,000 shares, approximately 87% of his holdings, at a sales price of $27 per share (¶ 93), while defendants House, Owens, Thomson, Celeste, and Foster each sold between 95% - 100% of their holdings at sales prices between $26.13 - $30.00 per share. ¶ 93.

Throughout August 1998, defendants continued to assure securities analysts of "no change in HealthSouth's operating trends" or in the "favorable fundamentals affecting HealthSouth." ¶¶ 77-80. As late as September 25, 1998, defendants maintained their shared "conviction" that HealthSouth would achieve $0.30, $0.31, and $1.15 EPS in 3Q98, 4Q98, and 1998, respectively. ¶¶ 13, 82. Only four days later, however, on September 29, 1998, HealthSouth's stock price began to collapse, falling from $18-3/8 to $14-5/8, as HealthSouth finally began to admit to analysts that it might miss EPS estimates for 3Q98, 4Q98, 1998, and 1999. Then on September 30, 1998, HealthSouth revealed that HealthSouth was being pressured

by major managed care firms to renegotiate existing contract terms; being pressured by payors to renegotiate rates and was seeing delays in payment under current contracts; unable to grow its earnings at the stated historical 20% - 25% rate; and likely to miss analysts' earnings estimates for 1998 and 1999.  ¶¶ 17, 84.

Upon these announcements, the plaintiffs allege several analysts revised their 1998 and 1999 EPS estimates downward; HealthSouth's stock virtually collapsed, losing approximately 43% in value as its price plummeted from $18-3/8 to $10-1/2; and the price of its 3.25% convertible subordinated debentures dropped approximately 20% below the price at which they were offered.  ¶¶ 18, 85.  Further, HealthSouth netted only $5.7 million, or a penny a share, for the quarter that ended September 30, 1998, down 93% from the prior year, and the Company closed about 30 agencies in at least six states during November of 1998.  Id.

The first of these seven consolidated lawsuits reached the court on October 16, 1998 – two weeks after the September 30, 1998, announcement.  The plaintiffs assert violations of §§ 11 and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77o (Claims for Relief I and II); § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10(b)-5, 17 C.F.R. § 240.10b-5.  (Claims for Relief III); and § 20(a) of the Exchange Act. 15 U.S.C. § 78k (Claim for Relief IV).  The plaintiffs rely on the fraud-on-the-market theory to establish a presumption of reliance.  That theory rests on the assumption that the market price of a security traded in an efficient market[7]

_____

[7]An "efficient market" is an "open" and "developed" market (e.g., the securities market like the New York Stock Exchange), where "the price of the company's stock is determined by all material information regarding the company and its business. . ." and "'information important to reasonable investors . . . is immediately incorporated into the stock price.'" *See Oran v. Stafford,* 226 F.3d 275, 282 (3d Cir. 2000) (quoting *In re Burlington Coat Factory Sec. Litig.* 114 F.3d 1410, 1425 (3d Cir. 1997)).

will be based on the material information available and that the market will respond to that information with buyers and sellers relying indirectly on material omissions or misrepresentations concerning the security. *See Basic Inc. v. Levinson*, 485 U.S. 224, 247 (1988). The fraud-on-the-market theory creates a <u>rebuttable</u> presumption of reliance. *Id.* at 248[8].

II.   Discussion

Plaintiffs seek to have certified as a class:

> all persons who purchased or otherwise acquired the securities of
> HealthSouth Corporation ("HealthSouth" or the "Company")
> between April 24, 1997 and September 30, 1998 (the "Class
> Period"), including those persons who acquired HealthSouth
> securities in exchange for the securities of Horizon/CMS
> Healthcare Corporation ("Horizon") in a merger consummated on
> or about October 29, 1997, and those persons who acquired
> HealthSouth securities in exchange for the securities of National
> Surgery Centers, Inc. ("NSC") in a merger consummated on or
> about July 22, 1998, and were injured thereby. Excluded from the
> Class are defendants herein, the officers, directors and employees
> of the Company, members of the immediate family of each of the
> individual defendants, any entities in which any of the defendants
> has or had a controlling interest, and the legal representatives,
> heirs, successors, predecessors in interest, affiliates or assigns of
> the defendants.

(Doc. 101).

---

[8]Defendants spent a considerable amount of time in their briefs and in the hearing arguing that the testimony of their expert witnesses negated the plaintiffs' fraud-on-the-market theory. See Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Class Certification, at 35-37 (Doc. 113); Defendants' Supplemental Brief in Opposition to Class Certification, at 12-15 (Doc. 151); TR 63. Plaintiffs countered that considering the defendants' evidence would amount to improper consideration of the merits. See Plaintiffs' Supplemental Brief in Support of Class Certification, at 12-13 (Doc. 141). The court need not determine, at this stage, whether defendants' persuasive evidence in fact rebutted the presumption of reliance because other evidence – including testimony from some of the proposed class representatives – raised substantial questions about the availability of the fraud-on-the-market presumption of reliance for at least some representatives and some class members. See discussion *infra*.

9

Thus, the class proposed by the plaintiffs include three separate but distinct groups: (1) purported class members who obtained their shares of HealthSouth stock on the open market; (2) former owners of Horizon stock or options whose interests were converted to HealthSouth stock or options; and (3) former owners of NSC stock or options whose interests were converted to HealthSouth stock or options.[9]

A.      Standards for Class Certification

The plaintiffs seeking class certification have the burden of proof. *Rutstein v. Avis Rent-A-Car Sys., Inc.,* 211 F.3d 1228, 1233 (11th Cir. 2000); *Heaven v. Trust Co. Bank,* 118 F.3d 735, 737 (11th Cir. 1997); *Morrison v. Booth,* 763 F.2d 1366, 1371 (11th Cir. 1985); *Gilchrist v. Bolger,* 733 F.2d 1551, 1556 (11th Cir. 1984). To qualify for class certification, the plaintiffs must prove the four requirements of Fed. R. Civ. P. 23(a) and at least one of the standards of Fed. R. Civ. P. 23(b) that is appropriate to the relief sought. *Turner v. Beneficial Corp.,* 242 F.3d 1023, 1025 (11th Cir. 2001). *See also Franze v. Equitable Assurance,* 296 F.3d 1250, 1253 (11th Cir. 2002); *Piazza v. Ebsco Indus., Inc.,* 273 F.3d 1341, 1346 (11th Cir. 2001).

Rule 23(a) provides for certification of a class only if:

> (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). These four prerequisites of Rule 23(a) have commonly been referred to as

---

[9] Many of the former owners of Horizon and NSC stock or options were also employees of those companies and may be classified as subclasses of these three groups. See discussion *infra.*

"'numerosity, commonality, typicality and adequacy of representation.'" *Franze*, 296 F.3d at

1253 (quoting *Piazza*, 273 F.3d at 1346). *See also Murray v. Auslander*, 244 F.3d 807, 810 (11th

Cir. 2001) (citing *General Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 156 (1982)). These

requirements serve to "'limit class claims to those fairly encompassed by the named plaintiffs'

individual claims.'" *Franze,* 296 F.3d at 1253 (quoting *Piazza*, 273 F.3d at 1346) (internal

quotation marks omitted).

To maintain a class action, plaintiffs must prove all of the requirements of subdivision (a)

of Rule 23 plus at least one of the alternative requirements of Rule 23(b). *Pickett v. Iowa Beef*

*Processors*, 209 F.3d 1276, 1279 (11th Cir. 2000). Failure to establish any one factor precludes

class certification. *See generally Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 615-18 (1997)

(describing the characteristics of class actions under the federal rules). In this case, plaintiffs

claim to meet the requirement of Rule 23(b)(3):

> questions of law or fact common to the members of the class
> predominate over any questions affecting only individual members,
> and . . . a class action is superior to other available methods for the
> fair and efficient adjudication of the controversy.

Fed. R. Civ. P. 23(b)(3).

Granted, class actions in securities fraud cases have received favorable treatment in the

Eleventh Circuit. *See Kirkpatrick v. J. C. Bradford & Co.*, 827 F.2d 718, 727-28 (11th Cir. 1987),

*cert. denied sub nom., Robinson Humphrey/American Express v. Sanders*, 485 U.S. 959 (1988).

Securities class actions benefit both the public interest in maintaining the integrity of the market

and the private interest of investors whose redress of grievances is not limited to a multitude of

small individual claims. *Kirkpatrick*, 827 F.2d at 727. However, class certification is not

11

automatic; the court must perform a "rigorous analysis" of the propriety of class certification. *See General Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 161 (1982); *Gilchrist*, 733 F.2d at 1555. The court must conduct a searching inquiry, including a possible "probe behind the pleadings before coming to rest on the certification question." *Falcon*, 457 U.S. at 160. *See also Amchem*, 521 U.S. at 615 (stating that Rule 23 invites a "close look" before certifying a class); *Rutstein*, 211 F.3d at 1234 ("Going beyond the pleadings is necessary, as a court must understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues.") (internal quotation marks and citation omitted).

Despite the favorable treatment of class actions in some securities fraud cases, class certification should not be automatically granted in light of Supreme Court and Eleventh Circuit precedent mandating "rigorous analysis" before certifying a class. *See Gilchrist*, 733 F.2d at 1555. In this securities fraud case, plaintiffs failed to carry their burden of demonstrating that every requirement for class certification has been met.

       B.      Rule 23(a) Analysis

The four prerequisites of Rule 23(a) are: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation. The numerosity requirement examines whether the class is so large that joinder of all members would be impracticable. Fed. R. Civ. P. 23(a)(1). The requirements of commonality, typicality, and adequate representation overlap and tend to merge. *Amchem*, 521 U.S. at 626 n.20. Generally, typicality and commonality examine "whether a sufficient nexus exists between the legal claims of the named class representatives and those of individual class members to warrant class certification." *Piazza*, 273 F.3d at 1346 (citations omitted).

> Traditionally, commonality refers to the group characteristics of the class as a whole, while typicality refers to the individual characteristics of the named plaintiff in relation to the class. Typicality also encompasses the question of the named plaintiff's standing, for "[w]ithout individual standing to raise a legal claim, a named representative does not have the requisite typicality to raise the same claim on behalf of a class." "Adequacy of representation" means that the class representative has common interests with unnamed class members and will vigorously prosecute the interests of the class through qualified counsel.

*Piazza,* 273 F.3d at 1346 (internal citations omitted).

Although the trial court should not determine the merits of the plaintiffs' claim at this stage, the court can – and indeed should – consider the merits of the case to the degree necessary to determine whether the plaintiffs have met the requirements of Rule 23. *See, e.g. Love v. Turlington,* 733 F.2d 1562, 1564 (11th Cir. 1984) (stating that the limitation on examining the merits "should not be talismanically invoked to artificially limit a trial court's examination of the factors necessary to a reasoned determination of whether a plaintiff has met her burden of establishing each of the Rule 23 class action requirements.")  Indeed, several recent Eleventh Circuit cases have indicated that inquiry into some aspects of the merits of plaintiffs' claims remains necessary to determine whether the representatives meet the requirements of Rule 23. *See e.g., Franze,* 296 F.3d at 1254 (representative plaintiffs' claims barred by the statute of limitations because they were on "inquiry notice" more than one year before suit was filed and, therefore, lacked typicality to pursue class claims); *Piazza,* 273 F.3d at 1347 (representative plaintiff's claim time-barred; therefore he lacked standing to pursue class action); *Andrews v. American Tel. & Tel. Co.,* 95 F.3d 1014, 1022 (11th Cir. 1996) (evaluation of class representatives' standing required some examination of the merits of their claims); *Clopton v.*

*Budget Rent-A-Car Corp.,* 197 F.R.D. 502, 506 (N.D. Ala. 2000) ("'It is inescapable that in some cases there will be overlap between the demands of Rule 23(a) and (b) and the question of whether plaintiff can succeed on the merits.'" (citation omitted); *In re Vesta Ins. Group, Inc., Securities Litigation,* C.A. No. 98-AR-1407-S, 1999 U.S. Dist. LEXIS 22233 at * 9 (N.D. Al. Oct. 25, 1999).

In this case, the court has carefully and thoroughly reviewed the Consolidated Amended Complaint and, for the purpose of this decision, accepts the allegations of the complaint as true.

1.     Numerosity

The defendants concede that plaintiffs established the numerosity requirement. Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Class Certification at 13 (Doc. 113). The court, however, should make an independent determination that all requirements of Rule 23 are met before certifying a class. *See Love,* 733 F.2d at 1564.

The plaintiffs meet the numerosity requirement if the proposed class is so large that joinder of all members is impracticable. Fed. R. Civ. P. 23(a)(1). "'Impracticable' does not mean 'impossible'; plaintiffs need only show that it would be extremely difficult or inconvenient to join all members of the class." *In re Domestic Air Transp. Antitrust Litig.,* 137 F.R.D. 677, 698 (N.D. Ga. 1991) (citing 3 Newberg, *Newberg on Class Actions,* § 18.03 at 455 (1985)). Courts generally presume that plaintiffs establish numerosity when the claims involve securities traded nationally. *Zeidman v. J. Ray McDermott & Co.,* 651 F.2d 1030, 1039 (5th Cir. 1981). To support a finding of numerosity, the court can make "common sense assumptions." *See Evans v. United States Pipe & Foundry Co.,* 696 F.2d 925, 930 (11th Cir. 1983).

HealthSouth stock trades on the New York Stock Exchange, with over 395 million

outstanding shares.  The court finds reasonable the plaintiffs' assertion that thousands of shares of HealthSouth stock were purchased or acquired by "many persons and entities" during the purported class period.  The court, thus, makes a "common sense assumption" that the potential class meets the numerosity requirement of Rule 23(a)(1).

   2.   Commonality

   Plaintiffs must show that class members share common questions of law or fact.  Fed. R. Civ. P. 23(a)(2).  To do so, the plaintiffs must establish issues of law or fact common to all members of the putative class.  This minimal standard merely requires and identity of some factual or legal matter among members of the class.  *See Hudson v. Delta Air Lines, Inc.*, 90 F.3d 451, 456 (11th Cir. 1996).  All questions of law or fact, however, need not be common to the class.  *See Cox v. American Cast Iron Pipe Co.*, 784 F.2d 1546, 1557 (11th Cir. 1986) *cert. denied*, 479 U.S. 883 (1986).  "The question of commonality in Rule 23(a)(2) overlaps significantly with the predominance requirement contained in Rule 23(b)(3)."  *In re Miller Indus., Inc., Sec. Litig.*, 186 F.R.D. 680, 685 (N.D. Ga. 1999).

   The plaintiffs assert securities fraud claims under Section 10(b) of the Exchange Act and Rule 10(b)-5.  To establish a cause of action for violation of Rule 10(b)-5, the plaintiffs must establish:  "'(1) false representation of a material fact (2) made with scienter (3) upon which the plaintiff justifiably relied[10] (4) that proximately caused the plaintiff's damages.'"  *Friedlander v. Troutman, Sanders, Ackerman & Ashmore*, 788 F.2d 1500, 1503 n.3 (11th Cir. 1986) (quoting *Diamond v. Lamotte*, 709 F.2d 1419, 1422-23 (11th Cir. 1983)) (citations omitted); *see also Ross v. Bank South, N.A.*, 885 F.2d 723, 728 (11th Cir. 1989) (en banc), *cert. denied*, 495 U.S. 905

_____

   [10]The plaintiffs submit that reliance is presumed under their fraud-on-the-market theory.

15

(1990).

The plaintiffs also assert claims under Sections 11 and 15 of the Securities Act. To succeed on those claims under section 11, the plaintiffs must prove: "1) that the registration statement contained an omission or misrepresentation, and 2) that the omission or misrepresentation was material, that is, it would have misled a reasonable investor about the nature of his or her investment." *Kaplan v. Rose*, 49 F.3d 1363, 1371 (9th Cir. 1994), *cert. denied sub nom. Payne v. Kaplan*, 516 U.S. 810 (1995). Section 15 of the Securities Act "makes persons who 'control' any person liable under [section] 11 . . . liable jointly and severally to the same extent as the controlled person, unless he 'had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist.'" *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 211 n. 27 (1976) (quoting 15 U.S.C. § 77o).

The plaintiffs assert that all of the claims of all class members arise out of the defendants' common scheme of false statements or omissions to hide the effect of the BBA on HealthSouth's financial condition. The court concludes that <u>some</u> questions of law or fact are common to the class and, thus, plaintiffs have met the minimum requirement of Fed. R. Civ. P. 23(a)(2).

3.    Typicality

To meet the typicality requirement, plaintiffs must show that the claims and defenses of the representative plaintiffs are typical of the claims and defenses of the class as a whole. Fed. R. Civ. P. 23(a)(3). In other words, both representative plaintiffs and the other class members must be able to travel to court on the same claims. *See Hudson*, 90 F.3d at 456. The requirement of typicality precludes certification of a class "where the legal theories of the named plaintiffs

potentially conflict with those of the absentees." *Georgine v. Amchem Prod. Inc.*, 83 F.3d 610,

631 (3rd Cir. 1996); aff'd sub nom. *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591 (1997).

(citations omitted).

The Eleventh Circuit established the standard for evaluating typicality in *Kornberg v.*

*Carnival Cruise Lines, Inc.*:

> A class representative's claims or defenses must be typical of the
> claims or defenses of the class. Fed. R. Civ. P. 23(a)(3). In other
> words, there must be a nexus between the class representative's
> claims or defenses and the common questions of fact or law which
> unite the class. A sufficient nexus is established if the claims or
> defenses of the class and the class representative arise from the
> same event or pattern or practice and are based on the same legal
> theory. Typicality, however, does not require identical claims or
> defenses. A factual variation will not render a class
> representative's claim atypical <u>unless the factual position of the
> representative markedly differs from that of other members of the
> class.</u>

741 F.2d 1332, 1337 (11th Cir. 1984), *cert denied*, 470 U.S. 1004 (1985) (emphasis added)

(citations omitted). The important inquiry is whether the proposed class representatives' claims

have the <u>same essential characteristics</u> as those of the proposed class. *Appleyard v. Wallace*, 754

F.2d 955, 958 (11th Cir. 1985).

In this case, defendants vigorously challenge the typicality of the various class

representatives' claims. As the court previously noted, the class proposed by the plaintiffs really

comprises three separate and distinct groups of HealthSouth shareholders: (1) those who acquired

HealthSouth stock on the open market; (2) those who acquired HealthSouth stock through

HealthSouth's acquisition of Horizon on October 29, 1997; and (3) those who acquired

HealthSouth stock through HealthSouth's acquisition of NSC on July 22, 1998. The groups that

17

obtained their HealthSouth stock via the acquisitions of Horizon and NSC each are comprised of

two subgroups: (1) those shareholders of NSC or Horizon who obtained their shares on the open

market; and (2) employees of NSC or Horizon who received stock or options from their

employer. Both NSC and Horizon were companies engaged in the health care industry.

The claims of the former NSC and Horizon employee/shareholders rest on the theory that

HealthSouth acquired those companies through the use of inflated stock to the detriment of the

shareholders of those companies. HealthSouth acquired Horizon on October 29, 1997, and NSC

on July 22, 1998.

Two proposed class representatives, Margaret Orman and Charles Smith, are former

employees of NSC who obtained their HealthSouth stock as a result of the acquisition of NSC in

July 1998. Their shares and options in NSC were <u>automatically</u> converted into HealthSouth

shares and options. (See Orman Dep. p. 67; Smith Dep. pp. 15, 21, 23.) They both worked for

HealthSouth for a short period of time after the acquisition and continue to work in the healthcare

industry.

The defendants argue that the claims of class representatives Orman and Smith – and

those of other class members who acquired shares as a result of the Horizon or NSC acquisitions

are atypical of the claims of the remainder of the class who purchased their shares on the open

market under very different circumstances. Both Horizon and NSC operated within the

healthcare industry and many of those shareholders were company employees. As such, the

former employee/shareholders of these companies, like Orman and Smith, who ultimately

received HealthSouth shares or options were experienced in the healthcare industry. These

employee/shareholders had knowledge and information not available to the open market

18

purchasers.  This knowledge and information of these shareholder/employees may provide distinct defenses to their claims.

For example, Orman admitted during her deposition that she had first hand knowledge of the Balanced Budget Act's impact on reimbursements for hospitals and rehabilitation facilities, and of the resulting pricing pressures exerted by managed care payors.  (*See* Orman Depo. pp. 29-36.)  Plaintiffs Orman and Smith were aware of the very facts the plaintiffs claim were withheld by the defendants or that caused certain statements by defendants to be misleading.  Other former employee/shareholders of NSC and Horizon also presumably would have such insider knowledge because of their experience in the healthcare industry.

Plaintiffs' knowledge of material facts that defendants allegedly failed to disclose provides a defense to a cause of action under 10(b)-5. *Straub v. Vaisman & Co.*, 540 F.2d 591, 596 (3d Cir. 1976).  Also, plaintiffs Orman and Smith became employees of HealthSouth after the acquisition of NSC, as did other NSC and Horizon employee/shareholders.  These employee/shareholders had – or had opportunities to have – conversations with some of the individual defendants during the proposed class period.  For example, plaintiff Smith testified that he relied on oral representations made to him by some of the individual defendants during July, August, and September of 1998.  (*See* Smith Depo. pp 43-45. 50-51.)  Plaintiffs Orman and Smith, like other former employee/shareholders of NSC and Horizon, thus, have unique claims of reliance apart from the fraud-on-the-market theory and would be subject to unique defenses so that their claims cannot be typical of the proposed class. *See Anderson v. Bank of the South, N.A.*, 118 F.R.D. 136, 148 (M.D. Fla. 1987) ("Because of this extensive personal investigation, including discussions with an insider . . . the court concludes that defendants have made a

19

sufficiently substantial showing that . . . [the class representative's] claims are atypical.").

The claims of Orman and Smith, and other former employee/shareholders of NSC and Horizon, are not typical of the class for another reason. Orman and Smith, like other former employees of NSC and Horizon, had no choice but to acquire HealthSouth stock through HealthSouth's acquisition of their employer. The alleged misrepresentations or omissions by the defendants then did not influence their decisions to acquire HealthSouth stock. Their claims, thus, do not rest on the fraud-in-the-market theory that underlies the claims of the purported class. See Memorandum of Law in Support of Plaintiffs' Motion for Class Certification, at 12-14 (Doc. 102).

Plaintiffs' counsel conceded at the hearing that "definite factual differences" exist between the former employee/shareholders of NSC and Horizon, and the shareholders who purchased HealthSouth stock on the open market. (TR. 33). However, plaintiffs argue that the same course of conduct by the defendants resulted in damage to all members of the class, regardless of how they acquired their stock. (See, e.g., TR 32, 33, 42).

While mere factual differences within the class generally do not make a claim atypical, the court is concerned that the factual position of Orman and Smith markedly differs from that of other members of the class. See Kornberg, 741 F.2d at 1337. These factual differences affect the nature of the legal claims asserted by Orman, Smith, and the former employees/shareholders of NSC and Horizon. These representatives and members of a portion of the class, unlike other members of the class, cannot say that the alleged misrepresentations and omissions affected their decision to purchase HealthSouth stock. Not only did they not voluntarily acquire their HealthSouth shares, Orman and Smith testified about their own knowledge of the anticipated

effect of the BBA on the healthcare industry. The defendants may well be able to rebut the presumption of reliance as to these employee/ shareholders that the other class members enjoy because of the fraud-on-the-market theory.

The court recognizes that the mere presence of factual differences and different defenses does not automatically defeat typicality. However, concerns over whether the claims of Orman and Smith are typical of the claims of the class as a whole pose only one of the problems the court sees with certifying a class in this case. These concerns, coupled with the other problems with plaintiffs' proof, make certifying a class in this case improper.

As the court wrestled with the intraclass conflicts discussed *infra*, the court also recognized another way in which the claims of certain class representatives are atypical of the claims of some class members. Representatives Pittman, Weaver, and McQueen all purchased their stock on the open market. These open market representatives lack standing to assert at least some of the claims resting in those class members who acquired their HealthSouth shares through the mergers with NSC and Horizon. The NSC/Horizon class members in essence complain that HealthSouth acquired their companies with inflated stock dollars and that if information about the true effect of the BBA had been disclosed, those mergers could not have been consummated because HealthSouth stock value would have fallen. These NSC/Horizon class members claim to have been damaged by the exchange of their valuable shares for less valuable HealthSouth stock. However, Pittman, Weaver, McQueen and the class members who held HealthSouth stock at the time of those acquisitions benefitted from those transactions brought about by the allegedly inflated HealthSouth share price. Plaintiffs' own expert acknowledged the benefit obtained by existing HealthSouth shareholders by virtue of obtaining

21

NSC and Horizon with inflated stock dollars. (TR 74-75). Thus, because the open market representatives were not injured by use of inflated stock to acquire NSC and Horizon, they do not have standing to assert that component of the NSC/Horizon class members claim.[11] *See Piazza v. EBSCO Indus. Inc.*, 273 F.3d 1341, 1354-55 (11th Cir. 2001); *Prado-Steiman v. Bush*, 221 F.3d 1266, 1279 (11th Cir. 2000).

For these reasons, the court finds that the claims of the representatives Orman and Smith are not typical of the class, and that the open market representatives (Pittman, Weaver, and McQueen) do not have standing to assert the claims of the former NSC/Horizon shareholders/employees.

4.      Adequate Representation

Under Fed. R. Civ. P. 23(a)(4), the plaintiffs must show that, as class representatives, they will fairly and adequately protect the interests of the class. The adequacy evaluation encompasses two inquiries: (1) whether any substantial conflicts of interest exist between the representatives and the class; and (2) whether the representatives will adequately prosecute the action. *See Sosna v. Iowa*, 419 U.S. 393, 403 (1975); *In re Miller Indus., Inc. Sec. Litig.*, 186 F.R.D. 680, 686 (N.D. Ga. 1999).

The defendants challenge the adequacy of the representatives under both prongs of the *Sosna* test. They point to the deposition testimony of various individual lead plaintiffs for evidence that the individual representatives lack knowledge about the factual and legal theories of the case. *See, e.g.*, Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for

---

[11]Granted, the NSC/Horizon class members also assert that they, like the other class members, suffered damage when the true information was revealed on September 29,1998.

Class Certification, at 18-22 (Doc. 113); Defendants' Supplemental Brief in Opposition to Class

Certification, at 5-7 (Doc. 151).  While the court finds some of the testimony by the

representatives troubling, the court is not persuaded that these representatives would not

adequately pursue prosecution of the action.

The defendants urge that the PSLRA requires a heightened adequacy standard as

announced by the Fifth Circuit in *Berger v. Compaq Computer Corp.*, 257 F.3d 475, 483-84 (5th

Cir. 2001).  Admittedly one of the policies of the PSLRA is to "increase supervision of counsel

by plaintiffs in securities fraud class actions." *In re Vesta Ins. Group, Inc., Sec. Litig.*  C.A. No.

98-AR-1407-S, 1999 U. S. Dist. LEXIS 22233 at *36 (N.D. Ala. 1999).  The Eleventh Circuit

has yet to address whether PSLRA requires a heightened analysis of the adequacy of class

representatives.  However, the court finds that "nothing on the face of the Reform Act . . .

requires and/or permits modification of the standard for adequacy under Rule 23(a)(4)." *In re*

*Theragenics Corp. Sec. Litig.*, 205 F.R.D. 687, 697 (N.D. Ga. 2002)

The court agrees with the pronouncement of Judge Acker in *Vesta*:

> Increased supervision, however, does not require that plaintiffs
> take over the duties and responsibilities of counsel. . . .  This court
> cannot expect the degree of involvement and expertise on the part
> of plaintiffs that defendants insist upon.  As the Eleventh Circuit
> has held when discussing this issue, demanding such involvement
> and expertise could "prevent the vindication of the legal rights of
> the absent class members under the guise of protecting those
> rights." *Kirkpatrick v. J. C. Bradford & Co.*, 827 F.2d 718, 728
> (11th Cir. 1987).

*In re Vesta Ins. Group Inc.*, 1999 U.S. Dist. LEXIS 22233 at *36-37.

Until the Supreme Court or the Eleventh Circuit announces a new standard, this court will

continue to follow the well-established standard for testing the adequacy of representatives'

ability to prosecute a case.  That inquiry focuses on whether plaintiffs' counsel are qualified,

experienced, and able to conduct the litigation. *Kirkpatrick*, 827 F.2d at 726.  The fact that

defendants do not challenge the abilities of plaintiffs' counsel does not surprise the court.[12]

Merely finding, however, that plaintiffs' counsel are capable and that plaintiffs will

adequately pursue prosecution of the lawsuit does not end the inquiry into the adequacy of the

class representatives.  The court must also examine whether any antagonistic interests exist

between the proposed representatives and the rest of the class. *See Sosna*, 419 U.S. at 403;

*Griffin v. Carlin*, 755 F.2d 1516, 1533 (11th Cir. 1985).

For purposes of that analysis:

> [a]ntagonistic interests are not only those which directly oppose
> one another, but also are those which may be hostile to one another
> or unharmonious such that one party's interest may be sacrificed
> for another's . . . . [The] plaintiffs bear the burden of proof on this
> issue just like all other issues raised in connection with the motion
> for class certification.  In challenging the representatives'
> adequacy, the defendant "does not have to show *actual*
> antagonistic interests; the potentiality is enough."

*Telecomm Tech. Servs., Inc. v. Siemens Rolm Communications, Inc.*, 172 F.R.D. 532, 544-45

(N.D. Ga. 1997) (quoting *Plekowski v. Ralston Purina Co.*, 68 F.R.D. 443, 452 (M.D. Ga. 1975))

(emphasis added).  Due process requires that no potential conflicts exist between class

---

[12]At the class certification hearing, the court announced that it had no questions about the adequacy of counsel.  (TR 142).  However, the court is somewhat concerned about counsel's refusal or neglect to address the court's stated concerns about intraclass conflicts and the suggestion that subclasses appeared necessary.  (See TR 32-33, 241-243).  The only response presented by plaintiffs' counsel was the naming of additional proposed representatives to serve the interests of the NSC shareholders who were not employees, the Horizon employee/shareholders, and the Horizon shareholders who were not employees – all groups that have differing interests that were not represented by the previously named representative plaintiffs. *See* Plaintiffs' Supplemental Brief in Support of Class Certification, at 11 (Doc. 141).

representatives and class members that would interfere with the representation of the class. *Wyatt v. Poundstone*, 169 F.R.D. 155, 165 (M.D. Ala. 1995); *see also Warren v. City of Tampa*, 693 F. Supp. 1051, 1061 (M.D. Fla. 1988), *aff'd*, 893 F.2d 347 (11th Cir. 1989) ("Conflicts relating to the specific issues being litigated will bar class certification").

The defendants vigorously argue two intra-class conflicts: the "seller/purchaser conflict" and the "equity conflicts." Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Class Certification, at 23 - 30 (Doc. 113). The seller/purchaser conflict, according to defendants, exists between class members who sold stock during the class period, thereby benefitting from the alleged price inflation, as compared to other class members who bought stock and were damaged by the inflated price. The defendants argue the equity conflict exists between class members who retained their stock and whose stock could be adversely affected by this litigation against HealthSouth and those class members who sold their stock prior to judgment and stand to gain by the litigation.

The defendants rely primarily upon *In re Seagate Technology II Securities Litigation* ("Seagate II"), 843 F. Supp. 1341 (N.D. Cal. 1994) and the cases that follow its reasoning. While the legal and economic reasoning presented by *Seagate II* is compelling, the two district court cases within the Eleventh Circuit that have addressed these issues have declined to follow *Seagate II*. See *In re Vesta Ins.*, 1999 U.S. Dist. LEXIS 22233 at *14-15; *In re Miller Ind.*, 186 F.R.D. at 687. The Eleventh Circuit has yet to wrestle with this issue. This court need not tackle the thorny issues of seller/purchaser and equity conflicts as espoused in *Seagate II* because other more significant conflicts, along with other problems, work against class certification in this case.

While the court declines to directly address the seller/purchaser issue as applied to the class as a whole, the court cannot ignore the conflicts that exist between the class members who purchased their stock on the open market and the class members who acquired their stock via the Horizon and NSC mergers. The class members who held stock at the time of the Horizon merger on October 29, 1997, and/or at the time of the NSC merger on July 22, 1998, actually benefitted from the alleged inflated share price. The owners of HealthSouth – by definition the shareholders – acquired assets with inflated stock dollars, thereby acquiring more value for the price paid. Thus open market class representatives Pittman, Weaver, and McQueen cannot represent the interest of the NSC/Horizon former shareholders because the open market representatives benefitted from the conduct that harmed the NSC/Horizon former shareholders. *See Piazza*, 273 F.3d at 1354-55; *Prado-Steiman*, 221 F.3d at 1279.

In fact, plaintiffs' own expert acknowledged this conflict. At the class certification hearing, Professor Sarin acknowledged this conflict between shareholders who received their stock via the NSC and Horizon transactions, and those shareholders who already held HealthSouth stock. Professor Sarin agreed that, under plaintiffs' theory, the NSC and Horizon stockholders suffered harm when they exchanged their more valuable NSC and Horizon stock for allegedly inflated HealthSouth stock. In contrast, as Mr. Sarin agreed, the existing HealthSouth shareholders actually benefitted from these transactions. (TR. 74-75).

The plaintiffs do not even address this admitted conflict in their post-hearing briefs, other than to suggest adding representatives from the Horizon employee/shareholders and from the non-employee NSC shareholders. See Plaintiffs' Supplemental Brief in Support of Class Certification, at 11 (Doc. 141). In their supplemental reply brief, the plaintiffs urge that all class

members complain of the same wrongs and quote *In re Miller*: "'the potential for intra-class conflict is a peripheral concern to a class whose primary interest is in proving materiality of the alleged omissions in an effort to prove liability.'" Plaintiffs' Supplemental Reply Brief in Support of Class Certification, at 7 (Doc. 152) (citing *In re Miller Indus. Sec. Litig.*, No. 1:97-CV-2811-TWT, 1999 U.S. Dist. LEXIS 14362 at *19 (N.D. Ga. May 27, 1999)).

The purported intra-class conflicts in *Miller* differ in kind and degree from the potential conflicts in this case between open market purchasers and class members who acquired their stock through the mergers. All of the class members in *Miller* purchased their stock on the open market. None of the class members in *Miller* sustained a direct benefit to their interest to the detriment of other class members[13] to the extent that the open market purchasers did at the expense of the NSC/Horizon employee/shareholders here. Similarly, none of the class members in *Miller* had access to the kind of industry information that the employees of NSC and Horizon had regarding the information allegedly withheld from the market by the defendants. From all that appears in the *Miller* opinion, that case involved a straightforward securities fraud class action with none of the significant and substantial problems involved in this case.

This matter presents "the occasional extreme case where a conflict of this type is too great and simply dominates the landscape too completely to ignore. . . ." *In re Vesta*, 1999 U.S. Dist. LEXIS 22233 at *31. This court cannot certify a class "when its members have opposing interest or when it consists of members who benefit from the same acts alleged to be harmful to other

---

[13]Defendants in *Miller* did argue the seller/purchaser conflicts of *Seagate II*, which the district court rejected. Those conflicts exist in any securities fraud class action. The court finds those conflicts to be indirect, as opposed to the more direct conflict here that goes to the very basis of plaintiffs' claims – using inflated stock dollars to purchase NSC and Horizon.

members of the class." *Pickett v. Iowa Beef Processors*, 209 F.3d 1276, 1280 (11th Cir. 2000) (emphasis added).  Therefore, the court concludes that the conflicts among the representatives, among subclasses, and between the representatives and the class as a whole are too great to ignore and negate the adequacy of representation.  Because of these conflicts, the plaintiffs have failed to satisfy the requirements of Rule 23(a).  Accordingly, the court cannot certify the proposed class.  Other reasons also support denial of class certification.

C.     Rule 23(b)(3)

       To certify a class, not only must the plaintiffs establish all of the requirements of Rule 23(a), they must also prove one of the alternative requirements to Rule 23(b).  The plaintiffs argue that in this case common questions of law or fact predominate and that a class action is superior to other methods, thus meeting the requirements of Rule 23(b)(3).  *See* Memorandum of Law in Support of Plaintiffs' Motion for Class Certification, at 15 (Doc. 102).

       1.     Predominance of Common Questions

              In evaluating whether common questions predominate, all questions of law or fact need not be common; but <u>some</u> questions must be common to the class and those questions must predominate over individual questions.  *See Cox v. American Cast Iron Pipe Co.*, 784 F.2d 1546, 1557 (11th Cir. 1986).  The issues of the class subject to generalized proof must predominate over issues subject to individualized proof.  *See Jackson v. Motel 6 Multipurpose, Inc.,* 130 F.3d 999, 1005 (11th Cir. 1997) (citing *Kerr v. City of West Palm Beach*, 875 F.2d 1546, 1557-58 (11th Cir. 1989)).  The inquiry of predominance "focuses on 'the legal or factual questions that qualify each class member's case as a genuine controversy,' and is '<u>far more demanding</u>' than Rule 23(a)'s commonality requirement." *Jackson*, 130 F.3d at 1005 (quoting *Amchem Prod., Inc., v. Windsor,*

28

521 U.S. 591, 594 (1997) (emphasis added).

The plaintiffs assert that the defendants made a series of misrepresentations or omitted material information.  Proof of this alleged fraud will be common for the class.  The claims of the class indeed arise out of the same set of operative facts.  The class as a whole faces the legal question of whether the alleged misrepresentations qualify as security fraud.

However, the bottom line inquiry regarding predominance "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prod. Inc.*, 521 U.S. at 623 (citation omitted).  As already demonstrated, this proposed class lacks that cohesiveness.  The open market representatives lack standing to assert some of the claims of the NSC/Horizon class members.  The open market representatives and class members benefitted from the very conduct that allegedly injured the NSC/Horizon class members.  The fraud-on-the-market presumption of reliance may not be available to the NSC/Horizon class members.  Special individual defenses may be available against the former NSC and Horizon employee/shareholders who had knowledge of the effect of the BBA on the healthcare market.  Different claims of reliance as well as individual defenses may also be available regarding former NSC and Horizon employees who became employees of HealthSouth.

As a general proposition, the case as a whole will focus on whether the defendants made false or misleading statements or omitted material information that violated securities laws.  However, "as a practical matter, the resolution of this overarching common issue breaks down into an unmanageable variety of individual legal and factual issues." *Andrews v. American Tel. & Tel. Co.*, 95 F.3d 1014, 1023 (11th Cir. 1996).  In light of these individual or subclass issues, the plaintiffs failed to meet their burden to show that common questions of law or fact

predominate over the individual questions.

      2.     Superiority of Class Action

          As a general rule, class action treatment presents a superior method for the fair

and efficient resolution of securities fraud cases. *See Kirkpatrick*, 827 F.2d at 727; *In re Vesta*

*Ins. Group, Inc.*, 1999 U.S. Dist. LEXIS 22233 at *44; *In re Miller Indus., Inc.*, 186 F.R.D. at

684. The court does not take lightly the fact that many potentially meritorious claims may go

unsatisfied and the defendants alleged misconduct left unpunished without the certification of

this class action. However, the mere fact that a class action normally provides the most efficient

and effective means for resolving securities fraud cases does not overcome the numerous

problems recognized in certifying the class requested by plaintiffs in this case.

Conclusion

          In finding that the plaintiffs failed to meet their burden of proof on various requirements

for class certification, the court does not mean to assert legal formalism in exchange for rigorous

analysis of the issues. *See* 3 Alba Conte & Herbert Newberg, Newberg on Class Actions § 7:17

(4th ed. 2002).   Indeed, the court originally intended to certify a class, recognizing that class

actions serve valid functions in securities fraud cases. However, the court struggled to craft a

class and subclasses to avoid the problems discussed in this opinion with little help from

plaintiffs' counsel. Much of the delay in issuing this decision can be directly traced to the vast

amount of time spent trying to construct a workable class scenario. With so little help from

plaintiffs' counsel at this stage, the court worries that accepting the plaintiffs' arbitrary class

period[14] and certifying the class designed by the plaintiffs, or reconfigured by the court without

---

      [14]At the class certification hearing, the court questioned the selection of April 24, 1997 as
the beginning of the class period. (TR 240-242). Plaintiffs' expert admitted that HealthSouth

30

input from counsel[15], would be opening Pandora's box. The court could not rely on the plaintiffs' counsel to help manage the class and subclasses that would be created.

Although a court "'should not decline to certify a class because it fears that insurmountable problems may later appear,' if the court finds 'that there are serious problems now appearing, it should not certify the class merely on the assurance . . . some solution will be found.'" *Andrews*, 95 F.3d at 1023 (quoting *Windham v. American Brands, Inc.*, 565 F.2d 59, 70 (4th Cir. 1997) (emphasis in original) (alteration in original). Because so many questions now appear and so little assurance has been given as to any solution, the court declines to certify the class requested by the plaintiffs. The Motion for Class Certification will be denied by separate order.

DONE and ORDERED this 27th day of February, 2003.

KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE

---

stock already carried inflated value at that time. (TR 74). In Plaintiffs' Supplemental Reply Brief in Support of Class Certification, at 3 (Doc. 152), plaintiffs argue that HealthSouth made a false statement on April 24, 1997, about the effect of the BBA. However, as the court noted at the hearing (TR. 35-36) and in footnote 6, the defendants are not required to be prophets. At least until the BBA was enacted in its final form, the defendants could not have misrepresented a "material fact" concerning the possible impact of the proposed BBA upon HealthSouth. If this court had certified a class, the class period would have been shortened to only commence with some alleged misrepresentation made after August 5, 1997 when Congress passed the BBA.

[15]Had the court reconfigured the class, it would have consisted of a much smaller class of only open market purchasers who purchased shares of HealthSouth stock between August 13, 1997 and September 30, 1998. The class would exclude NSC/Horizon shareholders who presumably could not be represented by class counsel because of the conflicts noted above. The court struggled with creating a subclass of NSC/Horizon shareholders, with separate sub-subclasses of NSC/Horizon employee/shareholders, but found that class counsel could not represent those subclasses and no alternatives appeared in the Record. Without help from counsel as to how to make such reclassifications work, the court felt compelled to deny certification.